Steven J. Reisman
Tami Kameda Sims (*pro hac vice pending*)
Shaya Rochester
Cindi M. Giglio
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, NY 10022
Telephone:    (212) 940-8800
Facsimile:    (212) 940-8776

*Proposed Conflicts Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| WINDSTREAM HOLDINGS, INC., et al.,[1] | Case No. 19-22312 (RDD) |
| Debtors. | (Jointly Administered) |
| WINDSTREAM HOLDINGS, INC., et al., | |
| Plaintiffs, | Adv. Pro. No. _____ |
| vs. | |
| CHARTER COMMUNICATIONS, INC. and CHARTER COMMUNICATIONS OPERATING, LLC, | |
| Defendants. | |

**DEBTORS' MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC**

---

[1] The last four digits of Debtor Windstream Holdings, Inc.'s tax identification number are 7717. Due to the large number of debtor entities in these Chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/windstream. The location of the Debtors' service address for purposes of these chapter 11 cases is: 4001 North Rodney Parham Road, Little Rock, Arkansas 72212.

Windstream Holdings, Inc. and its debtor affiliates as debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors" or "Windstream") respectfully submit this motion (the "Motion"), pursuant to Sections 105(a) and 362 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), 15 U.S.C. § 1125(a) (the "Lanham Act"), Rule 65 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 9077-1 of the Local Rules of the Bankruptcy Court for the Southern District of New York, and this Court's Interim Case Management Order Establishing Certain Notice, Case Management and Administrative Procedures [Dkt. No. 57], for entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order").  In support of the Motion, the Debtors respectfully refer the Court to the contemporaneously filed Affidavit of Lewis Langston (the "Langston Affidavit").  In further support of the Motion, the Debtors respectfully state the following:

## PRELIMINARY STATEMENT[2]

1.     Windstream moves for a temporary restraining order and preliminary injunction to enjoin a false and misleading advertising campaign that was commenced by its direct competitor, Charter, to deceive Windstream's customers into believing that Windstream is liquidating and will no longer be providing them services.  As has been publicly disclosed, the filing of these Chapter 11 cases was not the result of any operational issues with the Debtors' businesses.  Indeed, prior to the Chapter 11 filing, Windstream had experienced particularly strong growth, including three consecutive quarters of consumer broadband growth in which

---

[2] Capitalized terms used, but not otherwise defined in this Preliminary Statement, shall have the meanings subsequently ascribed to them in the Motion.

Windstream added over 14,000 subscribers in 2018.[3]  Windstream filed these Chapter 11 cases solely to effectuate a balance sheet restructuring following a federal court decision that Windstream is in default of an indenture with certain of Windstream's unsecured notes.  But as is plainly apparent from all of the public filings in these Chapter 11 cases, Windstream has no plans to downsize operations, let alone go out of business.

2.     Despite this reality, Charter commenced a scare-tactic campaign to mislead, deceive, and confuse consumers regarding the reason, status, and consequences of Windstream's Chapter 11 cases.  Charter disseminated false advertisements, directly targeting Windstream's strongest customer bases in Alabama, Georgia, Kentucky, Ohio, Nebraska, and North Carolina. With a clear intent to confuse customers, Charter's advertisements were sent to Windstream's customers in a manner designed to make customers believe that the communication was from Windstream.  On the envelopes, Charter used Windstream's name (a registered trademark) and copied the same distinct color pattern from Windstream's current advertising campaign.  Charter deceitfully used this bait-and-switch tactic to lure Windstream customers into opening the advertisement.  Instead of a Windstream communication as consumers would have expected, the envelopes contained false and misleading statements about Windstream's Chapter 11 cases.  The advertisements falsely implied that due to its bankruptcy, Windstream would not be able to continue services and was going to liquidate.  The advertisements urged customers to switch to Charter because Windstream was in imminent danger of going out of business.  Charter knew that these statements were false and misleading because there are no plans for Windstream to

---

[3] King, C., Thomas, T. & Gunderman, B. (March 15, 2019). Windstream Q4 Earnings Call. Audio retrieved from https://investor.windstream.com/events-and-presentations/event-details/2019/Windstream-Q4-earnings-call-2019/default.aspx.

liquidate or discontinue services. Rather, as Charter is well aware, the purpose of the Chapter 11 cases is simply to restructure the company's balance sheet.

3. The great irony to Charter's tactics, and which makes them particularly offensive, is that Charter is engaging in virtually the same bad acts for which Charter sought—and obtained—a TRO in its own Chapter 11 cases ten years ago. Specifically, in 2009, Charter sought a TRO claiming that DirecTV, one of its biggest competitors, falsely stated and deceptively implied that Charter's Chapter 11 filing would adversely affect Charter's customers and cause it to cease operations. As Charter itself recognized, this type of manipulative campaign to distort the truth behind a bankruptcy in order to cause consumer confusion and deceit violates the Lanham Act's prohibition on false advertising, causes irreparable injury, and is properly subject to immediate injunctive relief.

4. Indeed, Windstream is suffering and will continue to suffer irreparable harm until Charter is enjoined. Windstream's customers are confused and have been misled by Charter. Customers mistakenly believed that the advertisements were *from Windstream*. Customers were also misled into believing that Windstream was closing or cutting off services. Windstream received over 160 calls from customers in ten days. Already, Windstream customers have switched to Charter because of the false advertisements. Each day that Charter's conduct continues, Windstream will suffer loss sales, reduced profits, and damage to its goodwill.

## JURISDICTION

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated February 1, 2012. The Debtors confirm their consent, pursuant to Rule 7008 of the Bankruptcy Rules, to entry of a final order by this Court in

connection with this Motion to the extent that it is later determined that this Court, absent

consent of the parties, cannot enter final orders or judgments in connection herewith consistent

with Article III of the United States Constitution.

6. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The bases for the relief requested herein are sections 105(a) and 362(a) of the

Bankruptcy Code, 15 U.S.C. § 1125(a), and Bankruptcy Rules 7001(7) and 7065.

## **BACKGROUND**

**A. Windstream's Chapter 11 Filing Will Not Disrupt Its Operations Nor Its Ability To Serve Its Customers**

8. Windstream is a FORTUNE 500 company organized under the laws of Delaware.

Langston Aff. ¶ 4. Windstream is a leading provider of advanced network communications,

technology, broadband, entertainment, and core transport solutions to consumer and business

customers across the United States, with a national footprint spanning approximately 150,000

fiber miles. Windstream offers broadband and entertainment solutions to consumers and small

businesses, primarily in rural areas, in eighteen states. Central to Windstream's growth is a

focused operational strategy for each of its business segments with the overall objective of

generating strong financial returns for its stakeholders. Windstream's operational performance is

on an upward trajectory—throughout 2018, Windstream added over 14,000 new broadband

subscribers and improved strategic sales revenue. *Id.* ¶ 5.

9. On February 25, 2019 (the "Petition Date"), each of the Debtors filed voluntary

petitions for relief in this Court under Chapter 11 of the Bankruptcy Code. The Chapter 11 filing

was not the result of any failures in the Debtors' operations nor caused by concerns with the

overall financial health of the Debtors' businesses. Rather, the Chapter 11 filing was precipitated

by an adverse decision issued by the United States District Court for the Southern District of

New York, holding that Windstream had defaulted on an indenture with certain of Windstream's unsecured notes and had thereby also cross-defaulted certain of the Debtors' other debt obligations. The Debtors plan to address and resolve the claims arising from this decision pursuant to a plan of reorganization under which Windstream expects to emerge from Chapter 11 as a going concern and as a strong and viable company for years to come.[4] *Id.* ¶ 10.

10. Indeed, in the months prior to the Chapter 11 filing, Windstream's operations and businesses experienced a particularly strong period of growth. *Id.* ¶ 11. For example:

- Windstream ended the fourth quarter with three consecutive quarters of strategic sales in excess of total enterprise sales.
- The fourth quarter of 2018 represented the third consecutive quarter of consumer broadband growth, with Windstream adding over 14,000 subscribers in 2018.
- February 2019 represented the 12th consecutive month of consumer broadband growth.
- The growth was driven by both stronger sales and lower churn as Windstream benefited from recent investments in its network.
- Windstream has steadily increased the percentage of its footprint with access to higher-speed internet.
- For the foregoing reasons, the year prior to the Chapter 11 filing was a "transformational year," including consumer broadband subscriber growth.[5]

11. This strong operational momentum is not expected to be disrupted by the Chapter 11 filing. The Court has already granted the relief requested in all of the Debtors' "first day" motions, to help ensure that the Debtors' businesses will continue operating in the ordinary course and that the Debtors will be able to pay employees, maintain relationships with vendors

---

[4] A detailed description of the Debtors and their business are set forth in greater detail in the Declaration of Tony Thomas, Chief Executive Officer and President of Windstream Holdings, Inc. (I) In Support of Debtors' Chapter 11 Petitions and First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2 [Dkt No. 27] (the "Thomas Declaration"). Capitalized terms used, but not otherwise defined in this Motion, shall have the meanings ascribed to them in the Thomas Declaration.

