John Kingston (pro hac vice requested)
Brian Hockett (pro hac vice)
THOMPSON COBURN LLP
One U.S. Bank Plaza, Suite 2700
St. Louis, MO  63101
314-552-6000
314-552-7000 (fax)
jkingston@thompsoncoburn.com
bhockett@thompsoncoburn.com

*Attorneys for Defendants Charter Communications, Inc.*
*and Charter Communications Operating, LLC*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE** | **Chapter 11** |
| **WINDSTREAM HOLDINGS, INC., et al.,** | **(Jointly Administered)** |
| **Debtors.** | **Case No. 19-22312 (RDD)** |
| **WINDSTREAM HOLDINGS, INC., et al.,** | |
| **Plaintiffs,** | **Adv. Proc. No. 19-08246 (RDD)** |
| **vs.** | |
| **CHARTER COMMUNICATIONS, INC. and CHARTER COMMUNICATIONS OPERATING, LLC,** | |
| **Defendants.** | |

## CHARTER COMMUNICATIONS, INC. AND
## CHARTER COMMUNICATIONS OPERATING, LLC'S OPPOSITION
## <u>TO DEBTOR'S MOTION FOR TEMPORARY RESTRAINING ORDER</u>

# TABLE OF CONTENTS

PAGE

BACKGROUND ...............................................................................................................2

A.      Shortly after filing for bankruptcy protection, Windstream's President and Chief Executive Officer publicly states that its bankruptcy means uncertainty could ultimately materially impact customer service, and could lead to the liquidation of the company ................................................................................................................ 2

B.      Charter did not target Windstream customers for post-bankruptcy disconnects and went to great lengths to restore disconnected customers when they were discovered ............................................................................................................... 4

C.      Consistent with Charter's March 26, 2019, assurances to Windstream, Charter's upcoming Windstream campaign does not reference any bankruptcy risks or uncertainty.................................................................................................................. 5

D.      The statements enjoined in the Direct TV litigation were completely different from the statements that Windstream would enjoin here....................................................6

E.      Charter did not target Windstream customers for post-bankruptcy disconnects and went to great lengths to restore disconnected customers when they were discovered ............................................................................................................... 6

ARGUMENT ...................................................................................................................7

I.      Windstream is not likely to succeed on the merits of its false and deceptive advertising claim because it has unequivocally acknowledged the risk and uncertainty of bankruptcy ...................................................................................7

        A.      Windstream's public statements demonstrate the inherent "risk and uncertainty" of bankruptcy ...................................................................8

        B.      Charter's statements are neither false nor misleading ...........................9

        C.      The number of alleged inquiries and allegedly misled customers is both miniscule and susceptible to a damage calculation.................................10

II.      Windstream cannot demonstrate any risk of irreparable harm .........................12

        A.      Windstream has not demonstrated lost sales linked to any alleged falsity in Charter's statements...............................................................12

        B.      Monetary damages will be calculable and sufficient to compensate Windstream if it is ultimately successful ...........................................13

C.      The subject campaign ended two weeks ago ...........................................14

D.      Any damages for the alleged stay violations are also reparable ...........................14

III.    Any damages for the alleged stay violations are also reparable .......................................15

IV.     Public interest factors favor Charter ...................................................................15

CONCLUSION ...........................................................................................................16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC.*,
447 F.Supp.2d 266 (2006) ........................................................10

*Citigroup Glob. Mkts., Inc. VCG Special Opports. Master Fund Ltd*
598 F.3d 30 (2d 2010)................................................................7

*Chobani, LLC v. Dannon Company, Inc.*,
157 F. Supp. 3d 190 (N.D.N.Y. 2016) ....................................10, 12, 13

*EFS Mktg., Inc. v. Russ Berrie & Co.*,
76 F.3d 487 (2d Cir.1996)..........................................................7

*Giving Back Fund Inc v. Miami Mktg. Grp. LLC*,
2011 WL 13217774 (C.D. Cal. Jan. 20, 2011) ..........................8

