Terence P. Ross
Michael R. Justus (admitted *pro hac vice*)
Shaya Rochester
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, NY 10022
Telephone:    (212) 940-8800
Facsimile:    (212) 940-8776

*Conflicts Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WINDSTREAM HOLDINGS, INC., *et al.*,[1] | ) | Case No. 19-22312 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| WINDSTREAM HOLDINGS, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. Pro. No. 19-08246 |
| | ) | |
| v. | ) | |
| | ) | |
| CHARTER COMMUNICATIONS, INC. and | ) | |
| CHARTER COMMUNICATIONS OPERATING, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## DEBTORS' POST-TRIAL MEMORANDUM

---

[1] The last four digits of Debtor Windstream Holdings, Inc.'s tax identification number are 7717. Due to the large number of debtor entities in these Chapter 11 cases, for which joint administration has been granted, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/windstream. The location of the Debtors' service address for purposes of these Chapter 11 cases is: 4001 North Rodney Parham Road, Little Rock, Arkansas 72212.

# TABLE OF CONTENTS

STATUS OF ADVERSARY PROCEEDING AT TRIAL ............................................................ 4

ISSUES THAT REMAINED FOR TRIAL ............................................................................... 7

ARGUMENT ......................................................................................................................... 9

I.  CHARTER SHOULD BE HELD IN CIVIL CONTEMPT FOR ITS VIOLATIONS
    OF THE AUTOMATIC STAY. ....................................................................................... 9

    A.   Charter Willfully Violated The Automatic Stay. .................................................... 9

         1.   Charter Had Actual Knowledge Of Windstream's Bankruptcy
              Filing And The Automatic Stay. ................................................................. 10

         2.   Charter's False Advertising And Disconnection Of Windstream's
              Customers Were Intentional. ..................................................................... 10

    B.   Charter Had No Objectively Reasonable Basis To Believe Its Actions Did
         Not Violate The Automatic Stay. .......................................................................... 13

    C.   Charter's Argument To Apply The General Civil Contempt Standard Is
         Meritless. ............................................................................................................. 21

         1.   Charter Has Waived This Argument. .......................................................... 22

         2.   The General Civil Contempt Standard Is Not Applicable Here. .............. 22

II. CHARTER SHOULD BE SANCTIONED AT LEAST $19.9 MILLION FOR THE
    LOSSES IT CAUSED THE DEBTORS. ........................................................................ 24

    A.   The Sanction Assessed Against Charter Should Include All Business Losses
         Suffered And All Costs Incurred By Windstream As A Result of Charter's
         Unlawful Conduct. ............................................................................................... 25

         1.   Lost Customers ......................................................................................... 25

         2.   Corrective Advertising .............................................................................. 29

         3.   Promotional Campaign .............................................................................. 30

         4.   Customer Credits ...................................................................................... 32

    B.   The Sanction Assessed Against Charter Should Also Include All Attorneys'
         Fees And Litigation Costs Incurred By Windstream Relating To This
         Adversary Proceeding. .......................................................................................... 32

III.    CHARTER OPERATING'S CLAIMS AGAINST THE OBLIGOR DEBTORS
        SHOULD BE SUBORDINATED. .................................................................... 37

IV.    CHARTER CHOSE NOT TO PRESENT EXPERT TESTIMONY AT TRIAL............. 40

       A.    Charter's Pretrial Disclosures And Filings Reveal It Had Prepared Its
             Experts To Testify At Trial...................................................................... 41

       B.    Charter Had Ample Time To Prepare Its Experts.................................................. 44

CONCLUSION......................................................................................................................... 45

EXHIBITS


EXHIBIT A:   TOTAL LOSSES/COSTS INCURRED BY WINDSTREAM

EXHIBIT B:   CHARTER OPERATING'S CLAIMS AGAINST OBLIGOR DEBTORS

EXHIBIT C:   TIMELINE OF DISCLOSURES AND FILINGS RELATING TO CHARTER'S
             EXPERT WITNESSES

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 80 Nassau Assocs.*,
169 B.R. 832 (Bankr. S.D.N.Y. 1994) ....................................................................39

*In re Alert Holdings, Inc.*,
148 B.R. 194 (Bankr. S.D.N.Y. 1992) ....................................................................2

*Alexander v. Pine Buff School Dist.*,
No. 5:16-cv-00300, Dkt. No. 91 (E.D. Ark. Aug. 30, 2018) ..................................34

*Brazos River Auth. v. GE Ionics, Inc.*,
469 F.3d 416 (5th Cir. 2006) ...............................................................................6

*Broadcast Music, Inc. v. R Bar of Manhattan, Inc.*,
919 F. Supp. 656 (S.D.N.Y. 1996) ...............................................................33, 34

*Caldwell v. Unified Capital Corp.*,
77 F.3d 278 (9th Cir. 1996) ................................................................................13

*In re Chateaugay Corp.*,
920 F.2d 183 (2d Cir. 1990)........................................................................9, 13, 24

*In re Colonial Realty Co.*,
980 F.2d 125 (2d Cir. 1992)................................................................................23

*In re Crysen/Montenay Energy Co.*,
902 F.2d 1098 (2d Cir. 1990)...................................................................... *passim*

*In re Dominguez*,
312 B.R. 499 (Bankr. S.D.N.Y. 2004) ..................................................................10

*Drywall Tapers & Pointers of Greater N.Y. v. Local 530 of Operative Plasterers*,
889 F.2d 389 (2d Cir. 1989)..........................................................................21, 22

*In re Dyer*,
322 F.3d 1178 (9th Cir. 2003) .............................................................................23

*In re Eastman*,
No. 08-5055, 2010 WL 5462469 (Bankr. W.D. Tex. Dec. 29, 2010) .....................32

*In re Enron Corp.*,
379 B.R. 425 (S.D.N.Y. 2007)..............................................................................37

*In re Fabricators, Inc.*,
    109 B.R. 186 (Bankr. S.D. Miss. 1989)............................................................................39

*In re Family Health Serv. Inc.*,
    105 B.R. 937 (Bankr. C.D. Cal. 1989)............................................................................17

*Foster v. Lee*,
    93 F. Supp. 3d 223 (S.D.N.Y. 2015)..............................................................................22

*Gillette Co. v. Wilkinson Sword, Inc.*,
    No. 89-cv-3586, 1992 WL 30938 (S.D.N.Y. Feb. 3, 1992) ..........................................30

*In re Golden Distributors*,
    122 B.R. 15 (Bankr. S.D.N.Y. 1990)..................................................................16, 17, 18

*Hanig v. Lee*,
    415 F.3d 822 (8th Cir. 2005) ..........................................................................................34

*Helena Chem. Co. v. Cox Brothers*,
    No. 16-cv-00054, Dkt. No. 45 (E.D. Ark. Oct. 24, 2017) ..............................................34

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983).........................................................................................................37

*In re Hooker Investments, Inc.*,
    116 B.R. 375 (Bankr. S.D.N.Y. 1990) ..............................................................................9

*Humphreys v. Bank of Am.*,
    557 Fed. Appx. 416 (6th Cir. Feb. 11, 2014)....................................................................6

*In re Hydrogen, LLC*,
    431 B.R. 337 (Bankr. S.D.N.Y. 2010) ............................................................................39

*In re Ionosphere Clubs, Inc.*,
    171 B.R. 18 (S.D.N.Y. 1994), *aff'd sub. nom. Bartel v. E. Airlines*, 133 F.3d
    906 (2d Cir. 1998)..........................................................................................24, 25, 29, 32

*Jove Eng'g., Inc. v. I.R.S.*,
    92 F.3d 1539 (11th Cir. 1996) ..................................................................................21, 23

*Kulhawik v. Holder*,
    571 F.3d 296 (2d Cir. 2009).............................................................................................41

*In re LightSquared*,
    511 B.R. 253 (Bankr. S.D.N.Y. 2014) ............................................................................40

*Long Island Pine Barrens Soc'y v. Sandy Hills*,
    No. 8-12-74482, 2015 WL 5794363 (E.D.N.Y. Sept. 30, 2015)....................................21

*MA Salazar, Inc. v. Inc. Vill. of Atl. Beach*,
  499 B.R. 268 (E.D.N.Y. 2013) ........................................................................23

*In re Marine Pollution Serv., Inc.*,
  99 B.R. 210 (Bankr. S.D.N.Y. 1989) ...........................................................9, 10, 32

*In re Markus*,
  607 B.R. 379 (Bankr. S.D.N.Y. 2019) ...............................................................23

*In re Mobile Steel Co.*,
  563 F.2d 692 (5th Cir. 1977) ...............................................................8, 37, 38, 39

*Pace v. Air & Liquid Sys. Corp.*,
  171 F. Supp. 3d 254 (S.D.N.Y. 2016) .................................................................6

*Perez v. Danbury Hosp.*,
  347 F.3d 419 (2d Cir. 2003) .............................................................................22

*Pittsburgh Plate & Glass Co. v. Fidelity & Casualty Co.*,
  281 F.2d 538 (3rd Cir. 1960) ............................................................................33

*In re Prince*,
  85 F.3d 314 (7th Cir 1996) ................................................................................2

*In re Ramos*,
  No. 10-23019, 2013 WL 5461859 (Bankr. S.D.N.Y. Oct. 1, 2013) .......................21

*In re Residential Capital, LLC*,
  571 B.R. 581 (Bankr. S.D.N.Y. 2017) ...............................................................13

*Sheet Metal Workers Int'l Assn. v. E.E.O.C.*,
  478 U.S. 421 (1986) .....................................................................................8, 24

*Suh v. Anderson*,
  BAP No. CC-19-1244, 2020 WL 1277575 (B.A.P. 9th Cir. Mar. 16, 2020) ....................15, 32

*Taggart v. Lorenzen*,
  139 S. Ct. 1795 (2019) ............................................................................... *passim*

*In re Trump Entm't Resorts, Inc.*,
  534 B.R. 93 (Bankr. D. Del. 2015) ....................................................................17

*In re TS Employment, Inc.*,
  597 B.R. 494 (Bankr. S.D.N.Y. 2019) ............................................................7, 13

*United States v. Noland*,
  517 U.S. 535 (1996) .........................................................................................37

*In re Weber*,
719 F.3d 72 (2d Cir. 2013) ................................................................................................9, 10

*In re Worldcom, Inc.*,
361 B.R. 697 (Bankr. S.D.N.Y. 2007) ....................................................................................9

*Zacharias v. Shell Oil Co.*,
627 F. Supp. 31 (E.D.N.Y. 1984) .........................................................................................33

*Zilog, Inc. v. Corning*,
450 F.3d 996 (9th Cir. 2006) ...............................................................................................14

*Zino Davidoff SA v. CVS Corp.*,
No. 06-cv-15332, 2008 WL 1775410 (S.D.N.Y. Apr. 17, 2008) ...........................................22

**Statutes**

11 U.S.C. § 105(a) ...................................................................................................13, 14, 22

11 U.S.C. § 362(a) ........................................................................................................ *passim*

11 U.S.C. § 524 ....................................................................................................................14

11 U.S.C. § 541 ....................................................................................................................17

15 U.S.C. § 1125(a) ...............................................................................................................4

**Other Authorities**

Charter's *Daubert* ..................................................................................................................2

Fed. R. Civ. P. 26(a)(3) .....................................................................................................42, 2

Fed. R. Evid. 201 ...............................................................................................................3, 33

Fed. R. Evid. 702 ..................................................................................................................6

Windstream Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, "Windstream" or "Debtors"), and as plaintiffs in the above-captioned adversary proceeding, respectfully submit this post-trial memorandum in support of their request for a verdict in their favor and against Defendants Charter Communications, Inc. and Charter Communications Operating, LLC (collectively, "Charter") on Counts VI and VII of the Complaint in this adversary proceeding.

*    *    *    *    *

As the Court is aware, this adversary proceeding arises out of unlawful actions taken by Charter shortly after Windstream filed for Chapter 11 protection.  Specifically, Charter launched an advertising campaign in which it told Windstream customers and prospective customers that, because Windstream had filed for bankruptcy, there was an imminent risk of it going out of business and they had to switch service to Charter.  (Joint Trial Exs. 10, 12).[2]  In addition, Charter breached its VAR Agreement with Windstream (Joint Trial Ex. 1), by repeatedly disconnecting Windstream customers from "last mile" connectivity in order to collect pre-petition debt purportedly owed to Charter.

These actions by Charter—already found by the Court to be unlawful—inflicted significant harm on Windstream and its creditors.  Hundreds of customers contacted Windstream expressing confusion as to whether Windstream was going out of business.  (Plaintiffs Trial Exs. 17, 18, 19, 65, 66).  More than 1,300 Windstream customers switched their service to Charter.  (Declaration of John C. Jarosz in Lieu of Direct Testimony at Trial ("Jarosz Decl."), ¶ 27).  At least 4,500

---

[2] All exhibits admitted into evidence at the trial of this adversary proceeding are listed in a post-trial pleading captioned "Exhibits Admitted At Trial," filed with the Court on May 14, 2020.  (Adv. Dkt. No. 316).  Both Windstream and Charter confirmed that this pleading accurately lists all exhibits admitted at trial.