[5] King, C., Thomas, T. & Gunderman, B. (March 15, 2019). Windstream Q4 Earnings Call. Audio retrieved from https://investor.windstream.com/events-and-presentations/event-details/2019/Windstream-Q4-earnings-call-2019/default.aspx.

and business partners and, most importantly, serve customers as usual without disruption.  *Id.* ¶ 12.

12.    Moreover, and in a testament to the strength of Windstream's business operations and reorganizational prospects, the Debtors were able to secure ***$1 billion*** in DIP financing within one week of the Petition Date.  This DIP financing will provide the Debtors with sufficient capital and liquidity to pay vendors, employees, business partners, and other counterparties in the ordinary course throughout the pendency of the Chapter 11 cases.  *Id.* ¶ 13.

13.    For the foregoing reasons, it is expected that the Chapter 11 filing will not disrupt the Debtors' operations nor Windstream's ability to continue serving its customers.  Contrary to the misleading advertisements published and mailed by Charter to Windstream's customers, the Debtors did not file for Chapter 11 to liquidate or downsize operations, and there has been no interruption to Windstream's operations or services.  Rather, Windstream filed for Chapter 11 simply to restructure the company's balance sheet.  This is not a matter of opinion but of fact.

**B.    Windstream And Charter Are Direct Competitors**

14.    Defendant Charter is a publicly traded telecommunications company incorporated in the State of Delaware and headquartered in Connecticut.  Charter and its affiliates and subsidiaries provide cable and internet services to residential and commercial customers in forty-one states.  Through its brand Spectrum, introduced in 2013, Charter has expanded its business to over twenty-eight million customers.  Langston Aff. ¶ 7.

15.    Windstream and Charter compete directly with one another to provide telecommunications service to customers throughout the United States.  Charter is available in both urban and rural areas, including in every state Windstream is available.  Specifically, Charter has a strong presence, through coverage and customers, in some of Windstream's top

states including Kentucky, Georgia, and North Carolina.  The two companies also have competing retail stores in several areas, including Lexington, KY, a key market for Windstream. *Id.* ¶ 8.

## C.    Charter Launches A False And Misleading Advertising Campaign

16.    Shortly after Windstream filed for Chapter 11 protection, Charter commenced a false and misleading advertising campaign designed to create consumer confusion and to cause irreparable injury and damage to Windstream's reputation and business.  Charter targeted Windstream customers in Alabama, Georgia, Kentucky, Ohio, Nebraska, and North Carolina, which are several of Windstream's top performing states.  *See* Langston Aff. ¶ 18, Ex. 3.

17.    Charter disseminated a direct mail campaign containing a letter advertisement to Windstream's customers.  On the envelopes for the advertisement, Charter intentionally utilized Windstream's trademark[6] and signature color pattern to mislead Windstream customers into believing that the advertisement came directly from Windstream.  Indeed, Charter's advertisement stated that it was "**Important Information Enclosed for Windstream Customers**."  The envelope contained a highly visible color strip that copied the same distinct and eye-catching color pattern of dark purple gradually blending to a bright pink that Windstream is using in a current, pervasive marketing campaign, targeting the same area as the Charter advertisements.  The envelope did not contain Charter's trademark, logos, or any other indicia that would otherwise suggest that the contents of the envelope were from Charter.  *Id.* ¶ 17, Ex. 2.  Below is an image of the envelope that Windstream customers received from Charter:

---

[6] Windstream Services, LLC, who is among the debtors, owns several federal trademark registrations covering the word WINDSTREAM for various services, such as communication services that provide network access to multiple users.  *See, e.g.,* U.S. Trademark Registration No. 3390047 (filed on March 10, 2006). Langston Aff. ¶ 16.



**CHARTER ENVELOPE**

18. Windstream's current advertising campaign for Kinetic Internet has been running since September 2017 in Windstream's markets, including in Alabama, Georgia, Kentucky, Ohio, Nebraska, and North Carolina, where Charter's false advertisements were sent. Windstream's advertising campaign has consistently showcased the distinct and eye-catching color pattern of dark purple gradually blending to a bright pink for at least the past 12 months. Langston Aff. ¶ 15, Ex. 1.  Charter deliberately used Windstream's mark and this distinct color pattern on the envelopes to cause initial interest confusion.  Below are copies of a Windstream advertisement and its webpage (*Id.*, Ex. 1):

**WINDSTREAM ADVERTISEMENT**

# SUPERFAST
# EXTREMELY
# AFFORDABLE

Kinetic Internet by Windstream has the power to connect the entire family on multiple devices at the same time with superfast speeds. Thanks to our enhanced fiber-backed network, you'll have enough bandwidth to stream, game, download and enjoy a fully connected smart home.



SPEEDS UP TO
100 MBPS
$36
/MO FOR
12 MONTHS

**Unlimited** — Unlimited Internet with no data caps

**Locked Rate** — Locked rate for 12 months

**No Contract** — No term contract and no bundle required

**Money-Back** — 30-day money-back guarantee



Call us at 555-555-5555

Sign Up Today For Faster Speeds!

kinetic.
by windstream.

Kinetic by Windstream: Limited-time, non-transferable offer for residential customers that may not be combined with other promotions. Credit restrictions may apply. Subject to availability, Windstream Terms and Conditions (windstream.com/terms), and Windstream Acceptable Use Policy (www2.windstream.net/customersupport/usersguide/acept
(accept.html). **Details**: Must be a new Internet customer who has not received Windstream Internet service within the past 30 days. Must subscribe to select plans to qualify. After 12 months, the standard Kinetic Internet rate applies. Taxes, fees and surcharges are extra and not included in introductory or standard rate. Additional restrictions may apply. **Kinetic Internet**: Windstream cannot guarantee speeds or uninterrupted, error-free service. Speed availability, capabilities and provisioning vary depending on network and terrain conditions, Internet, website, or network congestion, and customer geographical location. Windstream makes no representations related to download or upload speeds. Windstream assumes no responsibility or liability for interruption of service or service performance differences, actual and advertised performance. In select areas, includes Internet transport, Internet access, and unlimited incoming calls. Outbound calls, except toll free and E911, will be charged at 10 cents/minute. Operator Service and 411 will be charged at tariffed rates. No features or long-distance service rates allowed. **Kinetic Internet Speed**: Monthly fees may apply. Windstream will provision customer's location for the fastest speed available, 20 Mbps to 100 Mbps at the time of order but cannot guarantee speed or uninterrupted, error-free service. **Equipment**: Monthly equipment fees may apply. Windstream-provided modem(s) will be capable of in-home wireless networking, but device(s) supplied by in-home wireless networking connections may experience speeds not equal to advertised speeds or the speed referenced on your Internet plan. With wireless networking, actual throughput speed may be impacted by several factors including interference from other equipment or devices at the location, distance from the modem, modem location, types of devices connected, physical obstructions, and time of day. To obtain advertised speed, connecting a device directly to the modem to provide a wired connection is recommended. Modem equipment must be returned upon termination, and if not, Windstream reserves the right to charge for the modem or a $10.00 fee. **Installation**: Plans with speeds 50 Mbps and higher may qualify for free professional installation. Plans with speeds less than 50 Mbps will incur a fee for professional installation. **Money-Back Guarantee**: If customer cancels new Internet service within 30 days after start of service, all service charges and any modem equipment and install charges, if applicable, related to Internet services only, will be refunded. Modem equipment must be returned upon termination and if not, Windstream reserves the right to charge for the modem or a $100 fee. © 2018 Windstream Services, LLC. All rights reserved. Kinetic and Windstream are registered service marks or trademarks of Windstream Intellectual Property Services, Inc. and/or its affiliates. All other marks are the property of their respective owners.