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*,
365 F. Supp. 707, 180 U.S.P.Q. 506 (S.D.N.Y. 1973), modified, 523 F.2d
1331, 186 U.S.P.Q. 436 (2d Cir. 1975)...........................................10-11

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
113 F.3d 373 (2d Cir. 1997).......................................................7

*In re Met-L-Wood*,
861 F.2d 1012 (7th 1988)...........................................................8

*Metropolitan Opera Ass'n v. Local*
100, 239 F.3d 172 (2d Cir. 2001)..............................................2, 16

*Mobileye, Inc. v. Picitup Corp.*, 928 F.Supp.3d 759, 777 (S.D.N.Y. 2013) ..............................11

*New Kids on the Block v. News Am. Publ'g, Inc.*,
971 F.2d 302 (9th Cir. 1992) .....................................................7

*New York Magazine v. Metro. Transp. Auth.*,
136 F.3d 123 (2d Cir. 1998).......................................................2, 16

*Pamlab, L.L.C. v. Macoven Pharm., L.L.C.*,
881 F. Supp. 2d 470 (S.D.N.Y. 2012).............................9, 13, 14, 15

*In re SW Boston Hotel Venture, LLC*,
460 B.R. 38 (Bankr. D. Mass 2011) ...........................................8

*Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 774 (1992) ...................................................7

*Wal-Mart Stores, Inc. v. Samara Bros.*,
      529 U.S. 205 (2000)..........................................................................................................7

**Statutes**

18 U.S.C. § 1350..............................................................................................................................1

**Other Authorities**

First Amendment .........................................................................................................................2, 16

Windstream Holdings, Inc. (Windstream) filed for bankruptcy on February 25, 2019. Almost a month later, in its form 10-K filed on March 15, 2019, and certified as true by Windstream's president, Tony Thomas, Windstream volunteered that its bankruptcy created "**uncertainty**", and that its Chapter 11 filing could ultimately "**have a material adverse effect on [Windstream's] ability to meet customer expectations**." [1] Windstream further stated that its Chapter 11 bankruptcy could be converted to a Chapter 7 bankruptcy, which could entail a "**cessation of operations**." Notwithstanding its president's unqualified—and sworn—certification that Chapter 11 bankruptcy means "uncertainty," Windstream wants this Court to impose a prior restraint on direct mail advertising stating that says what Windstream itself already told the Securities and Exchange Commission. And not only does Windstream seek injunctive relief on the very statements it has made itself, it attempts to obtain an injunction with evidence suggesting that that, at most, **0.02%** of the recipients of the challenged mailing may have concluded—like Windstream's president—that uncertainty related to Windstream's bankruptcy entails risk and that the bankruptcy might impact the company's ability to meet customer expectations.

Defendants Charter Communications, Inc. and Charter Communications Operating, LLC (Charter) respectfully request that this Court deny Windstream's Motion for Temporary Restraining Order. Windstream's motion stumbles at the gate because the "uncertainty" related advertising campaign is over. In any event, Windstream is not likely to succeed on the merits because (1) it cannot prove that the unremarkable truism that "bankruptcy means uncertainty" is

---

[1] See Windstream Holdings, Inc. Form 10-K for the fiscal year ended December 31, 2018 (March 15, 2019) at 19 attached as Exhibit A. Pursuant to, inter alia, 18 U.S.C. § 1350, Mr. Thomas certified the truth of the statements contained therein subject to both criminal and civil penalties.

false or deceptive and (2) even if Windstream's is the first "no uncertainty" debtor in the history of bankruptcy law, the company's own evidence establishes that it cannot demonstrate a sufficient number of "misled" customers to prevail on the merits.