1

Windstream customers "ported" their telephone service to Charter. (Declaration of Jeffrey H. Auman in Lieu of Direct Testimony at Trial ("Auman Decl."), ¶ 19; Plaintiffs Trial Ex. 14). Windstream also experienced a "significant spike in customers discontinuing service," even if they did not switch to Charter. (Auman Decl., ¶¶ 17-18; May 6 Trial Trans., 57:21-58:19). And, Windstream suffered a loss of customer goodwill, as well as damage to its brand. (Auman Decl., ¶¶ 14, 16; Deposition of Lewis Langston ("Langston Dep."), 150:24-154:12).[3]

Charter's unlawful actions cost Windstream approximately $19.9 million.[4] Windstream lost up to $5.1 million in profits as a result of its customers switching to Charter. (Jarosz Decl., ¶ 27). Moreover, Windstream was forced to incur significant expenses to mitigate the damage caused by Charter's false advertising. Windstream tasked employees with rectifying Charter's disconnects and issued customer credits to mollify its disconnected customers. (Auman Decl., ¶¶ 12-14; Plaintiffs Trial Ex. 316). In April 2019, Windstream was forced to launch a corrective advertising campaign to explain to its customers that it was *not* going out of business. (Auman Decl., ¶ 16). This corrective advertising campaign cost Windstream $862,775. (*Id.*, Joint Trial

---

[3] Charter suggested at trial that, because Windstream did not book a diminution of the dollar value of its "goodwill" on its consolidated balance sheets, it must not have suffered any harm to its goodwill from Charter's false advertising. (May 6 Trial Trans., 113:8-114:19). Under GAAP, "goodwill" is the price paid to acquire a company over and above the fair market value of the company's net assets. (*See* Statement of Financial Accounting Standards No. 141). Such "purchased" goodwill, which is recorded on a corporation's balance sheet, is different from goodwill developed in the normal course of business operations, which is not recorded on a corporation's balance sheet. (*Id.*). Such "created" goodwill includes what is commonly referred to as customer goodwill. Thus, Charter's reference to goodwill on the Debtors' consolidated balance sheet is irrelevant to the harm inflicted on Windstream's customer goodwill. Customer goodwill is typically incalculable, yet it is uniformly recognized as an asset of a debtor's estate, *In re Prince*, 85 F.3d 314, 323 (7th Cir 1996), and an attack on a debtor's goodwill constitutes a violation of the automatic stay. *E.g.*, *In re Alert Holdings, Inc.*, 148 B.R. 194, 207 (Bankr. S.D.N.Y. 1992).

[4] A table summarizing all Windstream losses/costs is appended hereto as Exhibit A.

Ex. 11; Plaintiffs Trial Exs. 62, 64).  In addition, in September 2019, Windstream launched a promotional campaign to attract new customers to make up for the customers who were deterred from subscribing to Windstream in the first place due to Charter's false advertising.  (May 6 Trial Trans., 48:8-15, 56:3-23, 109:14-110:12).  This promotional campaign cost Windstream $4,033,425.  (Auman Decl., ¶ 15; Plaintiffs Trial Exs. 313, 350).  Windstream was also forced to file this adversary proceeding to stop Charter's false advertising campaign and to stop it from continuing to disconnect customers, as well as to recover the losses caused by Charter's unlawful actions.  (Auman Decl., ¶ 20; Plaintiffs Trial Ex. 1).  The total cost to Windstream through May 31, 2020 for legal fees and litigation costs directly related to the prosecution of this adversary proceeding, including internal legal costs, is $9,921,716.  (Auman Decl., ¶ 20; Plaintiffs Trial Exs. 67-95, 100, 104-106).[5]  And, this total continues to increase.[6]

As this Court suggested to Charter at the April 15, 2019 hearing on Windstream's Motion for a Temporary Restraining Order, Charter should have recognized its unlawful actions and settled this adversary proceeding rather than "dig a deeper hole" for itself.  (Adv. Dkt. No. 84, 114:18-115:5).  Charter, however, has stubbornly refused to recognize its unlawful conduct (despite bringing suit against DirecTV over the same type of false advertising when it filed itself for bankruptcy) and make Windstream whole for the harm Charter inflicted upon it.  The time has now come for Charter to face the consequences of its unlawful actions and its frivolous and dilatory conduct of this litigation.

---

[5] This amount has been unnecessarily increased by Charter's "scorched earth" litigation tactics and frivolous motion practice—facts that the Court has repeatedly noted on the record, *infra* pp. 34-36, and is allowed to consider in rendering a verdict.  *See* Fed. R. Evid. 201.

[6] Windstream intends to supplement its sanctions request to include legal fees and costs that will be sought in subsequent fee applications filed with the Court.

## STATUS OF ADVERSARY PROCEEDING AT TRIAL

On April 5, 2019, Windstream filed the Complaint in this adversary proceeding.  (Plaintiffs Trial Ex. 1).  The Complaint sets forth seven causes of action.  Count I alleges a violation of Section 43(a) of the Lanham Act.  15 U.S.C. § 1125(a).  (*Id.* at ¶¶ 39-54).  Counts II-IV allege violations of various state deceptive trade practices laws.  (*Id.* at ¶¶ 55-68).  Count V alleges common law breach of contract.  (*Id.* at ¶¶ 69-78).  Count VI alleges a violation of the Bankruptcy Code's automatic stay.  (*Id.* at ¶¶ 79-84).  Count VII sets out a claim for equitable subordination. (*Id.* at ¶¶ 85-86).  On April 16, 2019, the Court entered a temporary restraining order against Charter.  (Adv. Dkt. No. 25).  And, on May 16, 2019, the Court entered a preliminary injunction against Charter.  (Adv. Dkt. No. 61).  Discovery ended on October 31, 2019.

On December 18, 2019, the Court held a hearing on Windstream's Motion for Partial Summary Judgment on Liability and Charter's Motion for Summary Judgment on Counts I-V, as well as Charter's Motion for Judgment on the Pleadings on Count VI and Motion to Dismiss Count VII.  The Court denied Charter's Motion for Summary Judgment.  (Adv. Dkt. No. 275).  The Court also denied Charter's Motion for Judgment on the Pleadings on Count VI.  (Adv. Dkt. No. 259). The Court granted in part and denied in part Charter's Motion to Dismiss Count VII.  (*Id.*). Specifically, because Charter Communications, Inc. did not file any proofs of claim against the Debtors in the Chapter 11 cases, Count VII was dismissed as to it, but denied as to Charter Communications Operating, LLC ("Charter Operating") because it had filed thirty-eight proofs of claim in the Chapter 11 cases.  (*Id.*).

The Court granted in part Windstream's Motion for Partial Summary Judgment on Liability.  (Adv. Dkt. No. 274).  Specifically, the Court granted summary judgment on liability on Counts I-V of the Complaint.  (*Id.* at 2-3).  The Court granted in part and denied in part

Windstream's motion with respect to Counts VI and VII. (*Id.* at 3-4). With respect to Count VI, the Court granted summary judgment and found that Charter had violated the Bankruptcy Code's automatic stay through two actions: (1) "the Defendants' breach of the VAR agreement, by terminating service to the Debtors' customers without the required prior notice in an effort to enforce a pre-petition debt and/or to control property of the estate," and (2) "the Defendants' literally false and misleading advertising in an effort to control property of the Debtors' estate, namely, the Debtors' customers or contracts with those customers." (*Id.*). The Court denied summary judgment on the remaining elements of the cause of action alleged in Count VI. (*Id.* at 4). With respect to Count VII, the Court granted summary judgment that Charter Operating had filed proofs of claim against certain Debtors in these Chapter 11 cases and had "engaged in inequitable conduct tantamount to fraud and misrepresentation through its literally false and misleading advertising, with an intent to deceive, in violation of the Lanham Act and related state deceptive trade practices laws." (*Id.* at 5). The Court denied summary judgment on the remaining elements of the cause of action alleged in Count VII. (*Id.*).

In a Memorandum of Decision dated March 17, 2020, the Court held that Charter was entitled to a jury trial on the damages to be assessed against it on Counts I-V. (Adv. Dkt. No. 281 at 12-17). The Court also held that Charter was not entitled to a jury trial on Counts VI and VII. (*Id.* at 9-12). Moreover, the Court held that a trial on Counts VI and VII would not have to be stayed until after a trial on the damages to be assessed on Counts I-V. (*Id.* at 17-18).

At the trial of Counts VI and VII, Windstream called as its witnesses Mr. Jeffrey H. Auman, its Executive Vice President of Sales and Marketing, and Mr. John C. Jarosz, an economist who

specializes in intellectual property valuation and monetary relief assessment for civil litigation.[7]

The Court found that Mr. Jarosz was qualified as an expert in those fields and allowed him to

testify as an expert pursuant to Rule 702 of the Federal Rules of Evidence.  (April 28 Trial Trans.,

183:8-188:14).[8]  In addition, Windstream called by deposition testimony the following persons:

1. Mr. Lewis Langston (Former Senior Executive of Windstream)
2. Mr. Paul Strickland (Senior Executive of Windstream)
3. Ms. Kelly Atkinson (Charter Rule 30(b)(6) Witness)
4. Mr. Keith Dardis (Charter Rule 30(b)(6) Witness)
5. Mr. Frederick Gunzel (Charter Rule 30(b)(6) Witness)
6. Mr. Matthew Kardos (Charter Rule 30(b)(6) Witness)
7. Mr. Peter Maguire (Senior Executive of RAPP, Charter's Advertising Agency)
8. Mr. Andrew Sites (Charter Sales Representative)
9. Ms. Latisha Truong (Charter Rule 30(b)(6) Witness)
10. Mr. Emmitt Walker (Charter Sales Representative)

(Adv. Dkt. No. 273).[9]

At the trial of Counts VI and VII, Charter called no witnesses.  Instead, it relied on

deposition testimony of the following persons:

---

[7] Charter argued that Mr. Auman could not testify to various facts either because he lacked personal knowledge or relied on what others told him.  Mr. Auman, however, testified "based upon personal knowledge."  (Auman Decl., ¶ 2).  Moreover, Mr. Auman testified as a corporate representative. (*Id.*).  Corporate representatives may testify as to facts outside of their personal knowledge, provided that those facts are based on information reviewed in their role within the company. *E.g., Brazos River Auth. v. GE Ionics, Inc.,* 469 F.3d 416, 434 (5th Cir. 2006) (witness testifying on behalf of a corporation at trial is not confined to his "personal knowledge or perceptions," but rather "testifies 'vicariously,' for the corporation, as to its knowledge and perceptions"); *Humphreys v. Bank of Am.,* 557 Fed. Appx. 416, 424 n.6 (6th Cir. Feb. 11, 2014) (a corporate representative may testify at trial "about information known or reasonably available to the organization," even if the witness lacks personal knowledge); *Pace v. Air & Liquid Sys. Corp.,* 171 F. Supp. 3d 254, 272 (S.D.N.Y. 2016) ("[I]t is axiomatic that a corporate representative may testify . . . based on knowledge gained from a review of corporate books and records.").

[8] Mr. Jarosz's CV establishing his qualifications as an expert witness was admitted into evidence in lieu of actual testimony regarding his qualifications.  (Plaintiffs Trial Ex. 103).

[9] The Court admitted this deposition testimony into evidence.  (April 28 Trial Trans., 191:5). Copies of the portions of the transcript containing Windstream's designated deposition testimony were submitted in hard copy to the Court on May 5, 2020.

1. Ms. Kelly Atkinson (Charter Rule 30(b)(6) Witness)
2. Mr. Keith Dardis (Charter Rule 30(b)(6) Witness)
3. Mr. Frederick Gunzel (Charter Rule 30(b)(6) Witness)
4. Ms. Latisha Truong (Charter Rule 30(b)(6) Witness)
5. Mr. Peter Maguire (Senior Executive of RAPP, Charter's Advertising Agency)
6. Mr. Jeffrey H. Auman (Windstream Rule 30(b)(6) Witness)
7. Ms. Shonne Bandy (Windstream employee)
8. Mr. Lewis Langston (Former Senior Executive of Windstream)

(Adv. Dkt. No. 272).

## ISSUES THAT REMAINED FOR TRIAL

Count VI alleges that Charter violated the Bankruptcy Code's automatic stay.  11 U.S.C. §
362(a)(3)&(6).   As noted, the Court has already granted summary judgment in favor of
Windstream holding that Charter violated the automatic stay by disconnecting Windstream's
customers who received "last mile" connectivity pursuant to the VAR Agreement without
providing the required advance written notice.  (Adv. Dkt. No. 274 at 3-4).  The Court also held
that Charter had violated the automatic stay through its "literally false and misleading advertising"
which sought "to control property of the Debtors' estates, namely, the Debtors' customers or
contracts with those customers."  (*Id.*).  Thus, the first element of Count VI – whether Charter's
actions violated the automatic stay – was not at issue at the trial of this adversary proceeding.

In order for Windstream to obtain sanctions against Charter for its violations of the
automatic stay, Windstream must establish that Charter's violations were "willful."  *E.g.*, *In re
Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1104 (2d Cir. 1990); *In re TS Employment, Inc.*,
597 B.R. 494, 536 (Bankr. S.D.N.Y. 2019).  If a willful violation of the automatic stay is
established, then sanctions may be assessed against Charter "if there is no objectively reasonable
basis for concluding that the creditor's conduct might be lawful."  *Taggart v. Lorenzen*, 139 S. Ct.

1795, 1804 (2019).[10]  Neither of those elements of Count VI were decided at summary judgment and, therefore, remained to be decided by the Court at the trial of this adversary proceeding. Finally, the Court must determine appropriate sanctions for Charter's willful violations of the automatic stay.  Sanctions here should compensate Windstream for all its losses sustained as a result of Charter's willful violations of the automatic stay.  *See Sheet Metal Workers Int'l Assn. v. E.E.O.C.*, 478 U.S. 421, 443 (1986).  The appropriate sanction to compensate Windstream for Charter's violations of the automatic stay also remained to be decided at the trial of this adversary proceeding.

Count VII alleges that the proofs of claim filed by Charter Operating against certain of the Debtors should be equitably subordinated to all other general unsecured claims against those Debtors.  The Court has granted summary judgment in favor of Windstream holding that Charter Operating's false advertising constituted "inequitable conduct tantamount to fraud and misrepresentation."  (Adv. Dkt. No. 274 at 5).  Thus, this first element of Count VII was not at issue at the trial of this adversary proceeding.  In order to obtain equitable subordination, however, Windstream must also show that Charter Operating's inequitable conduct resulted in injury to Windstream's creditors or conferred an unfair advantage on Charter Operating and that equitable subordination is consistent with the Bankruptcy Code.  *See In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977).  Neither of these elements of Count VII were decided at summary judgment and, therefore, they too remained to be decided by the Court at the trial of this adversary proceeding.  In addition, it remained to be decided by the Court at the trial of this adversary proceeding the extent to which Charter Operating's claims should be subordinated.