022952 TIER 1 12/18

**WINDSTREAM WEBSITE**



19.     Charter designed the envelopes with Windstream's mark and distinct color pattern to make Windstream's customers believe that the letters came from Windstream, and thus, lured customers into opening the letters.  Langston Aff., Exs. 1-2.  The envelopes, however, were not from Windstream and did not contain legitimate information concerning Windstream's business.  Instead, they contained a Charter advertisement, which contained false and misleading statements about Windstream.  *Id.*, Ex. 3.  In particular, the advertisements state:

> **Windstream Customers,**
> **Don't Risk Losing Your Internet and TV Services.**
> Windstream has filed for Chapter 11 bankruptcy, which means uncertainty.  Will they be able to provide the Internet and TV services you rely on in the future?  To ensure you are not left without vital Internet and TV services, switch to Spectrum.  With a network built for the future, Spectrum is here for the long haul . . . .
> . . .
> Goodbye, Windstream.

Hello, Spectrum.

. . .

Windstream's future is unknown, but Spectrum is here to stay—delivering internet and TV services you can count on. . . . [7]

20.     Charter's advertisements falsely state and imply that Windstream's bankruptcy means that Windstream will not be able to provide services.  Charter's advertisements further falsely state that Windstream's bankruptcy necessarily means "uncertainty," even though Windstream's Chapter 11 filing has not disrupted its operations and there is no expectation that Windstream will be forced to liquidate or even downsize operations.  *Id.*, Ex. 3.  Indeed, the Court has already granted relief to help ensure that Windstream's operations will continue in the ordinary course.  Further, the use of the phrase "Goodbye, Windstream," falsely implies that Windstream is going out of business altogether, when there are no plans for liquidation or downsizing.  A true and accurate copy of Charter's advertisement is copied below.

---

[7] Some of the advertisements contain slight variances in language. True and correct copies of Charter's advertisements are attached to the Langston Affidavit as Ex. 3.  The advertisements state that the offers therein will last through April 25, 2019.  Langston Aff., Ex. 3.







Tuesdays @ 10pm on BET

Wednesdays @ 9pm on VH1

# Windstream Customers,
## Don't Risk Losing Your Internet and TV Services.

Windstream has filed for Chapter 11 bankruptcy, which means uncertainty. Will they be able to provide the Internet and TV services you rely on in the future? To ensure you are not left without vital Internet and TV services, switch to Spectrum. With a network built for the future, Spectrum is here for the long haul—with our best deal for Internet and TV services from **$59.98/month for 12 months**.*

- **Fast speeds** up to **200 Mbps**.™ Everyone at home can stream, game and download at the same time with no data caps.

- **Spectrum is the top performing Internet provider**, delivering more speed, more consistently.¹¹

- **FREE** modem; Windstream charges $5.99/month for an Internet modem.¹

- **FREE** HD† with instant access to a huge selection of On Demand titles.

- Download the **Spectrum TV® App⁶** to stream up to 50+ LIVE channels† including BET, OWN and VH1 on your devices, anywhere in your home and everywhere on-the-go.

Windstream has a 2-year contract. With Spectrum there are no contracts.
**Plus, we will buy you out of your current contract up to $500.**



BEST DEAL EVER!

Goodbye, Windstream.
**Hello, Spectrum.**

**Call 1-855-280-7152**
or visit Spectrum.com/lifestyle

**Limited-time offer! Expires 04/25/19**

SPECTRUM INTERNET 200 Mbps
+ SPECTRUM LIFESTYLE TV



/mo. for
12 mos.*

**NO CONTRACT**

O325-ALD-59        33513001-A01-0059513L-001552

13

**CHARTER ADVERTISEMENT**

## Spectrum▶

# Now is the time to switch
## to Spectrum.

Windstream's future is unknown, but Spectrum is here to stay—delivering Internet and TV services you can count on. Enjoy super-reliable **200 Mbps** Internet speeds, plus a **FREE** modem and **FREE** Security Suite.

With Spectrum Lifestyle TV, watch LIVE TV, your favorite shows, sporting events and more in superior digital picture and sound quality. Get instant access to thousands of **FREE** On Demand movies, shows and Primetime favorites. Download the Spectrum TV* App* to stream LIVE TV and On Demand titles anywhere in your home and everywhere on-the-go.



Watch Do The Right Thing anytime on STARZ ENCORE Black




Tuesdays @ 9pm on BET

Goodbye, Windstream.
**Hello, Spectrum.**

**Call 1-855-280-7152**
or visit Spectrum.com/lifestyle

**Limited-time offer! Expires 04/25/19**

**SPECTRUM INTERNET 200 Mbps**
**+ SPECTRUM LIFESTYLE TV**

$ **59** **98**
/mo. for
12 mos.*

**BEST DEAL EVER!**

**NO CONTRACT**

Offer expires 04/25/19; valid to qualified residential customers who have not subscribed to any services within the previous 30 days and have no outstanding obligations to Charter. *Bundle price for Spectrum Lifestyle TV and Internet is $59.98/mo., from yr 1; standard rates apply after promotional period ends, additional services are extra. **Restrictions apply. For contract buyout qualifications, go to spectrum.com/buyout. ‡Channel and HD programming availability based on level of service and may vary by area. It is possible that some channels are not available in certain areas. §TV App account log-in may be required to stream some TV content online. Apps are free with corresponding level of service. Based and live streams available in the U.S. only and subject to additional restrictions. ‡Services compared to Kinetic Internet 200 and DirecTV packages per windstream.com: 03/07/19. General Terms: TV: Install, other equipment, taxes, fees and surcharges extra (3)dcst. surcharge up to $11.99/mo.). INTERNET: ‡Available Internet speeds may vary by address. ⊕Based on the 2016 FCC Broadband Report. Services subject to all applicable service terms and conditions, subject to change. Services not available in all areas. Restrictions apply. To reduce Charter direct mail, visit spectrum.com/dmoptout. Viacom Media Networks, a division of Viacom International Inc. Starz® and Starz Encore℠ and related channels and service marks are the property of Starz Entertainment, LLC. Visit starz.com for airdates/times. Do The Right Thing ©1989 Universal City Studios, Inc. All trademarks are the property of their respective owners. ©2019 Charter Communications.

0325-ALD-59      33513001-A01-00545136-001552      000020554

**D.      Windstream Customers Are Confused And Misled By Charter's Advertisements**

21.      Charter's advertising has caused and will continue to cause consumer confusion and consumer deception among Windstream's customers.  First, Windstream customers suffered initial interest confusion when they were misled into opening the envelopes because they believed that the communications came from Windstream.  As one customer explained, "I got that letter in the mail *from Windstream* and told me to get with you guys, um get with Spectrum, so that's what I did."  Langston Affidavit ¶ 21, Ex. 8 (emphasis added).  As another customer stated "they said *it came from Windstream* or I don't know. . . Well, it just says, important information enclosed for Windstream customers."  *Id.*  ¶ 21, Ex. 6 (emphasis added).   Second, upon opening the envelopes, customers were then confused and misled by the false statements contained in the advertisements.

22.      As a direct result of Charter's false advertising, many of Windstream's customers called in or visited local stores, upset and concerned about the status of Windstream's services.  As one example, a Windstream customer called Windstream to say that she was disconnecting service because she had switched to Spectrum just as the letter from *Windstream* had instructed her to do (Langston Aff. ¶ 21, Ex. 8):

> …. I got a letter in the mail saying that ya'll were going bankrupt and for me to go with Spectrum so I have gone to Spectrum and I have just called to have the services of Windstream disconnected.
> . . .
> I've got Spectrum over here so they go everything hooked up and so they told me not to call you until they got everything going like it's supposed to be but I got that letter in the mail *from Windstream* and told me to get with you guys – to get with Spectrum so that's what I did.
> . . .
> . . . I'm getting services disconnected with Windstream because of the letter that I got in the mail.
> . . .

[Customer care associate] . . . We haven't gone bankrupt where you would need to leave our services. So I definitely apologize for any misunderstanding with that.

Yea, I got a very much misunderstanding on that. I thought ya'll cause it said had gone uh…I got the letter right here and I thought ya'll were going bankrupt and ahh..get going out of service.

. . .

Oh, well I was just going there because it says hello I mean goodbye Windstream and uh..to got to Spectrum.

. . .

Oh lord, well I've been [Inaudible] on 'em honey. I thought the letter was from you cause it *said Windstream Corporation*.

. . .

I thought that I had a certain time to discontinue your service. You know.

. . .

The way the letter was written honey I mean. . .