Windstream faces no risk of irreparable harm and is comfortably on the wrong side of the balance of equities. And the public interests fundamentally do not favor a prior restraint on Charter's First Amendment rights without even the limited procedural safeguards of discovery and a preliminary injunction hearing. *See Metropolitan Opera Ass'n v. Local* 100, 239 F.3d 172, 176 (2d Cir. 2001) ("When a prior restraint takes the form of a court issued injunction, the risk of infringing on speech protected under the First Amendment increases."); *New York Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 131 (2d Cir. 1998) ("Although the Supreme Court has indicated that commercial speech may qualify as one of the exceptions to the bar on prior restraints … we see no reason why the requirement of procedural safeguards should be relaxed whether speech is commercial or not.").

Windstream's passing reference to alleged erroneous customer disconnects likewise provides no alternative basis for an emergency restraining order because Windstream has adduced no competent evidence in support of that claim. Charter remains fully committed to complying with the terms of the automatic stay.

## BACKGROUND

While an exhaustive recitation of the facts relevant to Windstream's Complaint is not feasible in these accelerated proceedings, Charter respectfully submits that the following background information may be useful for the Court's analysis of Windstream's emergency motion.

**A.** **Shortly after filing for bankruptcy protection, Windstream's President and Chief Executive Officer publicly states that its bankruptcy means uncertainty that could ultimately materially impact customer service, and could lead to the liquidation of the company.**

On February 25, 2019, Windstream filed for Chapter 11 bankruptcy. As of today, Windstream has not proposed a plan of reorganization for emerging from bankruptcy. Nor has Windstream yet succeeded in organizing and filing its schedules.

Windstream publicly discussed the risks and uncertainty associated with its bankruptcy in a Form 10-K filed with the United States Securities and Exchange Commission (SEC) on March 15, 2019 (the 2018 Windstream 10-K). Windstream's president certified that the statements in the Windstream 2018 10-K were true. *See* Ex. A at 206. In the 2018 Windstream 10-K, Windstream identified a number of "risks and uncertainties" associated with Windstream's Chapter 11 bankruptcy:

Windstream warned its investors that it was possible that this Court "could convert our Chapter 11 bankruptcy case to cases under Chapter 7 of the Bankruptcy Code." *Id.* at 22. According to Windstream, "[i]n such an event, a Chapter 7 trustee would be appointed or elected to **liquidate our assets for distribution**." *Id.* (emphasis added). In discussing the admitted possibility of a Chapter 7 conversion, Windstream acknowledged that such a conversion would entail "**a cessation of operations**." *Id.* (emphasis added)

Windstream also warned investors that uncertainty related to the Chapter 11 bankruptcy could ultimately have a "material adverse effect on [Windstream's] ability to meet customer expectations." *Id.* at 19.

The 2018 Windstream 10-K warned investors of a host of other factors underlying the risk and uncertainty of Chapter 11 bankruptcy, such as inability to maintain relationship with suppliers

and service providers; loss of employees; impact on customer confidence; and unavailability of financial resources.  *See id.* at 18-23.

Windstream's summary conclusions regarding the "risks and uncertainties associated with our Chapter 11 proceedings" were unequivocal:  "Because of the risks and uncertainties associated with our Chapter 11 proceedings, we cannot accurately predict or quantify the ultimate impact of events that will occur during our Chapter 11 proceedings that may be inconsistent with our plans." *Id.*  at 18.

**B.      In March of 2019, Charter ran a limited duration mailing campaign that addressed Windstream's bankruptcy in terms that were much milder than those in Windstream's own certified statement to the investing public.**

In March of 2019, Charter prepared and issued a single run of mailings, which mentioned the risk and uncertainty that Windstream associated with Windstream's Chapter 11 bankruptcy. Windstream has identified the following Charter statements as objectionable:

> "Don't risk losing your internet and TV services"
> "Windstream has filed for Chapter 11 bankruptcy, which means uncertainty."
> "Will they be able to provide the internet and TV services you rely on in the future?"
> "Windstream's future is unknown"
> "Goodbye Windstream…Hello Charter"

Unlike Windstream's own certified statements to investors, Charter's mailing did not indicate that Windstream's bankruptcy could result in "Windstream being broken up," "Windstream or its assets being acquired by a third party," or "Windstream being merged with a competitor."  *See* Exhibit A at 21.    Charter's statements about the uncertainty inherent in Windstream's bankruptcy were much less dire than Windstream's own representations to its investors regarding possible outcomes in these proceedings.