---

[10] The applicable standard is discussed in detail *infra* Section I.B.

**ARGUMENT**

I.    **CHARTER SHOULD BE HELD IN CIVIL CONTEMPT FOR ITS VIOLATIONS OF THE AUTOMATIC STAY.**

A.    **Charter Willfully Violated The Automatic Stay.**

In the Second Circuit, corporate debtors may obtain sanctions for "willful" violations of the Bankruptcy Code's automatic stay. *See In re Chateaugay Corp.*, 920 F.2d 183, 186-87 (2d Cir. 1990); *In re Worldcom, Inc.*, 361 B.R. 697, 721 (Bankr. S.D.N.Y. 2007). A corporate debtor meets its burden of proving a violation of the automatic stay was "willful" when it shows that: (i) the defendant had knowledge of the automatic stay and (ii) its actions were intentional. *E.g.*, *In re Weber*, 719 F.3d 72, 82-83 (2d Cir. 2013).[11]

A defendant knows of the automatic stay if it knows of the filing of a debtor's bankruptcy petition. *In re Weber*, 719 F.3d at 82-83; *In re Hooker Investments, Inc.*, 116 B.R. 375, 383 (Bankr. S.D.N.Y. 1990). Courts are more likely to find a defendant knew of the automatic stay when it is a "sophisticated commercial institution" that "should be . . . familiar with the [stay's] broad application[.]" *In re Marine Pollution Serv., Inc.*, 99 B.R. 210, 216 (Bankr. S.D.N.Y. 1989). Moreover, when a defendant has actual notice of the bankruptcy filing, it is presumed that its acts violating the stay were deliberate or intentional. *Id.* at 217. Even if the presumption is not applicable, it is not necessary that the corporate debtor prove that the defendant had the specific intent to violate the automatic stay. *See In re Weber*, 719 F.3d at 82. Instead, a debtor need only show that the defendant had the "general intent" to perform the act that violated the automatic stay.

---

[11] The Court has already found that Charter's false advertising and disconnection of service to Windstream customers violated the automatic stay. (Adv. Dkt. No. 274 at 3-4).

*Id.* In other words, so long as the action that violated the automatic stay was intended to be taken, the intent requirement is satisfied. *In re Dominguez*, 312 B.R. 499, 508 (Bankr. S.D.N.Y. 2004).

### 1. Charter Had Actual Knowledge Of Windstream's Bankruptcy Filing And The Automatic Stay.

Charter was aware of the possibility that Windstream might file for bankruptcy at least as early as February 22, 2019. (Plaintiffs Trial Ex. 33). And, Charter became aware of Windstream filing for bankruptcy within hours of it happening on February 25, 2019. (Plaintiffs Trial Ex. 8). Charter also received notification of Windstream's bankruptcy filing from a third-party, One Touch Intelligence. (Defendants Trial Exs. 26-27). Moreover, the false advertising disseminated by Charter noted that Windstream had filed for bankruptcy, thus confirming Charter's knowledge. (Joint Trial Ex. 10). In short, there can be no dispute that Charter had actual notice of the filing of Windstream's bankruptcy petition and, thus, was charged with knowledge of the automatic stay as a matter of law.[12]

### 2. Charter's False Advertising And Disconnection Of Windstream's Customers Were Intentional.

Because Charter had actual notice of the bankruptcy filing, it must be presumed as a matter of law that its decision to launch the false advertising campaign and to disconnect Windstream's customers receiving "last mile" connectivity through the VAR Agreement were intentional. *See In re Marine Pollution Serv., Inc.*, 99 B.R. at 217. In any event, as described below, the trial record establishes that Charter intended to take these actions.

---

[12] Charter is the second largest cable provider in the United States and itself had previously filed for Chapter 11 protection. (Joint Trial Ex. 3; Plaintiffs Trial Ex. 3). As such, it is a "sophisticated commercial institution" that should have known of the automatic stay and its broad application. *See In re Marine Pollution Serv., Inc.*, 99 B.R. at 216.

Charter began "brainstorming" an advertising campaign with a "going out of business offer" almost immediately upon learning of the possibility that Windstream might file for bankruptcy. (Plaintiffs Trial Ex. 33). At the direction of Charter's Head of Marketing, Kelly Atkinson, Charter developed "Operation Windstream"—its plan for a multiplatform advertising campaign (including a direct mailer) that would target Windstream's "remaining customers" with "switch messaging" that focused on Windstream's bankruptcy filing. (Plaintiffs Trial Exs. 26-27, 39; Deposition of Kelly Atkinson (Sept. 19, 2019) ("Atkinson Dep. II"), 81:23-83:24). By the time Windstream actually filed for bankruptcy, Charter decided that the "approach" for its advertising campaign was to be similar to that of a prior advertising campaign it had conducted in Louisville, Kentucky against a competitor that was "shutting down service." (Deposition of Kelly Atkinson (May 1, 2019) ("Atkinson Dep. I"), 42:21-24; Plaintiffs Trial Exs. 26-27). Even though it chose this "approach," Charter knew that it could not say things like "going away" or "abandoned," but its "goal" was still to "create doubt" in the minds of Windstream customers as to whether Windstream would remain in business. (Plaintiffs Trial Ex. 27; Joint Trial Exs. 6, 7). (*See also* Atkinson Dep. II, 117:4-118:24) ("goal" was to "capitalize on confusion" related to Windstream's services during bankruptcy). It is beyond doubt that Charter intended to disseminate the false advertising. And, although not required to be proven here, as the Court has already found, Charter intended to create false and misleading messaging that cast doubt on Windstream's ability to continue to provide services to its customers. (Adv. Dkt. No. 237, 144:6-145:17, 147:1-18, 154:2-10).

Charter's disconnection of Windstream customers receiving "last mile" connectivity under the VAR Agreement was also intentional. Charter intentionally implemented its own billing system that disconnected customers who reached a certain debt threshold. (Deposition of

Frederick Gunzel ("Gunzel Dep."), 22:12-23).  Although an automated billing system, Charter had the ability to remove specific accounts from the system to avoid a disconnection of service.  (*Id.* at 22:6-23:18).  It also had the ability to cancel manually an intended disconnection of service.  (Plaintiffs Trial Ex. 52) (indicating the disconnects for unpaid debts were manually cancelled by Charter *after the fact*).  As discussed *supra*, Charter had actual notice of Windstream's bankruptcy filing and thereby had notice of the automatic stay that would prohibit Charter's collection of pre-petition debt.  (Plaintiffs Trial Ex. 51 at 4; Gunzel Dep., 41:7-11).  Nonetheless, upon learning of Windstream's bankruptcy filing, Charter instructed its employees to convey a "message" to Windstream that it would "need . . . to bring [its] account current," despite the Bankruptcy Code's prohibition on collecting pre-petition debt.  (Plaintiffs Trial Ex. 50).  And, despite its awareness of the bankruptcy filing, Charter failed to reprogram its billing system to prevent the cancellation of Windstream customers receiving "last mile" connectivity under the VAR Agreement.  Thus, Charter assumed the ongoing risk of violating the automatic stay by its failure to stop disconnects.  (Gunzel Dep., 24:18-25, 48:25-49:7).[13]  Moreover, even after the Court entered a TRO to stop disconnects, Charter continued to disconnect Windstream customers receiving "last mile" connectivity under the VAR Agreement.  (*Id.* at 11:12-12:10).  It is clear from the foregoing trial record that Charter intended to implement a system that disconnected Windstream customers in violation of the automatic stay.

---

[13] As part of the VAR Agreement, Charter must provide 30-days' notice prior to disconnecting services to "last mile" customers.  (Joint Trial Ex. 1 at 2).  As the Court has already found, Windstream's customers were disconnected without Windstream being provided the 30-days' notice required under the VAR Agreement.  (Adv. Dkt. No. 237, 149:17-21).

**B.       Charter Had No Objectively Reasonable Basis To Believe Its Actions Did Not Violate The Automatic Stay.**

If a court finds that a party willfully violated the automatic stay in a case involving a corporate debtor, the court is authorized to order sanctions pursuant to Section 105(a) of the Bankruptcy Code and its inherent contempt power. *E.g., In re Chateaugay Corp.*, 920 F.2d at 186; *In re TS Employment, Inc.*, 597 B.R. at 536.[14]  Relying on this power, courts in the Second Circuit have held that, in cases involving corporate debtors, sanctions for willful violations of the automatic stay are appropriate unless the defendant acted with some belief that its conduct was lawful.  In the Second Circuit, this standard historically had been based upon the holding in *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098 (2d Cir. 1990).  In that case, the Second Circuit held that a corporate debtor could not obtain sanctions for a willful violation of the automatic stay as long as the defendant "had acted without maliciousness and had a good faith argument and belief that its actions did not violate the automatic stay." *In re Crysen/Montenay Energy Co.*, 902 F.2d at 1104.  In *Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019), however, the United States Supreme Court articulated a different standard, which is more objective in nature than the standard articulated by the Second Circuit in *In re Crysen/Montenay*.  This "*Taggart* standard" should, as already indicated by the Court, be applied here.[15]

---

[14] Section 105(a) of the Bankruptcy Code impliedly recognizes a bankruptcy court's inherent contempt power.  *Caldwell v. Unified Capital Corp.*, 77 F.3d 278, 284 (9th Cir. 1996); *In re Residential Capital, LLC*, 571 B.R. 581, 584-85 (Bankr. S.D.N.Y. 2017).

[15] At the December 18, 2019 hearing on summary judgment, the Court stated that "ultimate liability for both of those counts includes weighing issues where there are disputed facts, namely, with regard to Count VI for contempt, for violation of the automatic stay, whether the actions taken as alleged in the motion and the complaint in violation of the stay would satisfy the standard for civil contempt as most recently articulated by the Supreme Court in the *Taggart* case."  (Adv. Dkt. No. 237, 135:25-136:8).

13

In *Taggart*, the Supreme Court held that: "a court may hold a creditor in civil contempt for violating a discharge order if there is *no fair ground of doubt* as to whether the order barred the creditor's conduct. In other words, civil contempt may be appropriate if there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful." 139 S. Ct. at 1799 (emphasis in original). While *Taggart* involved a violation of a discharge order under Section 524 of the Bankruptcy Code, its rationale applies with equal force to violations of the automatic stay under Section 362 of the Bankruptcy Code involving a corporate debtor because the statutory basis for sanctioning a violation of either provision is the bankruptcy court's power under Section 105(a).[16] And, courts have held that the same standards should apply to violations of both the automatic stay and violations of discharge orders. *Zilog, Inc. v. Corning*, 450 F.3d 996, 1008 n.12 (9th Cir. 2006).

Moreover, the reasoning employed by the Supreme Court in *Taggart* strongly suggests that the objective standard it applied to sanctions for violation of a discharge order should also be applied to sanctions for a violation of the automatic stay. In reaching its decision in *Taggart*, the Supreme Court rejected the subjective framework applied by the Ninth Circuit, which held that contempt sanctions are not appropriate so long as a creditor had a subjective good faith belief that the discharge order did not apply to the creditor's claim. 139 S. Ct. at 1799. In rejecting the Ninth Circuit's subjective standard, the Supreme Court explained that such a "standard was inconsistent

---

[16] In *dicta*, the Supreme Court explained that there are differences between the remedies for a violation of a discharge order, on the one hand, and a violation of the automatic stay, on the other hand. *Taggart*, 139 S. Ct. at 1803-04. That discussion, however, is irrelevant here because the Supreme Court was drawing a distinction between Section 362(k) of the Bankruptcy Code, which applies to violations of the automatic stay in cases involving a non-corporate debtor, and Section 105(a) of the Bankruptcy Code, which applies to violations of the automatic stay in cases involving corporate debtors, as is the case here.

with traditional civil contempt principles, under which parties cannot be insulated from a finding

of civil contempt based on subjective good faith." *Id.* at 1802-1803. This reasoning renders the

subjective standard of *In re Crysen/Montenay* untenable and requires that the objective standard

articulated in *Taggart* be applied to violations of the automatic stay in corporate debtor cases.

At least one court has already applied the *Taggart* standard to order sanctions against a

party that violated the automatic stay. *See Suh v. Anderson*, BAP No. CC-19-1244, 2020 WL

1277575, at *4 n.3 (B.A.P. 9th Cir. Mar. 16, 2020). In *Suh*, the Ninth Circuit's Bankruptcy

Appellate Panel upheld an award of compensatory contempt sanctions, including attorneys' fees,

granted by the bankruptcy court. *Id.* at *8. The defendant had recorded corrective deeds of trust

against the debtor's property, later arguing that his actions did not constitute an attempt to control

property of the debtor's estate under Section 362(a)(4) of the Bankruptcy Code. *Id.* at *2, *5. The

Bankruptcy Appellate Panel, applying the *Taggart* standard, explained that "a party's subjective

belief that she was complying with an order ordinarily will not insulate her from civil contempt if

that belief was objectively unreasonable." *Id*. at *6 (citing *Taggart*, 139 S. Ct. at 1802).