. . .

Because I mean uh I got the letter and I mean you know I've never got a letter like that.

. . .

From anyone and then I get a letter from you and I didn't know what and it was telling me and I was just doing what the letter and it say *from Windstream*.

23.     Additionally, the following are examples of Windstream customer care associates' contemporaneous notes of Windstream customers who called in on March 22, 2019, and March 27, 2019, because they were confused and concerned after receiving Charter's advertisements (Langston Aff. ¶ 21, Exs. 4-5):[8]

[Redacted customer name, account information, and address]
LINCOLN, NE, United States, 68516
FLYER IN MAIL SAID SPECTRUM SAID THEY ARE LOSING THE WS SERVICE THEY NEED TO CALL THEM
. . .
Customer [Redacted] received a letter from Spectrum [redacted account information] stating that Windstream has filed for Bankruptcy and will soon be discontinuing service to his area in Morehead, KY. Account noted, customer reassured and thanked for the heads up
. . .
[Redacted customer name, account information, and address]
Tollesboro, KY 41189

---

[8] When Windstream's customer care associates receive customer calls they take contemporaneous notes, taking down the customer's information and describing the customer's concerns. Langston Affidavit ¶ 21.

Customer called in upset that spectrum called her and sent letter in mail saying we filed bankruptcy and they needed to switch over.

. . .

[Redacted customer name, account information, and address]

[Redacted name] CI[9] WNATED TO KNOW IF WE WERE CLOSING DUE TO CHAPTER 11 BANKRUPCY/ SAID THAT SHE RECEIVED A LETTER FROM SPECTRUM TELLING THEM THAT WE ARE [CLOSING]/ ADVISED IT WAS NOT TRUE AND GAVE INFO OF CHAPTER 11 TO BETTER UNDERSTAND/ ALSO WENT OVER SERVICES AND REMOVED SHIELD PRODUCT/ NO OTHER CHANGES

. . .

[Redacted customer name, account information, and address]

[Redacted name] called re Spectrum Letter re Windstream going away, has kinetic TV; she will mail letter to my attention; emailed info to [Redacted]

. . .

[Redacted customer name, account information, and address]

[Redacted name] ci to go over letter he received from spectrum and chapter 11/ advised we are not closing and no changes

. . .

[Redacted customer name, account information, and address]

[Redacted name] ci about receiving letter from Spectrum about Windstream going out of business/ sent email to [Redacted]/ reassured customer that she has no worries about her service going anywhere

. . .

[Redacted customer name, account information, and address]

[Redacted name] ci to adv she got letter from spectrum stating we were going out of business/ reassured her we are not/ upgraded to 50mg

24.     Additionally, the following Windstream customer took to posting on social media to express his obvious distress of learning from Charter's advertisements that he would be losing services due to Windstream's bankruptcy (Langston Aff. ¶ 22, Ex. 9):

---

[9] Windstream customer care associates often use short-hand in taking notes.  "CI" means "called in" and "adv" means "advised."  Langston Affidavit ¶ 21.



@Windstream @Talk2Windstream
I've been contacted via snail mail &
email by local cable co. (Spectrum)
that Windstream has filed for Ch. 11
Bankruptcy, urging me to switch
before I lose service. Were U
planning on telling UR customers
this? How long do we have? HELP
@ATT!

25.    In total, Windstream has received at least 160 calls over the course of ten days from its customers who called in to express concerns or to ask questions as a direct result of receiving Charter's false advertisements.  Langston Aff. ¶ 20.  Moreover, some customers who received the targeted advertising called Charter to inquire and were told by Charter that they "have a contract with Windstream to buy us out."  This is outright false.  *Id.*  Other customers, after speaking with Charter representatives, were led to believe that they would be forced to switch to Charter, and Charter did not correct these mistaken beliefs.  Indeed, Charter representatives told at least one of these Windstream customers not to call Windstream to disconnect service until **_after_** Charter had already completed installation of the new service.  *See id.* ¶ 21, Ex. 8.

26.    As a direct result of Charter's advertising campaign, Windstream has been forced to expend substantial time, money, and resources to combat these false claims.  When concerned customers have called in, Windstream has offered upgrades or other concessions, which many customers have taken.  Windstream has also incurred costs and resources to educate its customer care associates on how to provide a comprehensive response to Charter's false claims, which includes an explanation of the true effects of the Chapter 11 cases.  In addition, as a direct result of Charter's advertising campaign, Windstream has undertaken an extensive mailing and

advertising campaign, at significant cost and expense, to counter Charter's false and misleading advertising campaign. Windstream's Legal department has also expended extensive time and effort in researching and responding to this matter. Langston Aff. ¶ 24.

**E.    Charter Improperly Disconnected Service To Windstream Customers To Fabricate "Uncertain" Service**

27.    At the same time Charter engaged in its false advertising campaign, ███████
███████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████ █
███████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████ On or around March 14, 2019, Spectrum disconnected service to approximately 350 of these Windstream customers, ████████████████████████████████████. When Windstream customers contacted Charter to have their services reinstated, they were told by Charter that service was not being repaired because of Windstream's failure to pay certain amounts due to Charter. Windstream, however, is not currently authorized to make any payments to Charter on account of prepetition debt as a result of the Chapter 11 filing. *See* Langston Aff. ¶ 25. Accordingly, Charter's attempt to collect prepetition debt is a willful violation of the Bankruptcy Code's automatic stay, and was a deliberate attempt to manufacture a problem with Windstream's services. The only "uncertainty" in Windstream's services since the Chapter 11 Cases has been deceitfully caused by Charter in violation of the automatic stay.

**F.    Charter Claims It Is Entitled To Mislead Customers About Windstream's Bankruptcy Even Though It Previously Obtained An Injunction Against One Of Its Competitors For Engaging In The Same Type Of Advertising Campaign During Charter's Chapter 11 Cases**

28.     Windstream sought to confer with Charter about these issues prior to filing this Motion.  On March 20, 2019, representatives of the parties convened a call to discuss certain false and inaccurate statements made by Charter's employees and agents regarding Windstream's bankruptcy.  On March 21, 2019, Windstream sent a follow-up letter enclosing a copy of one of the false advertisements at issue and demanding that Charter immediately cease and desist from all further use of the advertisements.  When Charter did not respond in a meaningful way, Windstream sent a follow up letter on March 26, 2019.  Langston Aff. ¶ 26, Ex. 10.

29.     On March 26, 2019, Charter responded to Windstream's letters, claiming that its advertisements were not false or misleading.  According to Charter, a Chapter 11 filing "creates 'uncertainty' regarding Windstream's future until the bankruptcy is resolved."  *Id.* ¶ 27, Ex. 11.

30.     In 2009, however, when Charter was undergoing its own Chapter 11 bankruptcy, Charter took the ***exact opposite position***.  Specifically, Charter denounced an advertising campaign targeting its own bankruptcy as uncertain, as a false, misleading, and deceitful campaign orchestrated to cause consumer confusion and irreparable harm.

31.     Indeed, on April 11, 2009, Charter filed a complaint in the Eastern District of Missouri entitled *Charter Communications Holding Company, LLC v. DirecTV, Inc.*, Case No. 4:09-cv-00730-RWS, seeking a temporary restraining order and preliminary injunction under the Lanham Act to enjoin DirecTV from engaging in a false and misleading advertising campaign that was virtually identical to the campaign in which Charter is currently engaged. (Charter's Complaint is attached to Windstream's Complaint, filed concurrently herewith, as Exhibit E.)

Charter's complaint alleged that while it was in Chapter 11, DirecTV launched a national advertising campaign specifically targeting Charter's customers and prospective customers "to exploit the fact that Charter filed for bankruptcy to create a misimpression among Charter's actual and potential customers that Charter is liquidating and that Charter's services will end or be substantially impaired." Compl. at 2. Charter further alleged that because its "relief . . . to continue business as usual [was] granted . . . DirecTV's ads [were] literally false, grossly misleading, cause consumer confusion, and are likely to deceive Charter's current and prospective customers." *Id.* at 3. Charter also claimed that because "DirecTVs direct mail ads [were] enclosed in envelopes that do not readily identify DirecTV as the sender," this exacerbated the consumer confusion and deception. *Id.* at 10.

32. Charter asserted causes of action against DirecTV for false advertising under the Lanham Act and various other state consumer fraud and deceptive business practice claims. After Charter obtained an order temporarily restraining DirectTV from engaging in the advertising campaign, the matter was resolved via a settlement and DirecTV agreed to cease its advertising campaign.