Charter mailed marketing pieces referring to Windstream in March of 2019.  *See* Exhibit B.  Windstream has identified 161 calls or inquiries related to those 819,981 pieces.  If one assumes—contrary to Windstream's own records—that every single one of those inquiries

represented a confused customer, only 0.02% or 1 in 5000 of the mailed letters would have generated the ostensibly "misleading" impression that Windstream's Chapter 11 bankruptcy could entail uncertainty. If one uses the ten allegedly "concerned and confused" customers actually identified by Windstream for the calculation, the percentage of mailed letter that would have created the impression of uncertainty drops to 0.0012% or 1 in over 80,000.

## C. Consistent with Charter's March 26, 2019, assurances to Windstream, Charter's upcoming Windstream campaign does not reference any bankruptcy risks or uncertainty.

In a letter dated March 26, 2019—nearly two weeks before Windstream filed the emergency motion at issue—Charter informed Windstream that the direct mail campaign prompting Windstream's complaints had expired by its own terms:

> Despite Charter's disagreement with Windstream's accusations, the issue is moot as the direct mail piece in question was always intended to be of limited duration, and Charter is currently in the process of modifying its advertising for Windstream markets. Charter will take Windstream's objections into account in formulating future advertising materials. *See* Langston Aff. Ex. 11.

Consistent with its representations, Charter's next Windstream-related direct mail campaign—waiting to be mailed on April 22, 2019—does not include references to bankruptcy uncertainty and is being disseminated in envelopes that prominently display Charter's Spectrum label.[2] Copies of the subject envelopes and mailers are attached as Exhibit C.

---

[2] The next round of mailings are currently sitting on shrink wrapped pallets on Charter's print production floor or on trucks destined for the United States Postal Service's Sectional Center Facilities). Pulling out those mailers would entail breaking into pallets and manually identifying mail based on ID or address. Some of these pallets are already distributed across the country. There is no guarantee that all Windstream referencing mail could be identified and held back. There is no way to separate "Windstream Mail" from "Non-Windstream mail" as it is mixed by zip code…and in this particular case, all versions are using the same outer envelope (there is no identification on the outer envelope that Windstream is referenced therein).

**D.     The statements enjoined in the Direct TV litigation were completely different from the statements that Windstream would enjoin here.**

Windstream has attempted to draw comparisons between Charter's March 2019 direct mailing and an advertising campaign by DirectTV in 2009, which prompted litigation between Charter and DirectTV.  But the statements the court enjoined in the DirectTV litigation were not comparable to Charter parroting Windstream's representations regarding "uncertainty" here.  In 2009 (when Charter was substantially through a Chapter 11 bankruptcy and after a reorganization plan was on file) DirectTV issued marketing statements along the following lines:

> "there's no way [Charter will] be able to bring you the latest technology, more channels in HD and new exclusive programming."
> "do you really think [Charter will] be able to bring you the latest technology, more channels in HD or new exclusive programming? Probably not."
> "do you really think [Charter will] have the time to bring you the latest technology, more channels in HD or new exclusive programming? Probably not."

See Exhibit D (ECF #16 in Charter v. DirectTV, Case No. 4:09-cv-00730-RWS).  DirectTV's statements went far beyond merely noting the "risks and uncertainties" of bankruptcy.

**E.     Charter did not target Windstream customers for post-bankruptcy disconnects and went to great lengths to restore disconnected customers when they were discovered.**

Without adducing a shred of competent evidence, Windstream has suggested that Charter intentionally shut down service to Windstream customers in connection with a marketing campaign addressing Windstream's bankruptcy.  That conspiracy theory has no connection to reality.  Windstream has not identified any witness with personal knowledge related to its conspiracy claim.