Charter's *sole* basis in the trial record for arguing that it had an objectively reasonable basis

to believe that its conduct was lawful and did not violate the automatic stay consists of two reports

prepared by a third-party vendor, One Touch Intelligence. (Defendants Trial Exs. 26, 27).[17]

---

[17] Charter's Head of Marketing, Kelly Atkinson, was the Charter employee who decided to launch
the false advertising campaign. (Atkinson Dep. I, 32:22-25). She testified that the foundation for
Charter's advertising campaign was the One Touch Intelligence reports. (Atkinson Dep. II, 43:5-
44:13, 161:10-22). Ms. Atkinson further testified that neither she, nor employees at her direction,
conducted any independent research regarding Windstream's bankruptcy. (Atkinson Dep. I,
36:18-37:12; Atkinson Dep. II, 45:10-15). Ms. Atkinson testified that neither she, nor employees
at her direction, reviewed any of Windstream's Form 10-K filings or any documents filed on the
docket of the Windstream Chapter 11 cases. (*Id.*). Charter cannot now rely upon a *post-hoc*
rationale for believing the advertisements were lawful by pointing to Windstream's 10-K,
bankruptcy press release, form notice of commencement or any other document because Charter

Charter, however, could not have reasonably relied on those reports to conclude that Windstream was going out of business or that the Chapter 11 filing would disrupt its operations. Indeed, the February 25, 2019 report by One Touch Intelligence expressly states that the Chapter 11 filing "will allow Windstream to reorganize;" that Windstream had already "secured $1 billion in debtor-in-possession financing to maintain operations during the reorganization process;" and that such financing "minimizes any operational disruptions." (Defendants Trial Ex. 27). Thus, the One Touch Intelligence reports could not have provided Charter with an objectively reasonable basis to believe that it was lawful to tell Windstream customers that Windstream was at imminent risk of going out of business because it had filed for bankruptcy.[18] Moreover, Charter knew that Windstream "ha[d] funding to continue its normal operations" (Plaintiffs Trial Ex. 29), and would operate "BAU," meaning "business as usual." (Plaintiffs Trial Ex. 8).

Charter suggested in its Motion for Judicial Notice that it believed its advertising was lawful in light of case law purportedly holding that the automatic stay does not categorically forbid solicitation of a debtor's customers. (Adv. Dkt. No. 308 at 5) (citing *In re Golden Distributors*, 122 B.R. 15 (Bankr. S.D.N.Y. 1990)). But this argument is little more than a *post hoc* rationalization for Charter's unlawful behavior concocted by its counsel. Nothing in the trial record supports an argument that the Charter executive who launched the false advertising relied

---

admitted that it did not rely on any such documents when it made its decision to launch its false advertising campaign. (Atkinson Dep. I, 36:18-37:12; Atkinson Dep. II, 43:5-44:25, 45:10-15).

[18] Of course, these reports provided no basis whatsoever upon which Charter could believe that disconnecting Windstream customers without notice was lawful.

upon this case law.[19]  Moreover, as discussed below, unlike the debtor in *In re Golden Distributors*, Windstream had contractual subscriptions in place with its customers.

*In re Golden Distributors* involved solicitation of the debtor's customers by other candy and tobacco distributors.   Contrary to Charter's argument here, this Court did not create a blanket rule that a "debtor's customers cannot be regarded as property of the debtor's estate within the meaning of 11 U.S.C. § 541." (Adv. Dkt. No. 308 at 5).  Critically, none of the customers belonged exclusively to the debtor—*i.e.*, the customers were not "required to purchase from the debtor specific quantities of products." 122 B.R. at 20.  This Court contrasted such open-ended customer relationships with "circumstances where a debtor has contractual arrangements with its customers which can be translated into assured sales or income." *Id.* at 20.  This Court pointed out that, "where a debtor has contractual arrangements with subscribers . . . the debtor's good will and its contracts with its subscribers . . . will be regarded as so essential to the survival of the debtor that they constitute property of the estate within the meaning of 11 U.S.C. § 541," and any attempt to interfere with those relationships "should be stayed as an impermissible attempt to obtain possession or control of property of the estate in violation of 11 U.S.C. § 362(a)(3)." *Id. Accord In re Trump Entm't Resorts, Inc.*, 534 B.R. 93, 103 (Bankr. D. Del. 2015) (property of estate includes contractual relationships and expectations of continuing business from customers); *In re Family Health Serv. Inc.*, 105 B.R. 937, 942-43 (Bankr. C.D. Cal. 1989) (contracts with customers are property of the estate).   Here, Charter's false advertising was directed at customers contractually committed to Windstream.[20]   Charter knew this and, therefore, could not have

---

[19] Charter has taken the position that it is not relying here on an advice of counsel defense. (Atkinson Dep. II, 74:6-8).

[20] The average tenure of a Windstream customer is 50 months.  (Jarosz Decl., ¶ 23).

reasonably relied on *Golden Distributors* to believe it could lawfully poach Windstream customers. (Joint Trial Ex. 10; Atkinson Dep. I, 101:23-102:11) (offering to buy out Windstream customer contracts).

Even if the Court were to apply the Second Circuit's pre-*Taggart* standard, the trial record establishes that Charter's actions were malicious and lacking in good faith. *See In re Crysen/Montenay Energy Co.*, 902 F.2d at 1104. Indeed, the Court's summary judgment order found that Charter's actions were "tantamount to fraud and misrepresentation." (Adv. Dkt. No. 274 at 5). Charter knew that Windstream was *not* going out of business. Internal Charter emails reveal that, upon learning of Windstream's bankruptcy filing, certain senior Charter executives urged caution because Windstream would "operate BAU," meaning "business as usual." (Plaintiffs Trial Ex. 8). Charter was also aware that Windstream "ha[d] funding to continue its normal operations." (Plaintiffs Trial Ex. 29). Thus, Charter knew that any advertising suggesting that Windstream would be going out of business would be false. (Plaintiffs Trial Ex. 27). Indeed, Charter *itself* had previously argued that such conduct was *unlawful* when a competitor, DirecTV, launched a similar campaign to distort the truth behind Charter's own Chapter 11 bankruptcy. (Plaintiffs Trial Exs. 3, 20).[21]

Notwithstanding its own prior experience in bankruptcy, Charter directed its marketing team to "leverage" Windstream's bankruptcy filing "specifically [to] target[] [its] remaining customers." (Plaintiffs Trial Ex. 11). Following that directive, Charter informed its outside

---

[21] Charter has previously argued that the executive who decided to launch the false advertising campaign was unaware of Charter's bankruptcy or lawsuit against DirecTV. This is irrelevant. The causes of action in this adversary proceeding are asserted against Charter, not one of its executives, and Charter is charged with knowledge of its own bankruptcy and its own lawsuit against DirecTV.

advertising agency, RAPP Worldwide ("RAPP"), that it wanted "to go after Windstream" and its customers by capitalizing on Windstream's bankruptcy filing. (Plaintiffs Trial Exs. 28, 39). Despite knowing that Windstream would operate "business as usual" during its Chapter 11 proceedings, Charter initiated "Operation Windstream"—a marketing campaign that included a direct mailer based on a previous campaign that it had used when another competitor had ceased operations. (Atkinson Dep. I, 42:21-43:10; Plaintiffs Trial Exs. 26-27). Even though Charter knew Windstream was not going out of business, it instructed RAPP to create a "mood" of uncertainty in the advertising campaign. (Deposition of RAPP, 33:15-34:8; Joint Trial Ex. 7). Having previously filed for Chapter 11 protection, however, Charter knew that Windstream's services would remain uninterrupted. (*E.g.*, Joint Trial Ex. 6; Plaintiffs Trial Exs. 8, 27). Indeed, one of Charter's own senior executives told the management team that "[Windstream] does have funding to continue its normal operations while it restructures." (Plaintiffs Trial Ex. 29).

Moreover, in implementing the advertising campaign, Charter purposely engaged in deceptive conduct in order to trick Windstream customers. Charter used Windstream's colors and font on the envelope in which it mailed the false advertisement (Plaintiffs Trial Ex. 9), and printed in large bold letters on the front of the envelope: "**IMPORTANT INFORMATION ENCLOSED FOR WINDSTREAM CUSTOMERS**." (Joint Ex. 12; Atkinson Dep. I, 72:8-24, 76:13-77:10). As the Court has already held, Charter's use of such deceptive tactics in connection with the envelope in which the false advertisement was disseminated was intended to trick Windstream customers into opening the envelope and reading the false advertisement within. (Adv. Dkt. No. 237, 144:6-145:17, 147:1-18, 154:2-10). And, Charter's sales representatives lied to Windstream customers telling them that Windstream was "going out of business." (Deposition of Andrew Sites, 19:13-20:23; Deposition of Emmitt Walker, 25:16-28:10; Plaintiffs Trial Ex. 47

at Charter_020214).   The fact that Charter launched the advertising campaign knowing that Windstream was not going out of business and engaged in deceptive tactics to implement its advertising campaign constitute the type of malice and lack of good faith sufficient for contempt sanctions under the *In re Crysen/Montenay* standard, in the event that the Court declines to apply the *Taggart* standard.

Charter's disconnection of Windstream customers receiving "last mile" connectivity under the VAR Agreement also meets the *In re Crysen/Montenay* standard.   Charter implemented its own billing system that automatically disconnected customers (including Windstream "last mile" customers) who reached a certain debt threshold.  (Gunzel Dep., 22:12-23). Charter was aware of Windstream's bankruptcy filing and, thus, was aware of the automatic stay.   (*Id.* at 49:19-20) ("services . . . shouldn't be down because of protection from federal bankruptcy.").  Despite this awareness, Charter failed to remove Windstream "last mile" customers from its billing system or manually prevent the disconnects from occurring.  (*Id.* at 22:12-25:5; Joint Trial Exs. 14-15).  As a result, service was disconnected to Windstream customers for non-payment not once, but on *five separate occasions*, four of which occurred in April and May 2019, *after* the Court issued a TRO that expressly prohibited such disconnects.   (Auman Decl., ¶¶ 12-13; Gunzel Dep. 52:9-10). Rather than remove Windstream customers from its billing system to prevent disconnection, Charter directed its employees to "convey a message" that Windstream would "need . . . to bring [its] account current," despite knowing through its own bankruptcy of the prohibition on collecting pre-petition debt.  (Plaintiffs Trial Ex. 50).  Indeed, even after the Court's entry of a TRO, Charter failed to change its billing system.  (Gunzel Dep., 24:18-25; Joint Trial Exs. 14-15).  This was no mere omission on Charter's part, but rather an intentional decision to assume the risk of the "inefficiencies" in its billing system that would likely cause more disconnects in violation of the

20

automatic stay and TRO.  (Joint Trial Ex. 15) (Charter May 9 email noting that its billing system had "inefficiencies" that would not protect "accounts from further collection actions during Bankruptcy Automatic Stays.").  Such a decision to refuse to "correct known, glaring weaknesses in its internal controls" and permit repeated violations of the automatic stay, as well as the Court's TRO, establishes that Charter lacked any good faith argument and belief that its conduct did not violate the automatic stay.  *See Long Island Pine Barrens Soc'y v. Sandy Hills*, No. 8-12-74482, 2015 WL 5794363, at *3 (E.D.N.Y. Sept. 30, 2015).  *Cf. In re Ramos*, No. 10-23019, 2013 WL 5461859, at *3 (Bankr. S.D.N.Y. Oct. 1, 2013) (Drain, J.) (repeat offenses were not just a "stupid mistake" but rather a "policy" routinely implemented).  Such repeated violations of the automatic stay satisfy even the *In re Crysen/Montenay* standard.  *Jove Eng'g., Inc. v. I.R.S.*, 92 F.3d 1539, 1557 (11th Cir. 1996).

## C.    Charter's Argument To Apply The General Civil Contempt Standard Is Meritless.

Charter has argued that the Court should *not* use the standards set out in *Taggart* or even *In re Crysen/Montenay Energy* to determine whether it should be held in contempt here for its willful violations of the automatic stay.  (Adv. Dkt. No. 308 at 2-3).  Rather, Charter argues that the general civil contempt standard should apply.  (*Id.*).  Charter wants the general civil contempt standard to apply so it can argue its conduct did not violate any specific act prohibited by the "four corners" of an order issued by the Court.  (*Id.*) (citing *Drywall Tapers & Pointers of Greater N.Y. v. Local 530 of Operative Plasterers*, 889 F.2d 389, 395 (2d Cir. 1989)).[22]  Charter's argument should be rejected for two reasons.  First, Charter forfeited this argument by waiting until the eve

---

[22] Charter has also previously argued that the TRO did not prohibit the exact false advertising at issue.  Whether Charter violated the TRO, however, is not at issue here.  Rather, the Court has found that Charter's false advertising violated the automatic stay.  *See* 11 U.S.C. § 362(a).

of trial to raise it.  Second, Charter's argument is not supported by the law.  The Court's contempt power here flows specifically from Section 105(a) of the Bankruptcy Code and is governed by bankruptcy-specific law developed to address violations of the automatic stay.

### 1.    Charter Has Waived This Argument.

The Court announced its intent to apply the *Taggart* standard at the December 18, 2019 hearing on summary judgment.  (Adv. Dkt. No. 237, 135:25-136:8).  Charter did not object to the applicability of the *Taggart* standard at that time.  Nor did it suggest that the general civil contempt standard should be used instead.  Charter also did not object to use of the *Taggart* standard, let alone suggest that the general civil contempt should be used, in any of its numerous pleadings filed during the four months after the summary judgment hearing.  Charter first raised its argument that the general civil contempt standard should apply in its opposition to Windstream's Motion *in Limine*, filed one business day before the start of trial.  (Adv. Dkt. No. 306 at 2-3).  Charter raised it again in its so-called Motion for Judicial Notice, filed eighteen hours before the start of trial.  (Adv. Dkt. No. 308 at 1-2).  In these circumstances, the Court should deem this belatedly raised argument as forfeited.  *E.g.*, *Foster v. Lee*, 93 F. Supp. 3d 223, 230 (S.D.N.Y. 2015).

### 2.    The General Civil Contempt Standard Is Not Applicable Here.

Even if the Court does not deem Charter's belated argument forfeited, Charter's argument is wrong as a matter of law.  None of the cases cited by Charter to support its argument involve a contempt proceeding in connection with a violation of the automatic stay.  (Adv. Dkt. No. 306 at 2-3).[23]  In fact, only one is even a bankruptcy case.  That case involved the violation of a discovery

---

[23] For example, *Perez v. Danbury Hosp.*, 347 F.3d 419, 423-24 (2d Cir. 2003), involved a consent decree.  *Drywall Tapers & Pointers of Greater N.Y.*, 889 F.2d at 395, involved an injunction to enforce an arbitration award.  *Zino Davidoff SA v. CVS Corp.*, No. 06-cv-15332, 2008 WL

order during an adversary proceeding, not a violation of the automatic stay.  (*Id.*) (citing *In re Markus*, 607 B.R. 379 (Bankr. S.D.N.Y. 2019)).  Charter's inability to find any bankruptcy case supporting its argument is not surprising.  Violations of the automatic stay are treated differently by the courts than violations of a court-ordered injunction.