33. Moreover, Charter has filed at least two other lawsuits accusing competitors of false advertising. In *CC Michigan, LLC (d/b/a Charter Communications) v. SBC Communications, Inc.*, 4:02-cv-00031-RHB (W.D. Mich.), Charter accused its competitor of making false and misleading statements about its cable modem Internet service. In *Charter Communications, Inc. v. Central Wisconsin, Communications, LLC*, 3:15-cv-00615-jdp (W.D. Wisc.), Charter accused its competitor of making false statements that it offered higher internet speeds thereby enticing customers to choose it over Charter. And in *Charter Communications Holding Company, LLC v. Macrae,* 2:18-cv-00577-JFW-KS, Charter accused its competitors of

trademark infringement because the competitors copied Charter's design mark and used it in their marketing campaign and products. Charter apparently recognizes the harm in making false statements and improperly using one's trademark when it comes to its competitors' conduct, but believes that it is above the law when it comes to its *own efforts* to unlawfully gain an unfair competitive advantage.

## RELIEF REQUESTED

34. Windstream respectfully requests that this Court grant a temporary restraining order and preliminary injunction enjoining Charter: (a) from disseminating the advertisements described in this Motion and any other advertisements similar thereto; (b) from claiming, whether directly or by implication, in any advertisement, telephone campaign, media campaign, or any other type of promotional communication (including as part of any "door to door" campaign), that Windstream's bankruptcy will impair or otherwise adversely impact Windstream's ability to continue to provide service to its customers; (c) to provide Windstream a complete list of all customers to whom the advertisements were disseminated and/or who were otherwise contacted; (d) to disseminate corrective advertisements, approved by the Court, that inform customers of the falsity of Charter's prior statements; and (e) from precluding Charter from disconnecting or otherwise interrupting service to Windstream's customers.

## BASIS FOR RELIEF REQUESTED

**A.**     **Charter's False and Misleading Advertising Should Be Enjoined Pursuant to the Lanham Act**

   **(i)**   **Legal Standards For Issuing A Temporary Restraining Order and Preliminary Injunction Against Charter's False and Misleading Advertising**

35. "The standard[s] for granting a temporary restraining order and a preliminary injunction . . . are identical." *Kelly v. Evolution Mkts., Inc.*, 626 F. Supp. 2d 364, 375 (S.D.N.Y.

2009).  A temporary restraining order should issue where the plaintiff has shown (1) either a likelihood of success on the merits *or* sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in their favor; (2) the likelihood of irreparable harm; (3) that the balance of hardships tips in their favor regardless of the likelihood of success; and (4) that an injunction is in the public interest.  *Chobani, LLC v. Dannon Co., Inc.*, 157 F. Supp. 3d 190, 199 (N.D.N.Y. 2016) (reconciling the tests set forth in *Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7, 24, 129 S. Ct. 365, 172 L.Ed.2d 249 (2008) and *Salinger v. Colting,* 607 F.3d 68, 79–80 (2d Cir. 2010) (citing to *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 604 (S.D.N.Y. 2014)); *see also N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 521 (S.D.N.Y. 2013) (characterizing test as the "Second Circuit's *flexible . . .* standard") (emphasis added).

### (ii) There Is Substantial Likelihood that Windstream Will Succeed On The Merits

36.     Windstream has a likelihood of success on its claim against Charter for false advertising under the Lanham Act.[10]  Section 43(a) of the Lanham Act was designed to "secure a marketplace free from deceitful marketing practices."  *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980); *see also U-Haul Int'l, Inc. v. Jartran, Inc.*, 681 F.2d 1159, 1162 (9th Cir. 1982) ("Congressional intention was. . . to stop the kind of unfair competition that consists of lying about goods or services[.]").  To establish a claim for false advertising under the Lanham Act, Windstream must prove:  (i) a false statement of fact in Charter's advertising about its own or Windstream's services; (ii) the statement actually deceived

---

[10] To warrant a preliminary injunction, Windstream does not need to show a likelihood of success on the merits on "all of [its] claims for relief," rather it need only "show a likelihood of success on the merits of at least one of [its] claims." *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018) (citing *Westchester Legal Servs., Inc. v. Westchester Cty.*, 607 F .Supp. 1379, 1382 (S.D.N.Y. 1985) (internal quotations omitted).

or has the tendency to deceive a substantial segment of its audience; (iii) the deception is material; (iv) Charter caused its false statement to enter interstate commerce; and (v) Windstream has been, or is likely to be, injured as a result of the advertising. *Merck Eprova AG v. Brookstone Pharm.*, LLC, 920 F. Supp. 2d 404, 416 (S.D.N.Y. 2013).

37. In evaluating whether Windstream has shown a likelihood of success, this Court does not need to find that Windstream's chance of success is "more likely than not." *Citigroup Glob. Mkts., Inc. v. VCG Special Opports. Master Fund Ltd.*, 598 F.3d 30, 35, 37 (2d Cir. 2010) ("Requiring in every case a showing that ultimate success on the merits is *more likely than not* is unacceptable as a general rule.") (emphasis added). Rather, to prove it is entitled to emergency relief, Windstream need only show that it has a "fair chance of success on the merits." *Id.* at 37 (internal quotations omitted). This means that Windstream does not need to show that it will ultimately succeed at trial. *Id.* at 35. As such, it is permissible to grant emergency relief in cases where "factual dispute[s] render[] a fully reliable assessment of the merits impossible." *Id.* (citing *Ohio Oil Co. v. Conway*, 279 U.S. 813, 49 S. Ct. 256, 73 L. Ed. 972 (1929)).

38. Alternatively, a plaintiff can also obtain emergency relief by showing that at least there are "serious questions" going to the merits. *Id.* at 35. This alternative allows a plaintiff to obtain emergency relief "in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits, but where the costs outweigh the benefits of not granting the injunction." *Id.* (noting the value of this circuit's approach "lies in its flexibility in the face of . . . the greater uncertainties inherent at the outset of . . . litigation.").

### (a) Charter's Advertisements Contain False Statements About Windstream's Services

39. The first element of a false advertising claim is "a bit of a misnomer," since "'[f]alsity [within the Lanham Act] may be established by proving that (i) the advertising is

*literally false* as a factual matter, or (ii) although the advertisement is literally true, it is *likely to deceive* or confuse consumers.'" *Chobani, LLC v. Dannon Co., Inc.*, 157 F. Supp. 3d 190, 199 (N.D.N.Y. 2016) (quoting *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014)) (emphasis added).  In other words, a statement is actionable as false advertising if it is "literally false" or "misleading when considered in [its] full context." *Id.*

 40. A statement is literally false if it is "explicitly stated" or "false on its face." *Id.* (citing *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)).  A statement may also be literally false if it is false by implication.  Courts will find a statement is false by implication if, "considering the advertisement in its full context," it finds that "the relevant audience would recognize the false implied claim as if it had been stated explicitly." *Id.* (quoting *Pamlab, LLC v. Macoven Pharms., LLC*, 881 F. Supp. 2d 470, 476 (S.D.N.Y. 2012)).  In making this determination, the court must "consider the advertisement in its entirety and not . . . engage in disputatious dissection" of the advertisement. *Time Warner Cable, Inc.*, 497 F.3d at 158 (finding a statement can be false "if the words or images, considered in context . . . imply a false message").  If a plaintiff shows the advertisement is literally false, the court may "enjoin the use of the claim without reference to the advertising's impact on the buying public." *Merck Eprova*, 920 F. Supp. 2d at 417 (internal quotations omitted).  In other words, once a plaintiff establishes an advertisement is literally false, consumer deception is presumed, and a plaintiff need not submit evidence to support the second element of its false advertising claim. *Id.*

 41. Charter's advertisements contain literally false statements.  The advertisements open with: "**Windstream Customers, Don't Risk Losing Your Internet and TV Services.** Windstream has filed for Chapter 11 bankruptcy, which means uncertainty.  Will they be able to provide the Internet and TV services you rely on in the future?"  Langston Affidavit ¶ 18, Ex. 3.

The advertisements go on to urge customers to switch to Charter to "*ensure*" that they are "not left without vital Internet and TV services." *Id.*, Ex. 3 (emphasis added). It claims that "Spectrum is here for the long haul." *Id.*, Ex. 3. The first page of the advertisement closes with "Goodbye, Windstream. Hello Spectrum." *Id.*, Ex. 3. On the second page of the advertisement it states, "Windstream's future is unknown, but Spectrum is here to stay—delivering internet and TV services you can count on. . . ." *Id.*, Ex. 3.