# ARGUMENT

**I.**  **Windstream is not likely to succeed on the merits of its false and deceptive advertising claim because it has unequivocally acknowledged the risk and uncertainty of bankruptcy.**

To have any chance of securing a temporary restraining order, Windstream has the burden of demonstrating at least a likelihood of success on the merits on its claims that Charter's advertising statements are false and misleading. *Citigroup Glob. Mkts., Inc. VCG Special Opports. Master Fund Ltd.*, 598 F.3d 30, 37 (2d Cir. 2010)).  Windstream cannot meet that burden.

At the outset, it should be noted that—despite hinting at such claims for page upon page—Windstream has not actually asserted a single trademark infringement or trade dress infringement claim.  Windstream has good reason to forego any infringement claims here.  Windstream does not have the right to prohibit competitors from using the word "Windstream" when trying to convince customers to switch from Windstream. *See*, *e.g*., *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).  Windstream does not have the right to prohibit competitors from using blended purple and pink colors, just because it has recently used them. *See*, *e.g*., *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 214 (2000) (recognizing that colors are never inherently distinctive).  Windstream would need to show a likelihood of successfully demonstrating that it has a protectable trade dress in a color scheme to support such claims. *Landscape Forms, Inc. v. Columbia Cascade Co*., 113 F.3d 373, 377 (2d Cir. 1997) (*citing Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 774 (1992); *EFS Mktg., Inc. v. Russ Berrie & Co.,* 76 F.3d 487, 490 (2d Cir.1996)) ("Such an action requires a plaintiff-manufacturer to show (a) that its trade dress is entitled to protection under the Act, and (b) that the defendant's dress infringes on the plaintiff's dress by creating a likelihood of confusion. To be entitled to protection under the

Act, plaintiff's trade dress must either be inherently distinctive or be shown to have acquired distinctiveness through 'secondary meaning.'").

The only Lanham Act claim Windstream does assert in support of its emergency motion is the claim that Charter's uncertainty-themed advertising was false or misleading. That claim fails.

**A.      Windstream's public statements demonstrate the inherent "risk and uncertainty" of bankruptcy.**

As discussed above, Windstream has publicly acknowledged the inherent risk and uncertainties of Chapter 11 bankruptcy. Now, Windstream asks this Court to limit its competitor's speech which observes the obvious truth that bankruptcy involves uncertainty. Uncertainty in bankruptcy has been observed by the courts. *See, e.g., In re Met-L-Wood*, 861 F.2d 1012, 1017 (7th 1988) (noting the "uncertainty of bankruptcy"); *In re SW Boston Hotel Venture, LLC*, 460 B.R. 38, 59 (Bankr. D. Mass 2011) (recognizing the "stigma and uncertainty of bankruptcy" even while confirming the Chapter 11 plan at issue). And the uncertainty in *this* bankruptcy has been specifically described in Windstream's regulatory filing. *See* Exhibit A at 18-23. That uncertainty includes the risk of impact on operations and the ability to meet customer expectations.

**B.      Charter's statements are neither false nor misleading[3]**

Windstream states that the following Charter statements are literally false, impliedly false, or at least misleading:

"Don't risk losing your internet and TV services"
"Windstream has filed for Chapter 11 bankruptcy, which means uncertainty."
"Will they be able to provide the internet and TV services you rely on in the future?"
"Windstream's future is unknown"

---

[3] Charter notes that the causes of action in this matter relate specifically to the alleged false and misleading nature of Charter's statements. See Complaint at Counts I – IV. Despite spending several pages of the Motion and its Complaint discussing trademarks, color schemes, and initial interest confusion, Windstream asserts no causes of action on those allegations and those topics cannot properly form the basis of any preliminary injunction. *See, e.g., Giving Back Fund Inc v. Miami Mktg. Grp. LLC*, 2011 WL 13217774, at *3 (C.D. Cal. Jan. 20, 2011) ("The Court cannot, however, imply an unasserted cause of action to support the requested injunctive relief").