"Although essentially a court-ordered injunction, the automatic stay is actually a legislative creation with unique properties different from court-ordered injunctions."  *Jove Eng'g., Inc.*, 92 F.3d at 1546.  "The metes and bounds of the automatic stay are provided by statute and systematically applied to all cases."  *Id.*  In contrast, a court-ordered injunction is crafted on a case-by-case basis and requires tailoring the injunction to the specific facts of the case.  *Id.*  Because of this inherent difference between court-ordered injunctions and the automatic stay, different standards are applied to determine if a violation has occurred.  *Id.  Accord In re Dyer*, 322 F.3d 1178, 1196 (9th Cir. 2003).  In the case of court-ordered injunctions, the general civil contempt standard applies and a court must determine whether its order was "clear, definite and unambiguous."  *Id.*  This is not required, however, with respect to a violation of the automatic stay because "there can be no doubt that the automatic stay qualifies as a specific and definite court order."  *In re Dyer*, 322 F.3d at 1191.  This is why the Second Circuit and district courts therein have never applied the general civil contempt standard to a violation of the automatic stay.

Moreover, the "four corners" rule advocated by Charter would make no sense because there is no separate court order needed to enforce the automatic stay.  *In re Colonial Realty Co.*, 980 F.2d 125, 137 (2d Cir. 1992); *MA Salazar, Inc. v. Inc. Vill. of Atl. Beach*, 499 B.R. 268, 274 (E.D.N.Y. 2013) ("absence of a formal order regarding the automatic stay did not preclude . . .

---

1775410, at *13 (S.D.N.Y. Apr. 17, 2008), involved a TRO and a preliminary injunction in a Lanham Act case.

sanctioning . . . [a violation] of the automatic stay."). Congress could not possibly have listed every conceivable act prohibited by the automatic stay with the level of detail that Charter seemingly argues should apply. If Charter's view of the law was correct, Section 362(a) would need to be the size of a telephone book—and it would still probably be underinclusive.

## II.    CHARTER SHOULD BE SANCTIONED AT LEAST $19.9 MILLION FOR THE LOSSES IT CAUSED THE DEBTORS.

The Court should sanction Charter for its willful violations of the automatic stay. *See In re Chateaugay Corp.*, 920 F.2d at 187. Sanctions to enforce the automatic stay serve a dual purpose: "'to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.'" *In re Ionosphere Clubs, Inc.*, 171 B.R. 18, 21 (S.D.N.Y. 1994), *aff'd sub. nom. Bartel v. E. Airlines*, 133 F.3d 906 (2d Cir. 1998) (quoting *Sheet Metal Workers Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 443 (1986)). As discussed in detail below, Windstream's losses caused by Charter's violations of the automatic stay exceed $19.9 million. This amount includes up to $5.1 million in profits lost as a result of customers switching to Windstream due to Charter's false advertising. (Jarosz Decl., ¶ 27). It also includes $862,775 in costs relating to corrective advertising to inform Windstream customers that it was *not* going out of business. (Auman Decl., ¶ 16). It also includes $4,033,425 in promotional costs to attract new customers to make up for the customers who were deterred from subscribing to Windstream due to Charter's false advertising. (*Id.* at ¶ 15). It also includes $5,278.85 in customer credits for Charter's wrongful disconnects. (*Id.* at ¶ 14). Finally, this amount also includes attorneys' fees and litigation costs associated with the prosecution of this adversary proceeding which total $9,921,716 through May 31, 2020.[24]

---

[24] A table summarizing all Windstream losses/costs is appended hereto as Exhibit A. This calculation of the harm caused by Charter is conservative. Windstream executives and employees

A.    **The Sanction Assessed Against Charter Should Include All Business Losses Suffered And All Costs Incurred By Windstream As A Result of Charter's Unlawful Conduct.**

The sanction against Charter should include all business losses suffered and costs incurred by Windstream as a result of Charter's repeated violations of the automatic stay. *See In re Ionosphere Clubs, Inc.*, 171 B.R. at 21. As a direct result of Charter's false advertising, Windstream lost profits of up to $5.1 million due to customers switching to Charter. (Jarosz Decl., ¶ 27). In addition, Windstream was forced to incur costs of approximately $4.9 million to mitigate the effect of Charter's false advertising and disconnects. (Auman Decl., ¶¶ 14, 15, 16).

1.    **Lost Customers**

Windstream lost more than 1,300 customers as a result of Charter's false advertising. (Jarosz Decl., ¶ 27). These were Windstream customers who canceled their Windstream subscription services as a result of Charter's false advertising. Indeed, Charter admits that it poached at least 663 customers from Windstream. (Joint Exs. 2, 8, 17) (reflecting number of Windstream customers that called the unique 1-855 telephone number in Charter's false advertisement *and* switched service to Charter). As Mr. Jarosz testified, however, that number understated the total lost customers for several reasons. First, Charter stopped tracking customers who switched after June 24, 2019, which was months earlier than it should have stopped tracking.

---

were forced to spend "10s of thousands of hours" to deal with Charter's false advertising. (Langston Dep., 77:22-79:21). This cost to Windstream is in an estimated range of $1 - $5 million. (*Id.* at 81:5-82:8). None of this "lost opportunity cost" is included in the sanction amount sought. Moreover, the cost of the promotional campaign sought is conservative because it was limited to the cost incurred in Charter Exchanges, despite the fact that, in order to make up for the suppressed demand in the Charter Exchanges, Windstream had to offer promotions in the Non-Charter Exchanges as well. (May 6 Trial Trans., 56:3-57:2) ("This is a conservative number."). Similarly, only those customer credits that Windstream was "100% certain" were attributable to Charter disconnects were included, leaving Windstream uncompensated for tens of thousands of dollars in credits. (*Id.* at 42:14-23).

(Jarosz Decl., ¶ 21).  Second, Charter's number does not reflect customers who switched service through means other than calling the unique 1-855 phone number, such as in a store or over the Internet.  (*Id.*).  Third, Charter's number does not account for Windstream customers who switched service to third-party providers, instead of Charter, as a result of the damage done to Windstream's reputation by Charter's false advertising.  (*Id.*).

Using a common analytical technique employed by economists, Mr. Jarosz opined that the actual loss to Windstream was approximately 1,386 customers.  (*Id.* at ¶¶ 6-27).  Mr. Jarosz arrived at this number by conducting a "difference-in-difference" analysis. [25]  In this analysis, he compared the monthly churn rate of Windstream customers for the exchanges in which Charter and Windstream compete (the "Charter Exchanges") to the exchanges in which they do not compete (the "Non-Charter Exchanges").  (*Id.* at ¶¶ 11-19; Plaintiffs Trial Ex. 60).[26]  He conducted this comparison over two periods of time—April – August 2018 (before Charter's false advertising) (referred to as the "control period") and April – August 2019 (after Charter's false advertising) (referred to as the "treatment period").  (Jarosz Dep., ¶¶ 11-19).[27]  Depending upon the profit

---

[25] Mr. Jarosz testified that a "difference-in-differences" analysis was appropriate here because a parallel trend analysis performed on the churn rates for the Charter Exchanges and the Non-Charter Exchanges during the control period established that the churn rates for the two types of exchanges trended in parallel, thus indicating that any change in the trend lines away from parallel would confirm the introduction of new variable, such as Charter's false advertising. (Jarosz Decl., ¶¶ 11, 13-14; April 28 Trial Trans., 179:4-25).

[26] Windstream competes against Charter for residential and small business consumers in twelve of the eighteen states in which Windstream offers such service.  (Auman Decl., ¶ 4).  This is Windstream's "ILEC" business.  (May 6 Trial Trans., 118:7-12).  Windstream, however, also competes against Charter for enterprise business in all fifty states.  (*Id.*).  This is Windstream's "CLEC" business.  (*Id.*).  Mr. Jarosz's "difference-in-difference" analysis was applied only to the ILEC business.

[27] Mr. Jarosz studied the same months in 2018 and 2019 "to hold constant any seasonality effects." (April 28 Trial Trans., 180:18-181:8).  These months in 2018—as opposed to the same months in 2017—constituted the appropriate control period because they reflected Windstream's new

margin applied (*id.* at ¶¶ 24-26), Mr. Jarosz opined that the 1,386 lost customers represented lost

profits to Windstream in the range of $3.2 to $5.1 million.  (*Id.* at ¶ 27; Plaintiffs Trial Ex. 61).

Mr. Jarosz testified, however, that $5.1 million "is more likely to be the more accurate number."

(April 28 Trial Trans., 182:6-18).

Charter presented no expert of its own at trial to challenge Mr. Jarosz's expert opinion or

to offer a competing opinion on lost profits.  Instead, Charter used its cross examination of Mr.

Jarosz to reprise its failed *Daubert* motion which sought to exclude his trial testimony due to a

purported lack of a reliable methodology.  (April 28 Trial Trans., 183:8-188:11).  Charter again

took exception to the fact that Mr. Jarosz studied the differences in churn rate among

"exchanges"—a local geographic area in which Windstream offers service—as opposed to a

purportedly narrower geographic area used by the FCC known as a "census block."  (*Id.* at 130:16-

146:11).  Charter made this same argument—and the Court rejected it—in its Motion to Exclude

Mr. Jarosz.  (Adv. Dkt. No. 116 at 16).  The possibility that there might be a different or even more

granular geographic breakdown of Windstream's customers does not mean that Mr. Jarosz's

analysis based on exchanges was unreliable.  (April 28 Trial Trans., 162:20-21) ("Exchanges aren't

any less precise . . . than census blocks.").  Moreover, Mr. Jarosz testified that it would not have

been possible to conduct an analysis at the census block level because the data he needed did not

exist at that level.  (*Id.* at 177:8-21).[28]  Charter's argument ignores that the FCC's census block

data does not include the customer information required to conduct the analysis undertaken by Mr.

---

business strategies introduced early in 2018.  (Jarosz Decl., ¶ 15; April 28 Trial Trans., 173:20-24, 175:8-1).

[28] Mr. Jarosz testified Windstream maintained its customer data based on exchanges, not census blocks.  (April 28 Trial Trans., 141:19-22).  This was confirmed by Mr. Auman's testimony.  (May 6 Trial Trans., 76:20-25, 87:9-17).

Jarosz, specifically the number of Windstream customers in each census block on a month-to-month basis. (*Id.* at 141:19-22; May 6 Trial Trans., 121:6-12).

Charter also suggested that Mr. Jarosz's study did not consider purported confounding factors such as improved internet speed or the introduction of Spectrum Mobile into the Charter Exchanges. As Mr. Jarosz testified, however, both Spectrum Mobile and the speed upgrades were introduced by Charter during the control period—*prior* to Charter's false advertising. (April 28 Trial Trans., 129:25-130:2, 161:12-21, 178:10-17). In other words, these factors remained constant over both the control period and the treatment period. Therefore, neither of those factors would have impacted Mr. Jarosz's findings related to the treatment period—the period *after* Charter's false advertising. (*Id.* at 178:1-180:6).

Charter also attacked Mr. Jarosz because he did not analyze losses on an entity-by-entity basis. (*Id.* at 64:4-70:6). Charter has made this argument throughout this adversary proceeding, and the Court has already correctly dismissed it as a "red herring." (Adv. Dkt. No. 237, 112:9-13, 150:9-10). Mr. Jarosz's analysis was an enterprise-level analysis (April 28 Trial Trans., 70:12-15, 71:11-12, 71:23-25), because the harm inflicted by Charter was an enterprise-level harm. (*Id.* at 78:14-79:2). As Mr. Auman testified, "[t]he Debtors are all affiliates within the same Windstream corporate family." (Auman Decl., ¶ 3). All of the Debtors operate under and/or use the Windstream name in the marketplace. (*Id.*). Thus, the services offered by all Debtors are branded in the marketplace as "Kinetic by Windstream" (the "ILEC" business) or "Kinetic Business by Windstream" (the "CLEC" business), notwithstanding that any particular Debtor's corporate name may not include "Windstream" in it. (May 6 Trial Trans., 88:1-5, 118:7-12).[29] As Mr. Jarosz

---

[29] *E.g.*, Defendants Trial Ex. 127 (Windstream Georgia Communications, LLC using "Kinetic by Windstream" brand) and Defendants Trial Ex. 128 (Windstream Pennsylvania, LLC using

testified: "branding in the marketplace could very well be different from [the legal entity name]," and it is the branding in the marketplace that matters for determining harm. (April 28 Trial Trans., 56:19-57:2, 70:12-15, 71:11-12, 71:23-25). Charter's false advertising inflicted harm on the Windstream brand which impacted every Debtor without regard to any particular Debtor's corporate name or location. (*Id.* at 117:12-118:12) (Windstream's CLEC business "competes with Charter nationally").[30] Moreover, Windstream does not need to prove the exact harm suffered by each debtor in order for the Court to assess a sanction against Charter for this lost revenue. *See In re Ionosphere Clubs, Inc.*, 171 B.R. at 21 (sanction included "estimate" of harm caused by violation of automatic stay).

### 2. Corrective Advertising

Windstream was also forced to launch a costly corrective advertising campaign to mitigate the harm caused by Charter's false advertising. (Auman Decl., ¶ 16). The campaign consisted of direct mail pieces and emails sent out in April 2019 to all Windstream customers informing them that Windstream was not going out of business. (*Id.*). The total cost to Windstream for this

---

"Kinetic Business by Windstream" brand). All of the Debtors use such branding in the marketplace. (May 6 Trial Trans., 88:1-5).