42.     The advertisements are false on their face because they state that Windstream's Chapter 11 bankruptcy "means uncertainty," that "Windstream's future is unknown," and that customers' services are at "risk." This is false, as there is no meaningful chance that Windstream will be forced to liquidate or discontinue services. Indeed, the Court has already granted the "first day" relief requested by the Debtors, to ensure that Windstream's business can continue operating in the ordinary course and that Windstream will have the ability to pay employees, maintain relationships with vendors and business partners and, most importantly, serve customers as usual without disruption. Langston Affidavit ¶¶ 9-14. Moreover, Windstream was able to secure *$1 billion* in DIP financing within one week of the Petition Date. *Id.* ¶ 13. This DIP financing should ensure that Windstream will have sufficient capital and liquidity to pay vendors, employees, business partners and other counterparties in the ordinary course throughout the pendency of the Chapter 11 cases. *Id.* Windstream's business and services are thus not "unknown" or in a state of "uncertainty." Rather, the Chapter 11 filing has had no impact on Windstream's services or its operations, rendering Charter's statements false on their face.

43.     Charter's statements are also literally false by implication. Charter's statements falsely imply that as a result of Windstream's bankruptcy, it will not be able to provide services to its customers. This is false because Windstream's services are continuing interrupted and

26

unaffected throughout the Chapter 11 cases. Langston Affidavit ¶¶ 9-14. Further, the use of the phrase "Goodbye, Windstream," in context of the statements that Charter is "here for the long haul" and "here to stay" falsely implies that Windstream is going out of business altogether. In truth, there are no plans for liquidation or downsizing, and in the months prior to the Chapter 11 filing, Windstream's operations and businesses experienced a particularly strong period of growth. *Id.* ¶ 11. As Charter knows, Windstream filed for Chapter 11 to address an adverse decision by a federal court and to restructure its balance sheet accordingly. *Id.*

44. Even if an advertisement is literally true, a plaintiff can still recover if it shows that the advertisement "is nevertheless likely to mislead or confuse consumers." *Merck Eprova*, 920 F. Supp. 2d at 417. An advertisement is likely to mislead or confuse consumers if it leaves "an impression on the listener [or viewer] that conflicts with reality." *Id.* (citing *Schering Corp. v. Pfizer Inc.,* 189 F.3d 218, 229 (2d Cir. 1999)). At a minimum, Charter's advertisements are likely to mislead or confuse Windstream customers into believing that their services are at risk or uncertain because of the Chapter 11 cases. For the same reasons discussed above, this is misleading or confusing because, in actuality, Windstream's operations are continuing as usual and its services are remaining intact.

### (b) Charter's Statements Actually Deceived Or Have The Tendency To Deceive A Substantial Segment Of Its Audience

45. As an initial matter, because Charter's statements are literally false (either on their face or by implication), this second element is presumed, and Windstream does not need to provide any evidence of consumer deceit. *Merck Eprova*, 920 F. Supp. 2d at 417.

46. Additionally, Windstream is entitled to a presumption that this element is met because Charter's statements are not only literally false, but they are intentionally deceitful. Indeed, at least one customer has said that she received a letter that she believed to be from

Windstream, which letter told her that she had to switch to Charter before the 25th day of the month as a result of Windstream's Chapter 11 filing. Charter representatives did nothing to correct her mistaken belief. Further, the customer was specifically instructed to not call Windstream until after Charter had completed installing its equipment at her residence and the new Charter service was up and running. *See* Langston Affidavit ¶ 21, Ex. 8.

47.     Where, as here, the defendant has "intentionally set out to deceive the public," the plaintiff is entitled to a presumption that consumer deception is occurring and it need not submit evidence to support the second element of a false advertising claim. *Merck Eprova*, 920 F. Supp. 2d at 417. "The burden then shifts to the defendant to show that consumers were not misled or confused." *Id.* This presumption exists because "actual consumer confusion is not easily established through direct evidence or even through use of consumer surveys or market research." *Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 140 (2d Cir. 1991). "It seems fair, therefore, that the expenditure by a competitor of substantial funds in an effort to deceive consumers and influence their purchasing decisions justifies the existence of a presumption that consumers are, in fact, being deceived." *Id.* (analyzing *PPX Enters., Inc. v. Audiofidelity Enters., Inc.,* 818 F.2d 266, 270 (2d Cir.1987), *abrogated on other grounds, as recognized in Hannex Corp. v. GMI, Inc.,* 140 F.3d 194, 206 n. 9 (2d Cir.1998)).

48.     Accordingly, courts have held that where a defendant employs misleading advertisements to perpetrate a fraud on consumers, injunctive relief is warranted under the Lanham Act, without a showing of consumer confusion. *PPX Enters.*, 818 F.2d at 273. For example, in *PPX Enterprises, Inc.*, the Second Circuit found that the district court erred in requiring a plaintiff to show evidence of actual confusion, where the defendant misleadingly

claimed its records contained solo performances by Jimmy Hendricks, and intentionally added to, or "perpetrated," this deception through its "design, labeling and album covers." *Id.* at 271.

49.      In this case, Charter intentionally deceived customers by using a combination of underhanded tactics to lead customers to believe that the advertisements were coming from Windstream.  The front of the envelopes, in large bold font contained Windstream's mark and addressed Windstream's customers: "**Important Information Enclosed for Windstream Customers**."  To further mislead customers that it was a Windstream communication, Charter's envelopes contained a highly visible color strip that copied the same distinct and eye-catching color pattern of dark purple gradually blending to a bright pink that Windstream is using in a current, pervasive marketing campaign that targets the same geographic area as Charter's advertisements.  Most notably, the envelope did not contain Charter's mark, logos, or any other indicia that demonstrated to customers that the communication was from Charter.  *Compare* Langston Aff., Ex. 1, *with id.*, Ex. 2.

50.      Charter's clear purpose in using these envelopes was to cause initial interest confusion as a "bait-and-switch" technique to "capture the customers' attention and lead them to its own services."  *Grand Heritage Mgmt., LLC v. Murphy*, No. 06CIV.5977NRB, 2007 WL 3355380, at *7 (S.D.N.Y. Nov. 7, 2007) (citing *Grotrian, Helfferich, Schultz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1341 (2d Cir.1975)).  Charter knew that *Windstream's* trademark would attract *Windstream*'s customers "based on the reputation built up by" *Windstream*'s longstanding excellence in providing exemplary service.  *Grotrian*, 523 F.2d at 1342.

51.      As a result of Charter's deceit, Windstream customers were enticed to open the envelopes because they mistakenly believed that the letters were from Windstream.  *See*

Langston Aff. ¶ 21, Ex. 6 ("they said it came *from Windstream*") (emphasis added).  The

envelopes, however, contained Charter's false statements about Windstream, designed to divert

sales away from Windstream.  Because of Charter's tactics, certain customers were misled into

believing that the mailing was sent by Windstream and was instructing them to switch service to

Charter.  *See id.* ¶ 21, Ex. 8 ("I got that letter in the mail *from Windstream* and told me to get

with you guys, um get with Spectrum, so that's what I did.") (emphasis added).  This chicanery

is prohibited by the Lanham Act, even if by the time the consumers ultimately made a

purchasing decision the confusion had been resolved.  *See Grotrian*, 523 F.2d at 1342 (similar

mark would entice to consider defendant's pianos, even if any confusion was resolved prior to

any purchase); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987)

(competitor's logo confused oil traders into investing time and effort into pre-sale negotiations

with the defendant); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d

Cir. 1986) (finding initial interest confusion equally actionable as point of sale confusion).