"Goodbye Windstream…Hello Charter"

*See* Motion at ¶ 41. Windstream is wrong. These statements echo Windstream's own statements to investors and thus cannot be false or misleading. Windstream argues that the fact that it has obtained some financing proves there is no uncertainty. *See* Motion at ¶42. But that financing was obtained *before* Windstream's 10-K filing which analyzed the continued "risks and uncertainties" of the Chapter 11 cases. The financing did not obviate the risk, as Windstream's motion implies.

Windstream's allegations of implied falsity are also incorrect. Statements are impliedly false when "a statement, whatever its literal truth, has **left an impression** on the listener [or viewer] **that conflicts with reality'**—a claim that 'invites a comparison of the impression, rather than the statement, with the truth." *Pamlab, L.L.C. v. Macoven Pharm., L.L.C.*, 881 F. Supp. 2d 470, 477 (S.D.N.Y. 2012) (emphasis added)(internal quotations and citations omitted). That is not the case here. To the extent any of Charter's statements have an impression beyond their literal statements, the impression is: there is a "risk" and "uncertainty" associated with Windstream's Chapter 11 bankruptcy. The risk that bankruptcy may leave Windstream unable to meet customer expectations and have other unknown impact on operations is a truth acknowledged by Windstream itself:

> **Uncertainty as a result of the Chapter 11 Cases** may adversely affect our ability to attract and retain key personnel, and loss of key personnel or material erosion of employee morale **could have a material adverse effect on our ability to meet customer expectations** and could require the incurrence of substantial additional costs to recruit replacement personnel, thereby **adversely affecting our business and results of operations**.

*See* Exhibit A at 19 (emphasis added). Thus, the alleged impression of Charter's advertising is not false, but is instead accurate.

### C. The number of alleged inquiries and allegedly misled customers is both miniscule and susceptible to a damage calculation.

Windstream has alleged that 160 phones calls and one "tweet" were made by Windstream customers following the Charter mailing. *See* Motion at ¶ 25. Mere inquiries do not constitute evidence that consumers were confused or misled. *See*, *e.g.*, *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*., 447 F.Supp.2d 266 (2006) ("Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself.").

Windstream has not alleged or shown evidence likely to prove successful at trial that each of those callers was misled. Even assuming *arguendo* that each of those 161 persons were misled, that number is far from enough. As made clear in *Chobani*, to succeed in a case where the statement at issue is not literally false, the claimant "must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers, and also that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement." *Chobani, LLC v. Dannon Company, Inc*., 157 F. Supp. 3d 190, 200 and n.6 (N.D.N.Y. 2016) (further describing the standard as a "not insubstantial number of customers"). Survey results[4] demonstrating that 20% or more of customers (net of any survey "noise") are taking away an implied message that is false are generally considered sufficient to demonstrate actionable confusion, *see* 6 McCarthy on Trademarks and Unfair Competition § 32:188 (5th Ed.), but courts have accepted results as low as 7.7%. *See, e.g.*, *Grotrian, Helfferich,*

---

[4] Charter recognizes that the percentages referenced in the McCarthy treatises relate to percent confusion in consumer surveys and Windstream may argue that the call in reports are not directly comparable. However, a review of the typical levels of confusion found to be significant enough to support a finding of a likelihood of confusion is anticipated to be useful to the Court.

*Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F. Supp. 707, 716, 180 U.S.P.Q. 506, 513 (S.D.N.Y. 1973), modified, 523 F.2d 1331, 186 U.S.P.Q. 436 (2d Cir. 1975) (8.5% of persons interviewed confused the names STEINWAY and STEINWEG for pianos and 7.7% perceived a business connection between the two companies).[5]

Windstream's "evidence" of confusion falls far short of this standard. Windstream presents no consumer survey evidence in support of its motion, and has not demonstrated through the few customer inquiries it has supposedly received that a substantial percentage of the audience for the Charter mailings were misled. Even assuming *arguendo* that each of the 161 purported customer inquiries were "confused and concerned" or misled, that number is insufficient to demonstrate actionable confusion when compared to the more than 800,000 mailings. That number is only 0.02% (1 in 5000) whereas the legal standard is at least 7% (1 in 14), if not 20% (1 in 5).