[30] Charter suggested at trial that because the false advertising was not disseminated to Windstream customers in Maine, then Debtor Choice One Communications of Maine could not have been harmed by it. (April 28 Trial Trans., 78:5-83:20). Charter presumably intended this argument to apply to any Debtor operating in a state other than the 22 states into which Charter disseminated the false advertising. The harm caused by Charter's false advertising, however, is harm to the Windstream brand under which all the Debtors operate in the marketplace. (Auman Decl., ¶ 3; May 6 Trial Trans., 88:4-5) ("we do business as Kinetic by Windstream"). Thus, as Mr. Jarosz testified, a Windstream customer who received Charter's false advertising in Georgia could move to Maine and his choice of provider in Maine would be influenced by his receipt of the false advertising in Georgia. (April 28 Trial Trans., 102:4-8). Similarly, a Windstream customer in a market that received Charter's false advertising could tell a customer in a market that did not receive it that Windstream was going out of business. (May 6 Trial Trans., 117:12-118:12) ("word of mouth . . . means a lot").

corrective advertising was $862,775.  (*Id.*; Joint Ex. 11; Plaintiffs Trial Exs. 62, 64).[31]  Corrective advertising is uniformly regarded as a reasonable response to false advertising and should be included in the sanction assessed against Charter.  *E.g.*, *Gillette Co. v. Wilkinson Sword, Inc.*, No. 89-cv-3586, 1992 WL 30938, at *4 (S.D.N.Y. Feb. 3, 1992).  Moreover, the Court has already found that corrective advertising was a reasonable response by Windstream to Charter's false advertising when, at the hearing on Windstream's Motion for a Preliminary Injunction, it ordered additional corrective advertising be sent out in May 2019, to be paid for by Charter.  (Adv. Dkt. No. 83).[32]

### 3.    Promotional Campaign

In addition to corrective advertising in the immediate wake of Charter's false advertising, Windstream launched a promotional campaign to mitigate suppressed demand from new customers.  (Auman Decl., ¶ 15; May 6 Trial Trans., 51:12-52:13).  Because Charter's false advertising was sent to Windstream customers and non-Windstream customers who were not already Charter subscribers, it caused Windstream customers to switch service providers *and* deterred potential new customers from subscribing to Windstream, thus suppressing demand. (May 6 Trial Trans., 117:16-22) ("Both existing customers and potential prospects received information that we potentially were going out of business . . . .").  The campaign consisted of

---

[31] This amount does *not* include the cost of the additional corrective advertising that the Court ordered in May 2019 because Charter has already paid for it.

[32] Charter may argue that the cost of the April corrective advertising was inflated because it was mailed to more Windstream customers than actually received Charter's false advertising.  It is important, however, to recognize that, at the time in April when this corrective advertising was mailed, Windstream did not know which of its customers had received Charter's false advertising, so it mailed to all customers.  It was not until May 13, 2019 that Charter disclosed to which Windstream customers the false advertising had been sent.  (*See* Defendants Trial Ex. 110).

customer upgrades, discounts, and pricing promotions.  (*Id.*).  The total approximate cost of the promotional campaign was $4,033,425.  (Auman Decl., ¶ 15; Plaintiffs Trial Exs. 313, 350 at 13).

Charter has attempted to mischaracterize this campaign as a run-of-the-mill promotion.  As Mr. Auman testified, however, this promotional campaign was specifically designed to combat Charter's false advertising.  (Auman Decl., ¶ 15; May 6 Trial Trans., 51:12-52:6, 57:23-58:2, 110:2-20, 111:14-24).  He testified that this promotional campaign was not like normal campaigns.  It was "extremely aggressive, costly," and something never undertaken in his tenure at Windstream.  (May 6 Trial Trans., 111:14-24).

Nor is there any merit to the suggestion that the promotional campaign was unrelated to Charter's unlawful conduct because it does not overlap the same time period studied by Mr. Jarosz (*i.e.*, April 1, 2019 – August 31, 2019).  The promotional campaign did not begin immediately after Charter's false advertising for two reasons.  First, Windstream did not realize how damaging Charter's false advertising had been until after it had seen the April – May 2019 "spike in customers discontinuing service" in the Charter exchanges.  (Auman Decl., ¶ 17; May 6 Trial Trans., 58:2-4).  Second, the promotional campaign required three months to test.  (May 6 Trial Trans., 66:9-17, 110:13-111:24).  It was launched as soon as practicable on September 1, 2019.[33]

There is no evidence in the trial record calling into doubt the reasonableness of the cost of Windstream's promotional campaign.  Charter has not identified any reason why that cost should be discounted or is not a cost inflicted upon Windstream by Charter's unlawful conduct.

---

[33] The only reason that Mr. Jarosz's analysis stopped at August 31, 2019, was that, at the time his expert report was prepared (September 2019), Windstream only had data on customer churn rates available through August 31, 2019.  Mr. Jarosz never testified, as implied by Charter, that the harm caused by Charter's unlawful conduct stopped on August 31, 2019.  Indeed, Mr. Jarosz expressly testified that:  "[C]ustomers in the Charter Exchanges may have been influenced by Charter's false advertising beyond August 2019."  (Jarosz Decl., ¶ 20).

Therefore, the Court should include the $4,033,425 cost for the promotional campaign expenses in the sanction for Charter's unlawful conduct.

### 4.    Customer Credits

Windstream was also forced to give credits to certain customers to compensate them for Charter's service disconnections under the VAR Agreement.  (Plaintiffs Trial Ex. 34) (Windstream "trouble tickets" reflecting customer complaints about disconnects).  As Mr. Auman testified, Windstream provided at least $5,278.85 in "out of service" credits for certain customers who opened trouble tickets in connection with the disconnection of service by Charter.  (Auman Decl., ¶ 14; Plaintiffs Trial Ex. 316).  The Court should include this amount in the sanction assessed.

### B.    The Sanction Assessed Against Charter Should Also Include All Attorneys' Fees And Litigation Costs Incurred By Windstream Relating To This Adversary Proceeding.

The sanction assessed against Charter should also include all attorneys' fees and litigation costs incurred by Windstream relating to this adversary proceeding.  Charter does not contest that, as a general matter, attorneys' fees and litigation costs are appropriate elements for a court to include in a sanction for violation of the automatic stay.  Nor could it.  Attorneys' fees and litigation costs are routinely included in a sanction for a willful violation of the automatic stay.  *Suh v. Anderson*, 2020 WL 1277575, at *6-7; *In re Ionosphere Clubs, Inc.*, 171 B.R. at 20; *In re Marine Pollution Serv., Inc.*, 99 B.R. at 217.  Indeed, the cost of hiring an attorney to vindicate the debtor's rights is often the primary loss incurred.  *E.g.*, *In re Eastman*, No. 08-5055, 2010 WL 5462469, at *3 (Bankr. W.D. Tex. Dec. 29, 2010).  Here, Windstream incurred significant fees and costs prosecuting Charter's violations of the automatic stay—more than $9.9 million—that should be included in the sanction against Charter.

Mr. Auman testified at trial that Windstream incurred $7.74 million in attorneys' fees and litigation costs for outside counsel as of March 31, 2020.  (Auman Decl., ¶ 20; Plaintiffs Trial Exs.

67-95, 99-100, 104-06).[34]  During April 2020, Windstream incurred an additional $1,011,510.74 in attorneys' fees and litigation costs for outside counsel.  *See In re Windstream Holdings, Inc.*, Dkt. Nos. 1824, 1962.  And, during May 2020, Windstream incurred an additional $508,827 in attorneys' fees and litigation costs for outside counsel.  *Id*. at Dkt. No. 1993.[35]

In addition, Windstream incurred $389,200 in legal fees through the work of in-house counsel on this adversary proceeding.  (Auman Decl., ¶ 21; Plaintiffs Trial Exs. 315, 350 at 11-12).  These fees reflect the value of the time in-house attorneys for Windstream devoted to assisting outside counsel in the prosecution of this adversary proceeding.  Courts within the Second Circuit have long accepted that "[a]ttorney's fees may be awarded for the work of in-house counsel, and an hourly rate based on an estimate of the fee charged by independent counsel for similar services can provide a reasonable basis for calculating such an award . . . ."  *Broadcast Music, Inc. v. R Bar of Manhattan, Inc.*, 919 F. Supp. 656, 661 (S.D.N.Y. 1996) (citing additional cases).  *Accord Zacharias v. Shell Oil Co.*, 627 F. Supp. 31, 34 (E.D.N.Y. 1984) ("Compensating in-house or salaried employees by using an hourly rate is commonly used by courts in awarding attorneys' fees.").  As the Third Circuit pointed out long ago, "[t]here is no reason in law or equity why the [Defendant] should benefit from [Plaintiff's] choice to proceed with some of the work through its own legal department."  *Pittsburgh Plate & Glass Co. v. Fidelity & Casualty Co.*, 281 F.2d 538, 542 (3rd Cir. 1960).[36]

---

[34] As used herein, outside counsel fees also include fees relating to this adversary proceeding incurred by the Official Committee of the Unsecured Creditors, which are paid by Windstream.

[35] Because the billing records and invoices relating to legal work in April and May 2020 had not been finalized and filed with the Court by the close of trial, they are not trial exhibits.  The Court, however, can take judicial notice of the fees and costs in those fee applications now that they have been filed with the Court.  Fed. R. Evid. 201.

[36] Charter has argued that these fees were improperly documented.  All that is required is that such a fee request be supported by contemporaneous records specifying relevant dates, time spent and

Windstream's attorneys' fees and litigation costs reasonably reflect the loss inflicted upon

it by having to file and prosecute this adversary proceeding.  First, with respect to the rates charged,

Charter's unlawful conduct required the retention of experienced intellectual property law and

bankruptcy law attorneys—two specialized legal practices that often involve higher billing rates.

These billing rates have been publicly disclosed in fee applications made to and approved by the

Court.  (*See, e.g.*, Plaintiffs Trial Exs. 67-95, 99-100 and 104-106).[37]  This Court may rely on its

own substantial experience and knowledge of prevailing market billing rates in determining

whether rates sought are reasonable.  *Hanig v. Lee*, 415 F.3d 822, 825 (8th Cir. 2005).

Second, the hours worked on this adversary proceeding were reasonable.  This was a

complex adversary proceeding implicating both intellectual property law and bankruptcy law.  (*See*

Plaintiffs Trial Ex. 1).  To stop Charter's unlawful conduct, Windstream had to seek emergency

injunctive relief, which necessitated discovery, briefing, and argument on an expedited basis.

(Adv. Dkt. Nos. 2-3).  After Charter lost at the TRO hearing, it rebuffed the Court's plea to settle

the dispute and instead embarked on a "scorched earth" litigation campaign that involved excessive

---

work done.  *See Broadcast Music, Inc.*, 919 F. Supp. at 662.  The document evidencing
Windstream's in-house legal spend contains this information.  (Plaintiffs Trial Ex. 315).  It reflects
dates, times, and activities of legal staff compiled from contemporaneous records.  (Plaintiffs Trial
Ex. 350 at 11-12; May 6 Trial Trans., 103:24-104:21).  The underlying records from which this
exhibit was compiled were privileged and could not themselves be produced.  (Plaintiffs Trial Ex.
350 at 12).  As the Court has noted, the fact that the final compilation of in-house fees was not
assembled until shortly before trial is irrelevant because that compilation was based on
contemporaneous records.  (May 6 Trial Trans., 125:8-14).

[37]  The rates used for Windstream's in-house counsel were based on actual rates used by
comparable Little Rock, Arkansas lawyers and paralegals.  (Plaintiffs Trial Ex. 350 at 11-12).  *See
also Alexander v. Pine Buff School Dist.*, No. 5:16-cv-00300, Dkt. No. 91 (E.D. Ark. Aug. 30,
2018) ($350/hour reasonable rate for senior partner in Little Rock legal market in 2018); *Helena
Chem. Co. v. Cox Brothers*, No. 16-cv-00054, Dkt. No. 45 (E.D. Ark. Oct. 24, 2017) ($230/$240
per hour reasonable rate for partners, $130/$140 per hour reasonable rate for associates; and
$90/$95 per hour reasonable rate for paralegals in Little Rock legal market in 2017).

written and document discovery, numerous depositions, multiple needless discovery disputes, and expensive expert discovery.[38]    Charter also forced Windstream to defend against a meritless Motion for Summary Judgment and a meritless Motion to Exclude the Testimony of John C. Jarosz.  (Adv. Dkt. Nos. 116, 130).  Charter also filed a Motion for Judgment on the Pleadings on Counts VI and VII that wholly ignored binding Second Circuit law that directly contradicted Charter's argument therein.  (Adv. Dkt. Nos. 109).  Indeed, this Court labeled Charter's motion one of the "weakest motions [the Court] had ever read."  (Adv. Dkt. No. 237, 61:7-8).  Charter also filed a motion to compel Windstream to assume the VAR Agreement on the eve of Thanksgiving, only to later withdraw the motion, but only after Windstream filed an objection. (Case No. 19-22312, Dkt. No. Nos. 1263, 1298).

Following its loss at summary judgment, Charter launched a salvo of filings with the District Court in an attempt to frustrate the Court's adjudication of this adversary proceeding. These included:  a Notice of Appeal of the Court's interlocutory summary judgment order (Adv. Dkt. No. 201); a Motion for Leave for Interlocutory Appeal (Adv. Dkt Nos. 202-203); two purported objections to non-existent Bankruptcy Court reports and recommendations (Adv. Dkt. Nos. 204, 267) (one of which the Court *sua sponte* instructed Windstream to disregard (Adv. Dkt. No. 269)), and a frivolous argument that Charter's appellate filing somehow stripped this Court of jurisdiction—an argument that Charter "sprang" upon the Court without notice at the beginning of the hearing on its *Daubert* motion.  (Jan. 16, 2020 Hearing Trans., 85:7-92:19).  Charter lost every one of these motions, but each one required Windstream to incur additional legal fees.

_____

[38] Charter identified four experts to rebut the testimony of Windstream's one expert, forcing Windstream to conduct four expert depositions.  And, after inflicting that expense on Windstream, Charter called none of its experts at trial.