52.     Given Charter's clear efforts to intentionally deceive Windstream's customers by

causing initial interest confusion, Windstream is entitled to a presumption that consumer

deception is occurring, and the burden shifts to Charter to prove that customers were not misled

or confused.[11]

53.     Assuming *arguendo* that Windstream is not entitled to a presumption on

consumer deceit, it still has shown a likelihood of success by showing "extrinsic evidence of

---

[11] Due to Charter's exceptionally egregious conduct, Windstream is seeking corrective advertising and attorneys' fees, among other relief.  *See* 15 U.S.C. § 1117(a); *Merck Eprova AG*, 920 F. Supp. 2d at 432 (granting corrective advertising); *Linotype Co. v. Varityper, Inc.*, No. 89 CIV. 4747 (MJL), 1989 WL 94338, at *1 (S.D.N.Y. Aug. 4, 1989) (mandating defendant to issue corrective advertisements because in false advertising cases, the "relief ordered should be oriented toward *eliminating* the false nature of the offending advertisement, *as well* as the confusion it engenders in the minds of consumers").

consumer deception." *Merck Eprova*, 920 F. Supp. 2d at 417. "On an application for a preliminary injunction, . . . a full-blown survey is not always necessary and expert testimony or any other qualitative showing that a not insubstantial number of consumers received a false or misleading impression from it may be sufficient." *Herbko Int'l, Inc. v. Gemmy Indus. Corp.*, 916 F. Supp. 322, 331 (S.D.N.Y. 1996) (internal quotations omitted).

54.     In total, over the course of only ten days, Windstream received at least 160 calls from its customers regarding Charter's false advertising. Langston Aff. ¶ 20. As demonstrated above, many Windstream customers were actually confused and were led to believe that they would lose their services and/or that Windstream was shutting down. *See id.*, Exs. 4-9. Windstream customers stated that they were "losing" service, that Windstream "will soon be discontinuing service," that Windstream was "closing," that Windstream was "going away," and that Windstream was "going out of business." As one customer put it, Charter urged him to switch "before [he] lose[s] service. . . . HELP." *See id.*, Exs. 4-9.

55.     Accordingly, Windstream has shown that a significant number of its consumers received a false or misleading impression from Charter's advertisements. Thus, regardless of whether it is entitled to a presumption, Windstream has shown a likelihood of success on consumer deceit. Indeed, certain customers were deceived into believing that they would be forced to switch service to Charter as a result of Windstream's Chapter 11 cases.

### (c)   Charter's Deception Is Material

56.     Charter's deception is material and is likely to influence the purchasing decision of Windstream's customers. *Merck Eprova AG*, 920 F. Supp. 2d at 416. Windstream and Charter directly compete to provide telecommunications service to customers throughout the United States. Windstream's top states were targeted by Charter with the false advertising.

57. Charter's advertisements were intentionally designed to influence the purchasing decision of Windstream's customers. Charter's advertisements falsely stated or misled Windstream customer into believing that they were losing services, and urged the customers to switch to Charter. Langston Aff. ¶¶ 17-18, Ex. 3. The advertisements contained information on how to switch to Charter and offered defecting Windstream customers special offers, such as the payment of cancellation fees. *Id.*, Ex. 3. As shown, over a hundred of Windstream's customers contacted Windstream because of Charter's false advertisements, and numerous Windstream customers switched services to Charter because of the advertisements. *Id.* ¶ 21, Exs. 4-9. Accordingly, Windstream has shown a likelihood of success that Charter's deception was material and influenced purchasing decisions.

### (d) Charter Caused Its False Statements To Enter Interstate Commerce

58. There can be no question that Charter caused its false statement to enter interstate commerce. Charter is headquartered in Missouri. It sent the false advertisements to Windstream customers in Alabama, Georgia, Kentucky, Ohio, Nebraska, and North Carolina. Langston Aff. ¶ 18. It may also have sent advertisements to additional customers in other states that Windstream has not yet discovered.

### (e) Windstream Has Been, Or Is Likely To Be Injured As a Result of Charter's Advertising

59. Where, as here, a defendant's advertisement is literally false and mentions the plaintiff by name, the "likelihood of injury and causation . . . may be presumed." *Time Warner*, 497 F.3d at 149, 161-62; *see also McNeilab, Inc. v. Am. Home Prod. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988) (presumption recognized because a "misleading comparison" with a competitor's product or service "necessarily diminishes that product's value in the minds of the consumer").

60.     Even assuming that Windstream is not entitled to a presumption, it is likely to succeed on this element.  Under the Lanham Act, a plaintiff must "only provide a reasonable basis for the belief that [it] is likely to be damaged as a result of the false advertising."  *Zeneca Inc. v. Eli Lilly & Co.*, No. 99 CIV. 1452 (JGK), 1999 WL 509471, at *36 (S.D.N.Y. July 19, 1999) (citing *Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186, 190 (2d Cir. 1980)).  It "need not demonstrate that it is in direct competition with the defendant or that it has definitely lost sales because of the defendant's advertisements." *Id.* (internal citation omitted).  This is especially true in the context of a motion for injunctive relief.  *Id.* ("To obtain injunctive relief . . . a plaintiff need not even point to an actual loss or diversion of sales.").  So long as the plaintiff can show that the "(i) that the parties are competitors in the relevant market, and (ii) that there is a 'logical causal connection between the alleged false advertising and its own sales position,'" a plaintiff will meet its threshold showing of injury. *Id.* (citing *Johnson & Johnson*, 631 F.2d at 190-91).

61.     Windstream and Charter directly compete for the same customers.  In the event that customers believe Charter's false advertisements, they will likely switch to Charter, causing diverted sales.  And in fact, Windstream customers have done exactly that—switched to Charter because they were misled.  *See, e.g.* Langston Aff. ¶ 21, Ex. 8.  Further, while not necessary for recovery, Windstream can show that, as a direct result of Charter's false statements, it has had to undertake damage control efforts, at a significant cost and expense, including launching an extensive mailing and advertising campaign to counter Charter's deceptive advertising and offering customers upgrades or other concessions in order to convince customers to maintain their service.  These are reduced profits directly attributable to Charter's false advertising.

Windstream's Legal department has also expended extensive time and effort in researching and responding to this matter. *Id.*¶ 21.

62.     Charter's deceitful campaign was also intentionally designed to damage Windstream's goodwill. Windstream is a publicly traded, FORTUNE 500 company, with a longstanding reputation as a leading provider of telecommunication services. Windstream's operations and businesses have recently experienced a particularly strong period of growth. Charter's false advertisements directly assaulted Windstream's goodwill by causing consumers to believe that Windstream was unreliable and could not provide services, at best, and in imminent stages of shutting down, at worst. This has resulted in a loss of Windstream's goodwill. For these reasons, Windstream has shown that it was likely injured by Charter's deceitful campaign. *Id.* ¶ 28.

63.     In sum, Windstream has shown a likelihood of success on all elements of its false advertising claim. Alternatively, Windstream has raised serious questions on the merits, and is entitled to relief because, as explained below, the balance of hardships tips in its favor.

### (iii) Windstream Will Suffer Irreparable Harm If Charter's Advertising Campaign Is Not Temporarily Restrained And Ultimately Enjoined

64.     Windstream readily satisfies the second requirement of establishing irreparable harm. As an initial matter, irreparable injury may be presumed when, as here, "a plaintiff demonstrates the literal falsity" of a defendant's advertisement. *Reckitt Benckiser Inc. v. Motomco Ltd.*, 760 F. Supp. 2d 446, 453 (S.D.N.Y. 2011) (internal quotations omitted).

65.     Even if Windstream is not entitled to this presumption, it also can establish that the harm it is suffering from Charter's deceit is irreparable. The holding in *Chobani* is instructive. In that case, Chobani and Dannon, two well-known yogurt manufacturers, were in a dispute over the contents of Chobani's advertisements that falsely stated Dannon's yogurt

products contained "bad stuff" (*i.e.*, chlorine).  In granting Dannon's preliminary injunction, the court held that there was "no question" that the parties were in "direct competition in the relevant market, no matter how that term is defined" because they competed "generally in the health food and yogurt markets," but also "specifically in the market for low-calorie Greek yogurt products." *Chobani*, 157 F. Supp. 3d at 205.  Similarly, the court found it "easy to conclude" that a "logical casual connection" existed between the false advertisement and the advertiser's own sales position where "the sales of one party's products would certainly impact the sale of the other party's product." *Id.*

66.     Just as in *Chobani*, Windstream and Charter are direct competitors for telecommunications services.  Langston Aff. ¶ 8.  There is a clear logical causal connection between Charter's false advertisements and its sales position.  Charter intentionally sought to trick and deceive Windstream customers into switching to its services based on a multitude of lies about Windstream's bankruptcy.  Consequently, the logical causal connection between Charter's advertisements and Charter's sales is even more direct than in *Chobani*, making this a far easier case to conclude a likelihood of irreparable harm.