---

[5] More recent case law suggest that survey results of 9.2% customer confusion "is not overwhelming," but "the Court cannot conclude that it is insubstantial as a matter of law." *Mobileye, Inc. v. Picitup Corp.*, 928 F.Supp.3d 759, 777 (S.D.N.Y. 2013).



Windstream has not met its burden of demonstrating a likelihood of success on the merits because it has failed to demonstrate even a fair chance of success on the merits on its claims that Charter's advertising statements are false and misleading and that a statistically relevant portion of the commercial audience was confused or misled.

## II. Windstream cannot demonstrate any risk of irreparable harm.

### A. Windstream has not demonstrated lost sales linked to any alleged falsity in Charter's statements.

Windstream has not demonstrated literal falsity and is not entitled to any presumption of irreparable harm. Stripped of any presumption, Windstream claims that it is entitled to a preliminary injunction because Windstream and Charter are competitors. That is not the standard and the status of competitors alone does not entitle Windstream to an injunction. *Chobani*, relied

upon exclusively by Windstream on this point, made clear that when the movant does not have the benefit of a presumption of harm, it must "show two things: (i) that the parties are competitors in the relevant market; and (ii) that there is a logical causal connection between the alleged false advertising and its own sales position." *Chobani, LLC v. Dannon Co., Inc.*, 157 F. Supp. 3d 190, 204–05 (N.D.N.Y. 2016) (citation and internal quotation marks omitted). Here, Windstream has not shown the required connection between the challenged mailer and any alleged impact on Windstream's sales.

For example, the knowledge of the bankruptcy alone may have impacted consumer confidence in Windstream, as acknowledged by Windstream prior to any mailing by Charter:

> In addition, we could experience losses of customers who may be concerned about our long-term viability.

> Even once a plan of reorganization is implemented, our operating results may be adversely affected by the possible reluctance of customers to do business with a company that recently emerged from bankruptcy proceedings.

Exhibit A. at 21. Thus, the risk of impacting consumer confidence was inherent and known, before the Charter mailings were sent out. Further, the potential loss of goodwill was also known and could be due to the bankruptcy filing, not Charter's acknowledgement of the inherent "risks and uncertainties" in bankruptcy.

**B.** **Monetary damages will be calculable and sufficient to compensate Windstream if it is ultimately successful.**

Windstream, presumably to support the appearance of irreparable harm, made no effort to demonstrate the number of lost customers. While Windstream was able to precisely calculate that there were more than 160 customer calls in a 10 day period, it was *surprisingly* unable to make any approximation on the alleged "existing Windstream customers [that] are switching services to Charter." *See* Langston Affidavit at ¶ 28. An irreparable injury is the "kind of injury for which a money judgment cannot compensate" *Pamlab, L.L.C. v. Macoven Pharm., L.L.C.*, 881 F. Supp.

- 13 -

2d 470, 476 (S.D.N.Y. 2012) (internal quotations and citations omitted). Windstream does not get around this standard by simply choosing not to do the calculation. Windstream's damages, as stated in Paragraph 54 in its Complaint (Charter's profits, Windstream's monetary damages, treble damages, costs, attorney's fees) are calculable and within the specter of damages which can be determined by auditing Windstream's customer accounts and are frequently determined by finders of fact.

      **C.**      **The subject campaign ended two weeks ago.**

As evident on the mailing and noted by Windstream, the Charter offer stated in the advertisement expires on April 25, 2019. Charter sent its mailing in March and no other mailing has gone out since then. Accordingly, the period of concern is of limited ongoing duration and the alleged resulting damages, are likely calculable.