Charter's vexatious litigation conduct, however, did not reach its peak until the weeks before trial.  As part of its effort to stop a trial, Charter filed a Motion to Continue the March 30, 2020 Trial Setting for Counts VI-VII (the "Motion to Continue") that, once again, failed to address on-point precedent from the United States Supreme Court and the Second Circuit.  (Adv. Dkt. No. 247).  Again, Windstream was forced to respond to this motion.  (Adv. Dkt. No. 263).  In denying Charter's Motion to Continue, the Court labeled Charter's failure to deal with on-point law as "inexplicabl[e]."  (Adv. Dkt. No. 281 at 14).  Notwithstanding the Court's blunt rebuke, Charter filed a Motion for Relief from this Court's March 30, 2020 Order (the "Motion to Reconsider")— on a needlessly expedited basis—that not only mischaracterized Windstream's pleadings and this Court's holdings, but also sought new relief it had never previously sought—to separate claims against creditors and non-creditors.  (Adv. Dkt. No. 289).  Yet again, Windstream was forced to respond to this motion.  (Adv. Dkt. No. 294).  Finally, a mere eighteen hours before the start of trial, Charter filed a Motion for Judicial Notice.  (Adv. Dkt. No. 308).  That motion raised new, last-minute legal arguments.  (*Id.*).  At a time when it was preparing for trial, Windstream had to devote resources to oppose a motion that the Court would later describe as "ridiculous."  (April 27 Trial Trans., 97:16).  Even after this Court strongly suggested that Charter should withdraw the motion (*id.* at 98:24-99:3), Charter only partially withdrew it, forcing Windstream to respond to yet another frivolous filing.  (Adv. Dkt. No. 309).

Given the foregoing, the hours expended by Windstream's attorneys on this adversary proceeding were reasonable.  Moreover, these hours have been publicly disclosed in fee

applications made to and approved by the Court. (*See, e.g.*, Plaintiffs Trial Exs. 67-95, 99-100, 104-106).[39]

## III.    CHARTER OPERATING'S CLAIMS AGAINST THE OBLIGOR DEBTORS SHOULD BE SUBORDINATED.

Count VII seeks the equitable subordination of Charter Operating's proofs of claim filed against certain Debtors.  Charter Operating has filed proofs of claim against thirty-eight of the Debtors. (Joint Trial Ex. 9).  Of these thirty-eight Debtors, eighteen Debtors are Obligor Debtors (as defined in Debtors' Chapter 11 plan).  (*Id.*).  The total face value amount claimed by Charter Operating against these Obligor Debtors is $16,974,706.53.[40]  These claims should be equitably subordinated to all general unsecured claims against Obligor Debtors.

Courts have uniformly adopted the three-part test set out by the Fifth Circuit in *In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977), for determining whether equitable subordination is appropriate.  *See United States v. Noland*, 517 U.S. 535, 538 (1996) (citing *Mobile Steel* with approval); *In re Enron Corp.*, 379 B.R. 425, 433-34 (S.D.N.Y. 2007).  Under the *Mobile Steel* test, Windstream must show that:  (1) Charter engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of Windstream or conferred an unfair

---

[39] Charter might argue that some portion of Windstream's attorneys' fees should not be included in the sanction because only Counts VI and VII were at issue at trial.  Courts, however, routinely award all attorneys' fees incurred in a lawsuit—notwithstanding the existence of some causes of action not subject to a fee award—when a plaintiff's claims "involve a common core of facts or will be based on related legal theories," such that "[m]uch of counsel's time will be devoted generally to the litigation as a whole" and it would be "difficult to divide the hours expended on a claim-by-claim basis."  *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).  That is precisely what happened here.  Charter's violations of the automatic stay (Count VI) are predicated upon Charter's false advertising (Counts I-IV) and breach of the VAR Agreement (Count V).  As this Court has already pointed out, those claims were the factual basis for the violations of the automatic stay. (Adv. Dkt. No. 237, 151:22-152:19; Adv. Dkt. No. 281 at 16).  Accordingly, Windstream is entitled to its attorneys' fees incurred for all work on this adversary proceeding.

[40] *See* Exhibit B appended hereto.

advantage on Charter; and (3) equitable subordination must not be inconsistent with the provisions of the Bankruptcy Act. *In re Mobile Steel Co.*, 563 F.2d at 700. In determining whether these three elements have been satisfied, it is important to keep in mind that the inequitable conduct need not be related to the claim being subordinated. *Id.*

The Court has granted summary judgment to Windstream on the first element of the *Mobile Steel* test, holding that Charter's false advertising constituted inequitable conduct. (Adv. Dkt. No. 274 at 5). Thus, only the second and third elements of the *Mobile Steel* test remained to be decided by the Court at the trial of this adversary proceeding.

At trial, Windstream established that Charter's inequitable conduct resulted in injury to the creditors of Windstream *and* conferred an unfair advantage on Charter. First, Windstream was forced to expend resources of the Debtors' estates on corrective advertising, customer credits and a promotional campaign to address Charter's false advertising. (Auman Decl., ¶¶ 14-16; Joint Trial Ex. 11; Plaintiffs Trial Exs. 62, 64, 313, 316). Second, Charter's false advertising resulted in the loss of approximately 1,386 customers, costing Debtors' estates millions of dollars in lost revenue. (Jarosz Decl., ¶ 27). Third, Windstream was forced to expend resources of the Debtors' estates on legal fees to stop Charter's false advertising and to recoup the losses it caused. (Auman Decl., ¶¶ 20-21; Plaintiffs Trial Exs. 67-100, 104-106, 315). Finally, Charter's false advertising has damaged the "Windstream" brand and customer goodwill and, thus, further damaged the Debtors' estates. (May 6 Trial Trans., 117:12-118:12).

The effect of the foregoing was to diminish the value of the Debtors' estates, thereby reducing the amount of value available for distribution to creditors. As discussed above, the diminution of the estates is in the range of approximately $18 - $19.9 million. This is a very significant amount when, as here, unsecured creditors of Obligor Debtors—the relevant class of

creditors—will not receive anywhere close to 100% satisfaction of their claims. Indeed, such creditors are expected to receive less than a one percent recovery on their claims under the current Chapter 11 plan. (Auman Decl., ¶ 32; Plaintiffs Trial Exs. 101-102). Under such circumstances, the loss of almost $20 million clearly harmed the general unsecured creditors of the Obligor Debtors. *See In re 80 Nassau Assocs.*, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994); *In re Fabricators, Inc.*, 109 B.R. 186, 195 (Bankr. S.D. Miss. 1989). Moreover, the poaching of Windstream's customers by Charter – and the revenue brought to Charter from those customers – conferred an unfair advantage on Charter. Thus, the second element on the *Mobile Steel* test is met.[41]

The third element of the *Mobile Steel* test is also satisfied on this trial record. As this Court has noted, "the third prong of the *Mobile Steel* test carries minimal significance today because the current Bankruptcy Code provides explicitly for the remedy of equitable subordination, whereas the former Bankruptcy Act – under which *Mobile Steel* was decided – did not." *In re Hydrogen, LLC*, 431 B.R. 337, 360-61 (Bankr. S.D.N.Y. 2010). Indeed, this Court has observed that "if a court determines that the party advancing equitable subordination has satisfied the first two prongs of the *Mobile Steel* test, it is difficult to imagine a situation in which equitable subordination would not be warranted by bankruptcy law." *In re 80 Nassau Assoc.*, 169 B.R. 832, 841 (Bankr. S.D.N.Y. 1994) (describing third prong as "likely to be moot"). There is no fact of record here that suggests the exercise of this Court's power of equitable subordination would be inconsistent with the

---

[41] It is important to note that the law recognizes there may be multiple reasons why the general unsecured creditors of the Obligor Debtors will receive less than one percent of their claims. As *Mobile Steel* made clear, the inequitable conduct at issue need not be the exclusive reason for a creditor's recovery of less than one hundred percent of its claims. 563 F.2d at 700.

Bankruptcy Code.  Charter has certainly not identified one.  Equitable subordination here would be consistent with the significance that the automatic stay has in the bankruptcy process.

In determining the extent of subordination, the Court should evaluate the harm to the estate, including professional fees and costs incurred in the adversary proceeding.  *See In re LightSquared*, 511 B.R. 253, 350 (Bankr. S.D.N.Y. 2014).  In making this determination, the Court "need not arrive at a figure with 'precise accuracy' and any difficulty in precisely quantifying the harm should not redound to the benefit of the wrongdoer."  *Id.* at 352 (citation omitted).  As discussed in detail above, the range of approximate harm to the Debtors' estates is $18 - $19.9 million.  Charter Operating's proofs of claim against the Obligor Debtors, if accepted at face value, total $16,974,706.53.  (*See* Exhibit B appended hereto).  Given that Charter Operating's proofs of claim are less than the bottom of the range of harm caused, the entire amount should be subordinated.  Indeed, subordination of anything less than the entirety of Charter Operating's proofs of claim would be unreasonable given the nature of the inequitable conduct found by the Court here.  Quite simply, it would contravene the fundamental policies of the Bankruptcy Code to allow Charter Operating to recover any amount on its claims *pari passu* with the claims of the other general unsecured creditors after inflicting such significant harm on the Obligor Debtors and their estates.

## IV.    CHARTER CHOSE NOT TO PRESENT EXPERT TESTIMONY AT TRIAL.

Charter did not present any live testimony at trial.  In particular, despite identifying four experts to rebut the testimony of Windstream's one expert, Mr. Jarosz, Charter chose not to call

any of them to testify at trial.[42]  This was a choice made by Charter, and it cannot now complain that it had no opportunity to present rebuttal expert testimony.  (April 27 Trial Trans., 75:22-76:1, 77:11-14).  In particular, any complaint by Charter that it was misled by a February 24, 2020 email from the Court into stopping all expert witness preparation misrepresents the record.[43]  As the Court said when counsel to Charter complained it was prejudiced by not being able to call rebuttal expert witnesses:  "[T]hat's not prejudice.  That's your decision."  (*Id.* at 76:2-3).

### A.    Charter's Pretrial Disclosures And Filings Reveal It Had Prepared Its Experts To Testify At Trial.

Charter's claim that it was deprived of the opportunity to present rebuttal expert testimony at trial falls apart upon a review of the timing and substance of Charter's pretrial disclosures and filings.  Appended hereto as Exhibit C is a detailed timeline of the relevant pleadings.  A summary of the key events from that timeline and their significance is set out below.

On January 23, 2020, Charter filed its Motion to Continue.  (Adv. Dkt. No. 247).  Charter sought continuation of the trial on Counts VI and VII on the premise that holding such a trial would impinge upon its purported jury-trial right on Counts I-V.  (*Id.* at 1, 8).  On February 24, 2020, the Court informed the parties by email as to the high-level rationale for its forthcoming opinion denying Charter's Motion to Continue.  (Adv. Dkt. No. 289-1).  The Court stated that it could

---

[42] One of Charter's experts, Mr. Robert Borders, attended the first day of trial, but Charter announced later during the trial that it would not call him to testify because Charter did not believe it needed his testimony.  (April 28 Trial Trans., 193:14-18).

[43] It is important to note that no witness or counsel for Charter was willing to testify or sign a declaration under penalty of perjury stating that, in reliance on the Court's February 24, 2020 email, Charter directed its rebuttal experts to cease all trial preparation.  Nor has any witness or counsel for Charter averred under oath that, it was impossible for Charter to prepare its rebuttal experts in the five weeks remaining before trial.  Accordingly, these allegations are not facts of record that may even be considered by the Court.  *Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) ("An attorney's unsworn statements in a brief are not evidence.").

lawfully hold a bench trial on Counts VI and VII, but not on damages under Counts I-V.  (*Id.*).

The Court also stated:  "I am informing you of this conclusion now because I don't believe that

the parties should be preparing for a March 30 bench trial before me regarding the parties' damages

calculations under the Lanham Act and related state statutes." (*Id.*).  On March 17, 2020, the Court

issued its written decision on Charter's Motion to Continue, which tracked the Court's February

24 email.  (Adv. Dkt. No. 281).  In its March 17 decision, the Court stated that counsel for

Windstream "apparently confirmed . . . that Plaintiffs' witness on damages for purposes of Counts

I through V is not slated to testify on Counts VI and VII." (*Id.* at 16).  This *dicta* by the Court was

not supported by the transcript of the February 13 hearing.  In an effort to be completely

transparent, Windstream promptly advised the Court of this misunderstanding in a letter sent on

March 23, 2020—within four business days of the Court's decision—in which it made clear that

Mr. Jarosz would testify at trial.  (Adv. Dkt. No. 286).  Thus, Charter knew by March 23, 2020

that Mr. Jarosz would testify at a trial on Counts VI and VII—more than a month before trial.

While the parties litigated Charter's Motion to Continue, they continued to prepare for trial

by exchanging witness lists and pretrial disclosures.  These pleadings reveal that Windstream made

clear its intention to call Mr. Jarosz at trial and that Charter was in fact prepared to rebut his

testimony.  This is true for both the period before the Court's February 24 email, as well as the

period after it.  The parties exchanged proposed witnesses lists on January 30, 2020.  Windstream

identified Mr. Jarosz on its witness list.  (Adv. Dkt. No. 295 at Ex. B).  Similarly, Charter identified

its four experts on its witness list.  (*Id.* at Ex. C).

On March 2, 2020—one week *after* this Court's February 24, 2020 email—the parties filed

their pretrial disclosures pursuant to Rule 26(a)(3) of the Federal Rules of Civil Procedure.  Charter

identified the same four expert witnesses as witnesses that it "expect[ed] to call" at trial.  (Adv.

Dkt. No. 272 at 2).  Charter's March 2 disclosures also listed more than 150 exhibits, many of which were specific to the rebuttal of Mr. Jarosz's testimony.  (*Id.* at 13-16).

On April 13, 2020, Charter filed its Motion to Reconsider.  (Adv. Dkt. Nos. 289).  The Motion to Reconsider sought, yet again, to exclude Mr. Jarosz and to delay the trial.  (*Id.*).