67.     Moreover, each day that Charter's advertising continues, Windstream will continue to suffer harm due to losing customers that are switching to Charter, the time and resources it must expend to provide corrective information to its customers, and the ongoing assault to its goodwill created by consumers mistakenly believing that its services are at risk and/or that Windstream is going out of business.  Langston Aff. ¶ 28.  Once Windstream has lost a customer to Charter as a result of Charter's manipulation or its reputation is tarnished in the customer's eyes, it is unlikely that Windstream can recover this customer relationship.  Thus, Windstream will suffer irreparable harm until Charter's false advertising campaign is enjoined.

### (iv) The Balance Of Hardships Tips in Windstream's Favor

68.     The balance of hardships requires the court to determine "which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999).  In cases like this, courts routinely find that the hardships tip in the favor of the plaintiff because the defendant cannot "assert an equitable interest in the perpetuation of an advertising campaign that is literally false." *See N. Am. Olive Oil Ass'n*, 962 F. Supp. 2d at 524; *see also Reckitt Benckiser Inc.*, 760 F. Supp. 2d at 456–57; *Chobani*, 157 S. Supp. 3d at 205 (same); *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 149 (E.D.N.Y. 2011) (same); *Zeneca Inc. v. Eli Lilly & Co.*, No. 99 CIV. 1452 (JGK), 1999 WL 509471, at *41 (S.D.N.Y. July 19, 1999) (same).

69.     Here, the balance of hardships weighs strongly in favor of issuing a temporary restraining order and preliminary injunction.  As evident from the above, Windstream is *currently* and *will continue* to suffer irreparable harm from Charter's false and misleading advertisements.  That damage is not only in the form of a severe erosion of Windstream's goodwill, but also, and more importantly, in the form of lost customers and reduced sales directly resulting from Charter's behavior.  Langston Aff. ¶¶ 24, 28.  In contrast, the only hardship or "burden" Charter will incur is the "modest direct costs of creating and distributing" the advertisements and "any diminished goodwill resulting from negative publicity . . . largely because of [its] own doing." *N. Am. Olive Oil Ass'n*, 962 F. Supp. 2d at 524.

70.     Any so-called hardship suffered by Charter from the narrow relief sought by Windstream, particularly in light of the public interest in receiving accurate information, has routinely been found to fall far short of outweighing the harms suffered by parties like Windstream. *See, e.g.*, *id.*; *Reckitt Benckiser Inc.*, 760 F. Supp. 2d at 456–57.  Put simply,

Charter cannot assert an equitable interest in perpetuating an advertisement that is false or misleading. *See N. Am. Olive Oil Ass'n*, 962 F. Supp. 2d at 524. As a result, this factor heavily favors granting the requested relief.

### (v) Granting the Injunction Serves the Public Interest

71.     "It is self-evident that preventing false or misleading advertising is in the public interest." *Chobani*, 157 F. Supp. 3d at 205 (quoting *N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 524 (S.D.N.Y. 2013)). Indeed, courts regularly find the public interest is "well served by ensuring that consumers do not purchase a product based on false advertising." *N. Am. Olive Oil Ass'n*, 962 F. Supp. 2d at 524; *see e.g.*, *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 149 (E.D.N.Y. 2011) (granting preliminary injunction, finding that the "public has a strong interest in receiving accurate information); *Novo Nordisk A/S v. Becton Dickinson & Co.*, 997 F. Supp. 470, 478 (S.D.N.Y. 1998) (granting preliminary injunction, finding "consumers have an interest in receiving . . . accurate information").

72.     Moreover, there is a significant interest in ensuring that the public is safeguarded from deceptive or misleading marketing practices. As Charter itself admonished when it was on the receiving end of a false advertising campaign, the "public is entitled to the truth when deciding which television service provider to use." (4:09-cv-00730-RWS, Doc. 9-2 at 34.) Indeed, telecommunications consumers are undoubtedly entitled to receive accurate information when making their purchasing decisions and deciding between services offered by Windstream and Charter. Thus, the public interest will be "well-served" by eliminating Charter's false and misleading advertisements from the marketplace, and Windstream's temporary restraining order should be granted. *N. Am. Olive Oil Ass'n*, 962 F. Supp. 2d at 524.

**B.      Charter's Actions Have Violated the Bankruptcy Code's Automatic Stay**

73.      The automatic stay of Section 362(a) is "one of the most fundamental debtor protections provided by the bankruptcy laws." *Midlandtic Nat'l Bank v. N.J. Dep't of Envt'l Prot.*, 474 U.S. 494, 503 (1986).  The automatic stay prohibits, among other things, acts to exercise control over the property of a debtor's estate and any act to collect, assess, or recover a claim against a debtor that arose before the petition date.  *See* 11 U.S.C. §§ 362(a)(3), (6).  A debtor need not prove that a party intends to violate the stay; "general intent in taking actions which have the effect of violating the automatic stay is sufficient to warrant damages."  *In re Sturman*, No. 10 CIV. 6725 RJS, 2011 WL 4472412, at *2 (S.D.N.Y. Sept. 27, 2011) (internal citations omitted).

74.      A company's goodwill, which includes "name recognition, consumer brand loyalty, or special relationships with suppliers or clients" is property of the estate under Section 541 of the Bankruptcy Code.  *See In re Schultz*, 250 B.R. 22, 35 (Bankr. E.D.N.Y. 2000) (holding that "goodwill. . . retained by the Debtor after the Petition Date is an asset of the estate that must be evaluated"); *see also In re Prince*, 85 F.3d 314, 323 (7th Cir. 1996) (explaining that goodwill is an "intangible capital asset" of the company similar to a trademark and distinct from the potential future earnings which would not be part of the estate).   Thus, a company's goodwill is protected by the automatic stay.

75.      Since the Petition Date, Charter has taken repeated actions in willful violation of the automatic stay.  First, Charter improperly disconnected services to approximately 350 Windstream customers over Charter's network.  When customers called Charter to reinstate their services, Charter refused to open repair tickets and instead informed customers that service had been disrupted due to Windstream's failure to pay prepetition amounts allegedly owed to

Charter. Langston Aff. ¶ 25. Such conduct is a clear violation of the automatic stay and cannot be countenanced.

76. Second, Charter has taken actions that threaten Windstream's goodwill with its customers by falsely stating and implying that Windstream's Chapter 11 cases mean that Windstream will not be able to provide services and/or that Windstream will be going out of business altogether. *Id.* ¶¶ 17-24.

77. On this point, the *Alert Holdings* case is instructive. There, the bankruptcy court granted a preliminary injunction against the debtor's competitor enjoining it from communicating with the debtor's customers to induce customers to break their current contracts with the debtor and from making additional false or misleading statements about the debtor. *See generally In re Alert Holdings, Inc.*, 148 B.R. 194 (Bankr. S.D.N.Y. 1992). The competitor had targeted the debtor's customers through mass mailings and telephone calls, creating "the erroneous impression that [debtor] may be going out of business." *Id.* at 198. The court held that "accounts receivable, rights of action to recover accounts receivable and intangibles such as customer lists and goodwill" are all property of the estate. *Id.* at 203. The court granted an injunction out of the "fear that this practice will continue while [the debtor's] reputation, goodwill and customer relations continue to be irreparably tarnished due to defendants' dissemination of false and misleading information to [debtor's] customers." *Id.*

## MOTION PRACTICE

78. This Motion includes citations to the application rules and statutory authorities upon which the relief requested herein is predicated and a discussion of its application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## NOTICE

79.     The Debtors have provided notice of this Motion to:  (a) the entities on the Master Service List (as defined in the Case Management Order and available on the Debtors' case website at www.kccllc.net/windstream) and (b) any person or entity with a particularized interest in the subject matter of this motion.  The Debtors respectfully submit that no other or further notice is necessary.

## CONCLUSION

For all the reasons stated above, the Debtors respectfully request that this Court enter the Proposed Order, substantially in the form annexed hereto as Exhibit A, granting the relief requested in this Motion and such other and further relief as may be just and proper.


Dated: April 5, 2019     */s/ Steven J. Reisman*
New York, NY       Steven J. Reisman
            Tami Kameda Sims (*pro hac vice* application pending)
            Shaya Rochester
            Cindi M. Giglio
            **KATTEN MUCHIN ROSENMAN LLP**
            575 Madison Avenue
            New York, NY 10022
            Telephone: (212) 940-8800
            Facsimile: (212) 940-8876
            Email: sreisman@katten.com
              tami.smis@kattenlaw.com
              srochester@katten.com
              cgiglio@katten.com

            *Proposed Conflicts Counsel to the Debtors and Debtors in Possession*