      **D.**      **Any damages for the alleged stay violations are also reparable.**

In addition to seeking extraordinary relief to prevent Charter from making the truthful statements to the public regarding the uncertainty of Windstream's bankruptcy, Windstream is also seeking to restrain Charter "[f]rom taking any action or inaction, whether directly or indirectly, to interrupt, disrupt or otherwise impair service to [Windstream's] customers." The automatic stay prohibits actions being taken by a creditor to collect pre-petition obligations of a debtor and the exercise of control over property of the estate. Windstream demonstrates no reason to expand the scope of the automatic stay as requested by Windstream. Furthermore, if Charter's actions caused damage to Windstream, those alleged damages are calculable, and any alleged damage is reparable.

**III.    The balancing of the hardships favors Charter.**

Windstream is requesting an injunction requiring Charter to disclose its mailing list and to issue communications to the public that are blatantly contrary to Windstream's own sworn statements about the "risks and uncertainties" of its Chapter 11 cases. When the movant is seeking a mandatory injunction, "the injunction will issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Pamlab, L.L.C. v. Macoven Pharm., L.L.C.*, 881 F. Supp. 2d 470, 475-476 (S.D.N.Y. 2012) (internal quotations and citations omitted). Windstream cannot meet this heightened burden by relying on a 0.02% customer response rate.

Charter's new mailing referencing the Windstream bankruptcy is already distributed in mixed lots by locations. The burden on Charter to pull the current mailing would be excessive. There is no way for Charter to reliably separate Windstream-referencing mail from non-Windstream- referencing mail as the mailers are all in Spectrum-labeled envelopes and mixed by zip code. The Court has to compare that burden on Charter to the fact that the only item in the new mailing that would be subject to Windstream's proposed order is the reference to "Goodbye Windstream, Hello Charter." Windstream has shown that this item in the original mailer was mentioned by only two customers, neither of whom unequivocally expressed a belief that Windstream was going out of business. The balance of hardships in this case clearly favors Charter.

**IV.    Public interest factors favor Charter.**

Windstream states that the public is entitled to accurate and truthful information. Charter agrees and Windstream's own statements demonstrate the truthfulness of Charter's statements. Windstream has attempted to compare Charter's present mailings with mailings of DirectTV in

2009. But DirectTV's statements were literally false and misleading, going beyond merely acknowledging the "risks and uncertainties" of bankruptcy. Instead, those DirectTV messages told the consumer that "there's no way" Charter will emerge from bankruptcy. See Exhibit D (ECF #16 in Charter v. DirectTV, Case No. 4:09-cv-00730-RWS). Moreover, the public has an obvious interest in respecting procedural safeguards for free speech. *Metropolitan Opera*, 239 F.3d at 176. ("When a prior restraint takes the form of a court issued injunction, the risk of infringing on speech protected under the First Amendment increases."); *New York Magazine,* 136 F.3d at 131. ("Although the Supreme Court has indicated that commercial speech may qualify as one of the exceptions to the bar on prior restraints … we see no reason why the requirement of procedural safeguards should be relaxed whether speech is commercial or not.").

## CONCLUSION

For the foregoing reasons, Defendants Charter Communications, Inc. and Charter Communications Operating, LLC respectfully request this Court deny Debtor Windstream Holdings, Inc.'s motion for temporary restraining order, preliminary injunction or other equitable relief.

Respectfully submitted,

THOMPSON COBURN LLP

By  */s/ Brian Hockett*
    John S. Kingston (pro hac vice pending)
    Brian W. Hockett (pro hac vice)
    One US Bank Plaza
    St. Louis, Missouri  63101
    314-552-6000
    FAX 314-552-7000
    jkingston@thompsoncoburn.com
    bhockett@thompsoncoburn.com

Attorney for Defendants Charter Communications, Inc. and Charter Communications Operating, LLC