On April 22, 2020, Charter submitted an Omnibus Motion *in Limine*.  (Adv. Dkt. No. 297). Like its earlier *Daubert* motion, Motion to Continue, and Motion to Reconsider, the Omnibus Motion *in Limine* sought to exclude Mr. Jarosz and delay the trial on the same grounds previously rejected by the Court.  (Adv. Dkt. Nos. 115, 247, 289, 297).

The Court heard Charter's Motion to Reconsider on the first day of trial.  (April 27 Trial Trans., 68:21-78:13).  The Court denied the Motion, holding that Charter's purported decision to stop preparing its expert witnesses to rebut Mr. Jarosz at trial was a choice it made.  (*Id.*).  On April 28, 2020, Charter cross-examined Mr. Jarosz for more than four and one-half hours using dozens of exhibits, including thirteen impeachment exhibits.  (April 28 Trial Trans., 39:6-176:17).

In sum, from November 2019 to the start of trial on April 27, 2020, Charter filed and argued four separate motions seeking to exclude Mr. Jarosz and to delay the trial—all of which were rejected by the Court.  (Adv. Dkt. Nos. 115, 247, 254, 287, 289, 297; April 27 Trial Trans., 68:21-78:13).  The Court never entered any Order excluding Mr. Jarosz from testifying at trial on Counts VI and VII.  After all of Charter's failed attempts to exclude Mr. Jarosz, no trial attorney could have reasonably believed that it was "safe" to cease trial preparation with respect to Mr. Jarosz. Doing so would be a reckless gamble or an attempt to manufacture a phony issue for appeal. Moreover, the record reveals that Charter *never stopped* preparing to rebut Mr. Jarosz even while waging a months-long campaign to exclude his testimony.  Indeed, it is indisputable that Charter continued to list its rebuttal expert witnesses and exhibits targeted at Mr. Jarosz in its disclosures

*after* February 24, 2020—the point in time at which it purportedly told its rebuttal experts to stand down.[44]  There is simply no factual support in the record for Charter's claim that it was misled by the Court's February 24 email into stopping expert preparation.

### B.    Charter Had Ample Time To Prepare Its Experts.

Even accepting Charter's unsupported claim that it was somehow misled by the Court's February 24 email, Charter cannot claim it lacked the opportunity to prepare its rebuttal experts once it realized Mr. Jarosz would be testifying at trial.  The latest date on which Charter knew that Mr. Jarosz would testify at the trial of Counts VI and VII was March 23, 2020, when Charter received Windstream's letter to the Court indicating that Mr. Jarosz would testify.  (Adv. Dkt. No. 286).  That letter put to rest any possible misunderstanding Charter may have had regarding Mr. Jarosz's testimony at trial.  (*Id*.).  From that point forward, Charter still had *five weeks* until the start of trial and *four weeks* until the April 20, 2020 deadline to submit the direct testimony of its witnesses by declaration.  Of course, Charter's rebuttal experts had *months* of prior notice of Mr. Jarosz's testimony, had already submitted expert reports in rebuttal thereto, and had already been deposed regarding such reports.  Given all of that preparation work already undertaken by Charter and its experts, four to five weeks was ample time to prepare them for trial.

Indeed, although Charter listed four expert witnesses for trial, only three could have testified because Dr. Ostberg had been excluded.  (Adv. Dkt. No. 251).  And, Mr. Borders appeared at trial prepared to testify, but Charter decided it did not need him to testify.  (April 28 Trial Trans.,

---

[44] Charter argued that it continued to list rebuttal witnesses and evidence on its pre-trial disclosures "because this Court has not yet ordered a separate trial on Counts VI and VII."  (Adv. Dkt. No. 289 at 20).  This is nonsensical.  If Charter thought it was necessary to continue listing rebuttal witnesses in its pre-trial disclosures until an order for a separate trial was entered, how could it believe that it should stop preparing those witnesses for trial before an order was entered?

193:14-18).  That left only Mr. Kardos and Mr. Kamin to be prepared for trial.  Mr. Kardos is a Charter executive and the Court had limited Mr. Kardos' expert testimony to a narrow range "relating to Mr. Jarosz's churn rate analysis and the number of customers taken into account in that analysis."  (Adv. Dkt. No. 253).  Four to five weeks was certainly sufficient time for Charter to prepare Mr. Kardos for trial given this limited range of trial testimony.  Similarly, Mr. Kamin's testimony at trial was limited to critiquing Mr. Jarosz's testimony.  (Adv. Dkt. No. 250).  Charter and Mr. Kamin received Mr. Jarosz's expert report in October 2019.  Mr. Kamin submitted a rebuttal report and was deposed in late-October 2019.  Charter has no basis for claiming that four or five weeks was insufficient to prepare Mr. Kamin's rebuttal testimony in light of all the work Charter had previously done in preparing Mr. Kamin's rebuttal to Mr. Jarosz.

The foregoing record reveals that Charter went "all-in" on a gambit to withhold its expert witnesses from testifying at trial in the hope of either delaying the trial or manufacturing an argument for appeal.  Charter's lack of expert testimony at trial was a problem of its own making— a deliberate choice it made.  Charter must live with that choice.

## CONCLUSION

For the foregoing reasons, Windstream respectfully requests that the Court:  return a verdict in its favor on Counts VI and VII of the Complaint; enter a sanction against Charter for its violations of the automatic stay in an amount of at least $19.9 million; and equitably subordinate all of Charter Operating's claims against the Obligor Debtors.  Furthermore, Windstream respectfully requests that all attorneys' fees and litigation costs in subsequently filed fee applications relating to this adversary proceeding be added to the sanction.

Dated:  June 9, 2020                    /s/  Terence P. Ross
New York, NY                           Terence P. Ross
                                       Michael R. Justus (admitted *pro hac vice*)
                                       Shaya Rochester
                                       **KATTEN MUCHIN ROSENMAN LLP**
                                       575 Madison Avenue
                                       New York, NY 10022
                                       Telephone:  (212) 940-8800
                                       Facsimile:  (212) 940-8876
                                       Email:  terence.ross@katten.com
                                               michael.justus@katten.com
                                               srochester@katten.com

                                       *Conflicts Counsel to the Debtors and Debtors in*
                                       *Possession*

# EXHIBIT A

# Total Losses/Costs Incurred By Windstream

| | | |
|---|---|---|
| Attorneys' Fees and Litigation Costs | | $9,921,716 |
| Lost Profits | (Jarosz Decl., ¶ 27) | $3.2 – $5.1 MM |
| Promotional Costs | (Auman Decl., ¶ 15) | $4,033,425 |
| Corrective Advertising Costs | (Auman Decl., ¶ 16) | $862,775 |
| Out of Service Credits | (Auman Decl., ¶ 14) | $5,278 |
| **Total Losses/Costs** | | $18,020,194 – $19,923,194 |

# EXHIBIT B

## Charter Communications Operating, LLC's Claims Against Obligor Debtors[*]

| Claim # | Name of Claimant | Debtor Name | Filed Amount |
|---------|------------------|-------------|-------------|
| 5731 | Charter Communications Operating, LLC | Conversent Communications Long Distance, LLC | $200.51 |
| 5732 | Charter Communications Operating, LLC | Valor Telecommunications of Texas, LLC | $200.51 |
| 5733 | Charter Communications Operating, LLC | Windstream NuVox Kansas, LLC | $200.51 |
| 5735 | Charter Communications Operating, LLC | PAETEC, LLC | $200.51 |
| 5736 | Charter Communications Operating, LLC | CoreComm Communications, LLC | $328.13 |
| 5738 | Charter Communications Operating, LLC | Broadview Networks of Massachusetts, Inc. | $200.51 |
| 5739 | Charter Communications Operating, LLC | Allworx Corp. | $681.40 |
| 5758 | Charter Communications Operating, LLC | Conversent Communications of New Hampshire, LLC | $55,538.82 |
| 5759 | Charter Communications Operating, LLC | Conversent Communications of Massachusetts, Inc. | $55,538.82 |
| 5760 | Charter Communications Operating, LLC | Conversent Communications of Maine, LLC | $55,538.82 |
| 5762 | Charter Communications Operating, LLC | Conversent Communications of Rhode Island, LLC | $55,538.82 |
| 5764 | Charter Communications Operating, LLC | Windstream Alabama, LLC | $970,592.96 |
| 5765 | Charter Communications Operating, LLC | Southwest Enhanced Network Services, LLC | $970,592.96 |
| 5766 | Charter Communications Operating, LLC | InfoHighway of Virginia, Inc. | $970,592.96 |
| 5769 | Charter Communications Operating, LLC | Windstream Services, LLC | $13,672,143.83 |
| 5790 | Charter Communications Operating, LLC | Conversent Communications of Vermont, LLC | $55,538.82 |
| 5791 | Charter Communications Operating, LLC | Conversent Communications of Connecticut, LLC | $55,538.82 |
| 5792 | Charter Communications Operating, LLC | Conversent Communications Long Distance, LLC | $55,538.82 |

**TOTAL:**     **$16,974,706.53**

---

[*] *See* Joint Trial Ex. 9 (All Proofs of Claim filed by Charter entities); Plaintiffs Trial Ex. 101 at 54 (List of Obligor Debtors in Joint Chapter 11 Plan of Reorganization).

# EXHIBIT C

## Timeline Of Disclosures And Filings Relating To Charter's Expert Witnesses

| Date | Event | Adv. Dkt. No. |
|---|---|---|
| October 11, 2019 | Windstream served the expert report of John C. Jarosz | 116, Ex. 1 |
| October 25, 2019 | Charter served the expert reports of its four experts to rebut the expert report of Mr. Jarosz, namely, Mr. Ostberg, Mr. Borders, Mr. Kardos, and Mr. Kamin | 132, Ex. 20; 187, Ex. B; 190, Ex. C; 193, Ex. A |
| October 30, 2019 | Charter deposed Mr. Jarosz.  Windstream deposed Dr. Ostberg | Not applicable |
| October 31, 2019 | Windstream deposed Mr. Kamin and Mr. Borders | Not applicable |
| November 7, 2019 | Windstream deposed Mr. Kardos | Not applicable |
| November 15, 2019 | Charter filed its *Daubert* motion to exclude Mr. Jarosz, based in part on the opinions in its four rebuttal expert reports | 115-16 |
| December 6, 2019 | Windstream filed its *Daubert* motion to exclude Dr. Ostberg | 155-56 |
| December 23, 2019 | Windstream filed its *Daubert* motions to exclude Mr. Borders, Mr. Kardos, and Mr. Kamin | 185-93 |
| January 16, 2020 | The Court held a hearing on the parties' *Daubert* motions and ruled from the bench.  The Court denied Charter's *Daubert* motion to exclude Mr. Jarosz; granted Windstream's motion to exclude Dr. Ostberg; granted *in part* and denied *in part* Windstream's motions to exclude Mr. Kardos and Mr. Borders; and denied *in part* and continued *in part* Windstream's motion to exclude Mr. Kamin | Not applicable |
| January 23, 2020 | Charter filed its Motion to Continue | 247 |
| January 28, 2020 | The Court entered Orders regarding its bench rulings on the parties' *Daubert* motions | 250-55 |
| January 30, 2020 | The parties served their trial witness lists.  Windstream's witness list included Mr. Jarosz.  Charter's witness list included Messrs. Borders, Kamin, Kardos, and Dr. Ostberg | 295, Exs. B-C |
| February 6, 2020 | Windstream filed its objection to Charter's Motion to Continue | 263 |
| February 13, 2020 | The Court held a hearing on Charter's Motion to Continue | Not applicable |
| February 24, 2020 | The Court emailed the parties regarding its forthcoming decision on Charter's Motion to Continue | 289-1 |
| March 2, 2020 | Charter served its Fed. R. Civ. P. 26(a)(3) pretrial disclosures that listed its four rebuttal experts on its "expect to call" witness list, and included many exhibits relating to Mr. Jarosz | 272 |
| March 17, 2020 | The Court issued its Memorandum of Decision on Charter's Motion to Continue | 281 |
| March 17, 2020 | Charter served its first supplemental exhibit list with many exhibits relating to Mr. Jarosz | 295, Ex. D |
| March 23, 2020 | Windstream served its letter regarding the misunderstanding in the Court's Memorandum of Decision on Charter's Motion to Continue | 286 |
| March 30, 2020 | The Court entered its Order denying Charter's Motion to Continue | 287 |
| April 13, 2020 | Charter filed its Motion to Reconsider | 289 |
| April 13, 2020 | Charter served its second supplemental exhibit list with many exhibits relating to Mr. Jarosz | 295, Ex. D |
| April 20, 2020 | Windstream filed its list of Skype participants for trial, which included Mr. Jarosz | 292 |

| Date | Event | Adv. Dkt. No. |
|---|---|---|
| April 20, 2020 | Windstream served declarations in lieu of direct testimony for Mr. Jarosz and Mr. Auman.  Charter served a declaration in lieu of direct testimony for Mr. Borders | Not applicable |
| April 21, 2020 | Windstream filed its objection to Charter's Motion to Reconsider | 294 |
| April 21, 2020 | Charter served its Third Supplemental Exhibit List and its Impeachment Exhibits 1-66, which included exhibits relating to Mr. Jarosz | Not applicable |
| April 22, 2020 | Charter filed its Omnibus Motion *In Limine* | 297 |
| April 27, 2020 | Start of trial.  The parties argued Charter's Motion to Reconsider and the Court denied the Motion | April 27 Trial Trans., 68:21-78:13 |
| April 28, 2020 | Charter cross-examined Mr. Jarosz and withdrew Mr. Borders from testifying | April 28 Trial Trans., 38:25-176:17; 193:14-18 |

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of June 2020, I caused a true and correct copy of the

Debtors' Post-Trial Memorandum to be filed electronically using the CM/ECF System, which will

then send a notification of such filing (NEF) to all counsel of record in this lawsuit.


Dated:  June 9, 2020                              */s/ Terence P. Ross*_____
                                                  Terence P. Ross