John Kingston (*pro hac vice*)
Michael Nepple (*pro hac vice*)
Brian Hockett (*pro hac vice*)
**THOMPSON COBURN LLP**
One US Bank Plaza
St. Louis, MO 63101
Telephone:     (314) 552-6000
Facsimile:     (314) 552-7000

*Counsel for Defendants Charter Communications, Inc. and*
*Charter Communications Operating, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| WINDSTREAM HOLDINGS, INC., et al., | Case No. 19-22312 (RDD) |
| Debtors. | (Jointly Administered) |
| WINDSTREAM HOLDINGS, INC., et al., | |
| Plaintiffs, | Adv. Pro. No. 19-08246 |
| vs. | |
| CHARTER COMMUNICATIONS, INC. and CHARTER COMMUNICATIONS OPERATING, LLC, | |
| Defendants. | |

## DEFENDANTS' POST-TRIAL BRIEF ON COUNTS VI AND VII

# TABLE OF CONTENTS

PAGE

INTRODUCTION ..................................................................................................1

PROCEDURAL HISTORY.....................................................................................4

BACKGROUND ....................................................................................................7

     A.    In the 2009 DirecTV Lawsuit, Charter did not contend § 362(a) enjoined advertising and the court did not enjoin most bankruptcy-related advertising.................................................................................................7

     B.    The Challenged Advertisement would have been entirely permissible under the standard applied in the 2009 DirecTV Lawsuit .......................................8

     C.    The Challenged Advertisement was drawn directly from statements of industry experts and was consistent with statements made by both plaintiffs and this Court .......................................................................11

     D.    Defendants promptly responded to all of Plaintiffs' complaints about the "Challenged Advertisement" before Plaintiffs filed this lawsuit...........................13

     E.    Those plaintiffs that provide broadband service fell further and further behind Charter in terms of speed and product offerings in 2019...........................14

     F.    Plaintiffs' asserted false advertising damage claims are based entirely on false testimony, junk science, and hearsay opinion testimony from an out-of-court declarant .................................................................................16

     G.    Plaintiffs' assert claims for a Lost Customer Injury and Retained Customer Injury at trial ......................................................................................17

     H.    Seeking a double recovery on Lost Customer Damages, Plaintiffs' chief fact witness lied about the nature of an alleged $4 million dollar injury..............19

          1.    Jarosz admitted he cannot estimate damages from an alleged stay violation and did not attempt to estimate any individual plaintiff's injury ................................................................................21

          2.    Jarosz made no effort to address confounding variables or ensure that his control group and treatment group were reliably identified..........22

     I.    The only non-speculative evidence is that not a single plaintiff suffered any quantifiable harm to its goodwill ..................................................23

J.      Defendants spent thousands of hours working to avoid disconnects even as Plaintiffs failed to pay millions of dollars in post-petition debt ...........................24

K.      All of Auman's trial testimony regarding disconnections of service was the alleged the repetition of out of court statements by unidentified declarants .........................................................................................................26

L.      The thirty-six plaintiffs asserting claims under Count VII have introduced no evidence that any of their creditors were harmed or unfairly prejudiced .........27

ARGUMENT ...................................................................................................................27

I.      Civil contempt is not possible where the subject injunction does not clearly and unambiguously proscribe the challenged conduct or plaintiffs do not prove a lack of reasonable diligence in complying with the subject injunction.....................................27

II.     Section 362(a)(3) does not clearly and unambiguously enjoin bankruptcy related advertisements.........................................................................................................28

A.      Because an ex parte prior restraint on speech before a finding that the speech was false or misleading would be unconstitutional, there is fair ground to doubt § 362(a)(3) imposes such an injunction .......................................29

B.      Section 362(a)(3) does not unambiguously enjoin the Challenged Advertisement ....................................................................................................30

C.      Because there is a difference between a verb phrase and a noun, the Code's broad definition of "property" does not help Plaintiffs' claim for contemptuous advertising ...................................................................................31

III.    Plaintiffs cannot salvage their contemptuous advertising claims by invoking inherent authority or inventing novel subjective contempt standards ...............................33

A.      Plaintiffs cannot circumvent the Second Circuit "old soil" governing contempt under §105(a) by seeking "inherent authority" sanctions.....................33

B.      No subjective standard could salvage a plaintiff's claim for civil contempt for violating §362(a)(3) through bankruptcy-related advertising .........................34

IV.     Having spent more than 3,600 hours trying to avoid service interruptions related to 14,500 accounts potentially connected to 205 separate entities, Defendants cannot be accused of a lack of diligence.............................................................................37

V.      This Court cannot constitutionally decide the damage issues that are to be decided by a jury in Counts I through V ............................................................................37

VI.    Because no legal fees were incurred to convince defendants to comply with §
       362(a) and this Court cannot determine damages, fees are not available here ................39

VII.   Even ignoring that a jury must decide facts pertaining to damages, Plaintiffs have
       introduced no cognizable damage evidence ....................................................................40

VIII.  No plaintiff has introduced evidence related to its creditors even remotely
       sufficient to sustain an equitable subordination claim.......................................................42

IX.    Equitable disallowance is not available because no plaintiff has asserted a claim
       objection under 11 U.S.C. § 502(b) ...................................................................................44

CONCLUSION.................................................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 80 Nassau Associates*,
  169 B.R. 832 (Bankr. S.D.N.Y. 1994) ..............................................................43, 44

*In re A.M.R.*,
  485 B.R. 279 (Bankr. S.D.N.Y. 2013) ....................................................................32

*In re Alert Holdings, Inc.*,
  148 B.R. 194 (Bankr. S.D.N.Y. 1992) .....................................................................32

*Alexander v. United States*,
  509 U.S. 544 (1993) .................................................................................................28

*In re Allentown Ambassadors, Inc.*,
  361 B.R. 422 (Bankr. E.D. Pa. 2007) ......................................................................31

*AQ Consulting WLL v. Branca*,
  No. 10 CIV 7496 AKH, 2011 WL 240812 (S.D.N.Y. Jan. 19, 2011) ............2, 9, 17

*In re Arab Bank, PLC Alien Tort Statute Litig.*,
  808 F.3d 144 (2d Cir. 2015)......................................................................................34

*Beacon Theatre v. Westover*,
  359 U.S. 500 (1959) .......................................................................................37, 38, 39

*In re Bernard L. Madoff Inv. Sec. LLC*,
  515 B.R. 117 (Bankr. S.D.N.Y. 2014)......................................................................43

*Carroll v. President & Comm'rs of Princess Anne*,
  393 U.S. 175 (1968) ............................................................................................1, 28

*In re CBI Holding Co., Inc.*,
  529 F.3d 432 (2d Cir. 2008)......................................................................................38

*In re CBI Holdings, Inc.*,
  311 B.R. 350 (S.D.N.Y. June 30, 2004) ..............................................................38, 39

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ...................................................................................................34

*Chamilia LLC v. Pandora Jewelry LLC*,
  No. 04-CV-6017, 2007 WL 2781246 (S.D.N.Y. 2007)..............................................5

*Chao v. Gotham Registry, Inc.*,
    514 F.3d 280 (2d Cir. 2008)................................................................................27

*In re Charter Comms., S.E.C. Litig.*,
    443 F.3d. 987 (8th Cir. 2006) .............................................................................23

*In re Chateaugay Corp.*,
    920 F.2d 183 (2d Cir. 1990).......................................................................... *passim*

*Clark v. Martinez*,
    543 U.S. 371 (2005)............................................................................................29

*In re Collier*,
    410 B.R. 464 (Bankr. E.D. Tex. 2009) ..............................................................30

*Colon v. Howard*,
    215 F.3d 227 (2d Cir. 2000)...............................................................................33

*In re Crysen/Montenay Energy Co.*,
    902 F.2d 1098 (2d Cir. 1990).............................................................................27

*Dairy Queen, Inc. v. Wood*,
    369 U.S. 469 (1962)......................................................................................38, 39

*Dammers & Vanderheide & Scheepvaart Maats Christina B.V. v. Corona*,
    836 F.2d 750 (2d Cir. 1988)...............................................................................38

*In re DiBattiston*,
    No. 19-cv-8118 (CS), 2020 WL 1819948 (S.D.N.Y. 2020)................................32

*Drywall Tapers & Pointers v. Local 530*,
    889 F.2d 389 (2d Cir. 1989)...............................................................3, 27, 34, 37

*In re Enron Corp.*,
    300 B.R. 201 (Bankr. S.D.N.Y. 2003) ...............................................................31

*In re Enron Corp.*,
    No. 01-16034 (AJG), 2005 WL 3832053 (Bankr. S.D.N.Y. Nov. 28, 2005)........43

*Fiber-Shield Indus., Inc. v. N.Y. Fire-Shield, Inc.*,
    189 F.3d 460 (2d Cir. 1999)...............................................................................37

*Fleming v. Jacksonville Paper Co.*,
    128 F.2d 395 (5th Cir. 1942) .............................................................................35

*Frankford Tr. Co. v. Allanoff*,
    29 B.R. 407 (E.D. Pa. 1983) ..............................................................................28

*Freedman v. State of Md.*,
     380 U.S. 51 (1965)................................................................................29

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
     111 F.3d 993 (2d Cir. 1997).................................................................11

*Global Tech Led, LLC v. Hilumz Int'l Corp.*,
     No. 2:15-cv-553, 2017 WL 588669 (M.D. Fla. Feb. 14, 2017)................9

*In re Golden Distributors, Ltd.*,
     122 B.R. 15 (Bankr. S.D.N.Y. 1990)........................................2, 30, 32

*In re Harchar*,
     393 B.R. 160 (Bankr. N.D. Ohio 2008)................................................31

*Hatahley v. United States*,
     351 U.S. 173 (1956)..........................................................................6, 41

*Int'l Bus. Machines Corp. v. BGC Partners, Inc.*,
     No. 10 Civ. 128 PAC, 2013 WL 1775367 (S.D.N.Y. Apr. 25, 2013).....42

*In re Kalikow*,
     602 F.3d 82 (2d Cir. 2010)...................................................................32

*Katchen v. Landy*,
     382 U.S. 323 (1966).......................................................................38, 39

*Lamarr-Arruz v. CVS Pharmacy, Inc.*,
     No. 15-CV-04261 (JGK), 2017 WL 4277188 (S.D.N.Y. Sept. 26, 2017)............41

*Latino Officers Ass'n. v. City of New York*,
     558 F.3d 159 (2d Cir. 2009).................................................................27

*In re LightSquared Inc.*,
     511 B.R. 253 (Bankr. S.D.N.Y. 2014).............................................43, 45

*Mackler Prods., Inc. v. Cohen*,
     146 F.3d 126 (2d Cir. 1998).................................................................33

*Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*,
     779 F.3d 102 (2d Cir. 2015).................................................................27

*In re MarketXT Holdings Corp.*,
     336 B.R. 39 (Bankr. S.D.N.Y. 2006)....................................................37

*In re Masterwear Corp.*,
     229 B.R. 301 (Bankr. S.D.N.Y. 1999)..................................................27

*McComb v. Jacksonville Paper Co.*,
   336 U.S. 187 (1949).................................................................33, 35, 36

*Metro. Opera Ass'n, Inc. v. Local 100*,
   239 F.3d 172 (2d Cir. 2001)......................................................1, 27, 36

*Ming Shi Xue v. Bd. of Immigration Appeals*,
   439 F.3d 111 (2d Cir. 2006).........................................................34, 39

*In re Mobile Steel*,
   563 F.2d 692 (5th Cir. 1977) .............................................................43

*In re Nat'l Serv. Corp.*,
   742 F.2d 859 (5th Cir. 1984) ........................................................2, 30

*New York Magazine v. Metro. Transp. Auth.*,
   136 F.3d 123 (2d Cir. 1998)..........................................................1, 29

*U.S. on behalf of I.R.S. of I.R.S. v. Norton*,
   717 F.2d 767 (3d Cir. 1983)...............................................................28

*Perfect Fit Indus., Inc. v. Acme Quilting Co.*,
   646 F.2d 800 (2d Cir. 1981)...............................................................41

*Phelan v. Local 305*,
   973 F.2d 1050 (2d Cir. 1992)......................................................16, 19

*Rosenthal v. Poland*,
   337 F. Supp. 1161 (S.D.N.Y. 1972).....................................................42

*Ross v. Bernhard*,
   396 U.S. 531 (1970)...................................................................38, 39

*In re Sanchez*,
   941 F.3d 625 (2d Cir. 2019).................................................................33

*In re Smith*,
   170 B.R. 111 (Bankr. N.D. Ohio 1994) ..............................................37

*In re Sturman*,
   2011 WL 4472412 (Bankr. S.D.N.Y. 2011) ........................................40

*In re Sunbeam Corp.*,
   284 B.R. 355 (Bankr. S.D.N.Y. 2002)............................................4, 43

*Taggart v. Lorenzen*,
   139 S. Ct. 1795 (2019).................................................. *passim*

*In re Tarrant*,
190 B.R. 704 (Bankr. S.D. Ga. 1995) ...................................................................37

*In re Treco*,
No. 00-8137, 2001 WL 1566709 (Bankr. S.D.N.Y. Dec. 10, 2001) ........................27

*In re Trump Ent. Resorts, Inc.*,
534 B.R. 93 (Bankr. D. Del. 2015) .......................................................................31

*U.S. v. United Mine Workers of Am.*,
330 U.S. 258 (1947)..............................................................................................40

*United States v. Twentieth Century Fox Film Corp.*,
882 F.2d 656 (2d Cir. 1989)............................................................................33, 34

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976).................................................................................................2

*Vance v. Universal Amusement Co.*,
445 U.S. 308 (1980)..............................................................................................28

*In re W.T. Grant Co.*,
699 F.2d at 610-11 .................................................................................................43

*Walling v. Jacksonville Paper Co.*,
317 U.S. 564 (1943)..............................................................................................35

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
481 U.S. 787 (1987)..............................................................................................41

*In re Young*,
193 B.R. 620 (Bankr. D.D.C. 1996) ...................................................................3, 31

*Yu Y Ho v. SIM Enters., Inc.*,
No. 11 Civ. 2855 (PKC), 2014 WL 1998237 (S.D.N.Y. May 13, 2014) ..................6

**Statutes**

11 U.S.C. § 105(a) ......................................................................................3, 6, 33, 35

11 U.S.C. § 362............................................................................................... *passim*

11 U.S.C. § 502(b) .............................................................................................45

11 U.S.C. §510(c) ...................................................................................................6

11 U.S.C. § 541 ....................................................................................................30

18 U.S.C. § 1623(d) .............................................................................................20

## Other Authorities

1978 U.S.C.C.A.N. 5963 ............................................................................................29

23 A.L.R. Fed. 2d 339 ..............................................................................................30

2 A.L.R. Fed. 2d 459 ................................................................................................30

9B Am. Jur. 2d Bankruptcy § 1742 .........................................................................30

First Amendment ...........................................................................................1, 28, 30

Sixth Amendment ....................................................................................................33

Seventh Amendment ....................................................................................37, 38, 39

Fed. R. Evid. 802 ....................................................................................................42

Fed. R. Evid. 803 ....................................................................................................42

Federal Rule of Civil Procedure 20 ........................................................................38

Federal Rule of Civil Procedure 26(a)(2) ..........................................................17, 18

Federal Rule of Civil Procedure 42 .........................................................................7

Federal Rule of Civil Procedure 52(a) .....................................................................6

Federal Rule of Evidence 201(c) ............................................................................17

## INTRODUCTION

To find civil contempt based on alleged false advertising, this Court would have to read 11 U.S.C. § 362(a)(3) as unambiguously imposing an ex parte prior restraint on speech—permanently enjoining bankruptcy-related advertising that no court has found false or misleading. Read in that fashion, § 362(a)(3) would be unquestionably unconstitutional. *See New York Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 131 (2d Cir. 1998)(First Amendment prohibits prior restraint on commercial speech before it is found to be false or misleading); *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 180 (1968)("there is no place within the area of basic freedoms guaranteed by the First Amendment" for ex parte prior restraints on speech). And where the Second Circuit in *Metropolitan Opera* found an order enjoining "fraudulent or defamatory representations" too vague to sustain contempt for future speech, this Court would have to read § 362(a)(3) to eliminate similar ambiguity as to what representations are enjoined without even mentioning "representations." *See Metro. Opera Ass'n, Inc. v. Local 100*, 239 F.3d 172, 176-178 (2d Cir. 2001)( "the terms of the injunction are so vague and imprecise that the Union cannot fairly determine what future speech is permitted and what speech might place it in contempt").

On April 16, 2019, this Court entered a temporary restraining order enjoining Defendants under the Lanham Act from stating or implying that Plaintiffs were "in bankruptcy or Chapter 11" as part of an effort to win customers.[1] Plaintiffs' civil contempt claims would have this Court find no "fair ground of doubt" as to whether § 362(a)(3) had already imposed an identical (but permanent) injunction without the constitutional niceties of notice, a pre-injunction chance to be

---

[1] Specifically, this Court ordered Defendants to, inter alia, "Cease and desist from expressly or impliedly stating in commerce, publishing, or otherwise disseminating in any and all media (including, without limitation, Internet, television, radio, newspaper and other print, billboards, direct mail, telephone and as part of any door-to-door campaign) that Windstream is in bankruptcy or Chapter 11 as part of an effort to persuade Windstream customers to switch their service to Spectrum." *See* Dkt. No. 25 at 5-6, ¶1(k).

heard, or a prior adjudication that the subject speech was false or misleading commercial speech.[2] *See Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019).

Section 362(a)(3) states that a Chapter 11 petition "operates as a stay, applicable to all entities, of … any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." It does not purport to enjoin any advertising (and would be unconstitutional if it did). There is no hint in its legislative history that Congress intended to enjoin advertising. No court has ever found, nor treatise suggested, that § 362(a)(3) enjoins advertising and this Court itself informed Plaintiffs that "the stay violation is really quite different than the other Lanham Act relief you're seeking." *See* Plts. Ex. 48 at 82:15-17.[3] The suggestion that it would be "objectively unreasonable," *Taggart*, 139 S.Ct. at 1802, to believe that § 362(a)(3) does not enjoin advertising is nonsense. *Accord In re Golden Distributors, Ltd*., 122 B.R. 15, 21-22 (Bankr. S.D.N.Y. 1990)(wrongful solicitation of debtor's customers "does not constitute an act to obtain possession of property of the estate or the exercise of control over property of the estate within the context of the automatic stay as imposed under 11 U.S.C. § 362(a)(3)").

Any injunction on advertising in § 362(a)(3) would be found in the verb phrases "act to obtain possession" or "exercise control," not the noun "property." Thus, any argument based on the Bankruptcy Code's broad definition of "property" is a red herring and cannot help Plaintiffs'

---

[2] Or for that matter, even commercial speech. Commercial speech "does no more than propose a commercial transaction." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)(citation and internal punctuation omitted). An advertisement that implied Plaintiffs were in bankruptcy but did not include a specific sale offer would not be commercial speech. *Accord In re Nat'l Serv. Corp.*, 742 F.2d 859, 862 (5th Cir. 1984)(creditor's billboard stating "that NSC is in bankruptcy and that NSC cannot pay its bills" was not commercial speech and could not be enjoined as a violation of § 362). But such an advertisement would nevertheless be enjoined here if it was "part of an effort to persuade Windstream customers to switch."

[3] Jeffrey Auman declared that "Plaintiffs Trial Exhibit 48 is a true and correct copy of a certified transcript of a hearing held in this adversary proceeding on April 15, 2019." Auman Decl. at ¶ 57. Plaintiffs' Exhibit 48 is missing pages 75-116. This Court can take judicial notice of the missing pages from its own docket. *See* Dkt. No. 237. *See, e.g.*, *AQ Consulting WLL v. Branca*, No. 10 CIV 7496 AKH, 2011 WL 240812, at *1 (S.D.N.Y. Jan. 19, 2011).

claims. *Accord, e.g., In re Young*, 193 B.R. 620, 624 (Bankr. D.D.C. 1996)("the significance of the phrase 'to exercise control' in the Code is, at best, ambiguous").

Moreover, because there is no evidentiary support for the proposition that either defendant subjectively believed § 362(a)(3) enjoined any form of advertising, no plaintiff can salvage its "contemptuous advertising" claim by inviting this Court to create some novel subjective contempt standard reserved for "sophisticated" defendants under 11 U.S.C. § 105(a).

Contempt is also improper for service disconnects involving the "last mile" customers of unspecified plaintiffs. In holding strict liability contempt unavailable under §105(a), the Supreme Court found in *Taggart* that the contempt statute incorporates the "old soil" of "the traditional standards in equity practice for determining when a party may be held in civil contempt for violating an injunction." 139 S. Ct. at 1801. In the Second Circuit, that old soil has long included the rule that a court may not find contempt without proof that "the defendant has not been reasonably diligent and energetic in attempting to accomplish what was ordered." *Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389, 394 (2d Cir. 1989). Because it is undisputed that Defendants spent literally thousands of hours trying to avoid the plainly-unintended disconnects here, those disconnects cannot sustain a finding that Defendants were not reasonably diligent in attempting to comply with 11 U.S.C. § 362(a)(3) and (a)(6).

After Plaintiffs filed for bankruptcy in late February, Defendants spent roughly 3,600 hours identifying and securing roughly 14,500 customer accounts potentially associated with each of the 205 different plaintiffs (who have operated under 284 different names). Until those 14,500 accounts were identified and secured, their internet service could be disrupted pursuant to automatic nonpayment protocols commonly employed in the industry to avoid potentially misleading investors. As of Friday, March 15, 2019, Defendants had not yet completed this

- 3 -

massive project and automatic protocols (established long before the Plaintiffs' bankruptcy filings) interrupted service to 289 of the 14,500 accounts in question (i.e., roughly 2%). Defendants restored service to all 289 of the affected accounts by Monday, March 18, 2019—*a day before even one of Plaintiffs' lawyers managed to bill even one hour to the file*.

The equitable subordination claims asserted by thirty-six plaintiffs under Count VII against Defendant Charter Communications Operating, LLC (CCO) likewise fail. For equitable subordination, the injury to the creditors of the debtor plaintiff "sets the limits of the remedy regardless of the nature of the claimant's conduct." *In re Sunbeam Corp.*, 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002). Not one of the thirty-six plaintiffs seeking equitable subordination has introduced evidence of its own injury or that of its creditors. Not one of those plaintiffs has even named a creditor on the record. Without any evidence of an injury to provide a benchmark, equitable subordination is not available. Likewise, no CCO claim can be subordinated in the Second Circuit without proof that CCO obtained an unfair debt collection advantage over other creditors of the same debtor. This Court cannot move CCO to the back of the collection line without proof that CCO first unfairly moved to the front. None of the thirty-six plaintiffs has identified another creditor in line—much less offered evidence that CCO unfairly jumped ahead. Because there is no evidence for essential elements of the equitable subordination claims in Count VII, judgment must be entered for CCO on those claims.

On May 6, 2020, this Court requested a timeline of dates related to expert witness disclosures. That timeline is attached as Appendix A.

## PROCEDURAL HISTORY

Section 362 provides a cause of action for "an individual injured by any willful violation of a stay provided by this section." 11 U.S.C. § 362(k). In their Complaint, Plaintiffs alleged "Charter has willfully violated the automatic stay" in support of claims in Count VI for "Violation

of Automatic Stay, 11 U.S.C. § 362." Dkt No. 1 at 27-28. Relying on the Second Circuit's

*Chateaugay* holding that a bankruptcy court may impose sanctions pursuant to § 362(k) "only for

violating a stay as to debtors who are natural persons," Defendants moved for judgment on the

pleadings on Count VI on October 14, 2019. Dkt. No. 109.

During the morning session of a December 18, 2019 hearing, the Court denied

Defendants' motion and permitted Plaintiffs to proceed under Count VI with causes of action for

contempt. Dkt No. 237 (Revised Transcript of 12/18/19 Hearing) at 57:6-58:5. During the

afternoon session of the same hearing, the Court granted partial summary judgment for all

plaintiffs on their contempt causes of action.[4] *See id*. at 88:9-91:3; 135:23-136:23; 151:22-152:19.

The Court found Defendants violated 11 U.S.C § 362(a)(3) and § 362(a)(6) by terminating service

to the customers of certain plaintiffs. It also found Defendants violated § 362(a)(3) "by the mailing

campaign" including false and misleading advertising.[5] Dkt. No. 274 at 3-4, ¶ 1(c)(i) and 237 at

151:22-152:19. This Court has already found that a bankruptcy court's inherent authority to award

noncompensatory penal sanctions is limited to light or modest sanctions. *See* 4/28/20 Trial Tr. at

30-31. Thus, the remaining issues on Count VI are whether Plaintiffs have established the other

requirements for a finding of civil contempt under 11 U.S.C. § 105(a), and, if so, whether any

coercive fine is required to secure either defendant's compliance and the appropriate payment each

defendant should make to each plaintiff in compensation for its proven damages.[6] *See* Fed. R. Civ.

P. 52(a); *Hatahley v. United States*, 351 U.S. 173, 182 (1956)(remand for particularized fact-

---

[4] Without mentioning the word "contempt," Plaintiffs moved for partial summary judgment on liability for Count VI
on November 15, 2019. *See* Dkt. Nos. 122, 123. Plaintiffs only purported to invoke "contempt proceedings" for Count
VI in a summary judgment reply memorandum filed five days before December 18. *See* Dkt. No. 169.

[5] Consistent with *Chamilia LLC v. Pandora Jewelry LLC*, No. 04-CV-6017, 2007 WL 2781246, at *9 (S.D.N.Y.
2007), the Court did not find a violation of § 362(a)(3) based on allegations related to individual employees or
employees of third parties such as Walmart.

[6] As this Court has already recognized, a bankruptcy court's inherent authority to award noncompensatory penal
sanctions is limited to light or modest sanctions. *See* 4/28/20 Trial Tr. at 30-31.

finding required where the district court made "no attempt to allot any particular sum to any of the 30 plaintiffs"); *Yu Y Ho v. SIM Enters., Inc.*, No. 11 Civ. 2855 (PKC), 2014 WL 1998237 (S.D.N.Y. May 13, 2014) (applying Rule 52(a) and noting that "Plaintiffs have submitted detailed damages calculations for each plaintiff on each cause of action in this litigation").

In Count VII of their Complaint, Plaintiffs asserted claims under 11 U.S.C. §510(c), seeking to redress alleged injuries to their creditors through an order subordinating claims asserted by Defendant Charter Communications, Inc. (CCI) or its affiliates. CCI has never asserted a claim. In July of 2019, CCO asserted claims against the estates of thirty-six plaintiffs.[7] Defendants moved to dismiss Count VII for lack of subject matter jurisdiction because (1) "case or controversy" standing under Article III requires that a claimed injury be redressable when the Complaint is filed, and (2) with no existing claims to subordinate, the injuries alleged in the Complaint were not redressable by claim subordination on April 5, 2019. This Court dismissed the 374 claims asserted by Plaintiffs against non-creditors, but permitted the remaining 36 claims to proceed against CCO. The remaining issues on Count VII are the existence and extent of any injury and unfair prejudice to the creditors of those thirty-six plaintiffs.

Plaintiffs identified Counts I through V as "predicate claims" to Counts VI and VII. On January 23, 2020, Defendants moved to continue the trial on Counts VI and VII until after a jury

---

[7] Those plaintiffs are Allworx Corp., American Telephone Company, LLC, Broadview Networks of Massachusetts, Inc., Broadview Networks, Inc., Business Telecom, LLC, Conversent Communications Long Distance, LLC, Conversent Communications of Connecticut, LLC, Conversent Communications of Maine, LLC, Conversent Communications of Massachusetts, LLC, Conversent Communications of New Hampshire, LLC, Conversent Communications of New Jersey, LLC, Conversent Communications of New York, LLC, Conversent Communications of Pennsylvania, LLC, Conversent Communications of Rhode Island, LLC, Conversent Communications of Vermont, LLC, Conversent Communications Resale, LLC, CoreComm Communications, LLC, DeltaCom, LLC, Earthlink Business, LLC, Georgia Windstream, LLC, InfoHighway of Virginia, Inc., Masscomm, LLC, Paetec Communications, LLC, Paetec, LLC, Southwest Enhanced Network Services, LLC, US LEC Communications, LLC, Valor Telecommunications of Texas, LLC, Windstream Alabama, LLC, Windstream Communications, LLC, Windstream Iowa Communications, LLC, Windstream Kentucky East, LLC, Windstream Lexcom Communications, LLC, Windstream Nuvox Kansas, LLC, Windstream NuVox, LLC, Windstream of the Midwest, Inc., and Windstream Services, LLC.

trial on the predicate claims. Relying on Plaintiffs' representation that there were "no common issues of fact," and finding that the issues to be tried for Counts VI and VII were "fundamentally different" from those remaining in Counts I through V, this Court denied Defendants' motion. *See* Dkt. No. 281 at 5, 16; Dkt. No. 287. This Court did not order separate trials pursuant to Federal Rule of Civil Procedure 42. But the United States District Court for the Southern District of New York has had exclusive jurisdiction over Counts I through IV since withdrawing the automatic reference for those counts on April 21, 2020.

## BACKGROUND

A.    *In the 2009 DirecTV Lawsuit, Charter did not contend § 362(a) enjoined advertising and the court did not enjoin most bankruptcy-related advertising.*

After the commencement of their pre-negotiated Chapter 11 bankruptcy in 2009, CCI and Charter Communications Holding Co. (Charter Holding) filed a lawsuit against DirecTV based on false advertising claims (the "2009 DirecTV Lawsuit"). Plts. Ex 3. In a motion for temporary restraining order (TRO), the plaintiffs requested that the district court enjoin seven examples of bankruptcy-related advertising. *Charter Comms. Holdings Co., LLC et al., v. DirecTV, Inc.*, Case No. 4:09-cv-00730-RWS, Dkt. No. 9. The district court refused to enjoin six of the seven, but entered enjoined advertising predicting the outcome of the Charter bankruptcy. *Id.*, Dkt. No. 16.

At Plaintiffs' request, this Court has taken judicial notice of various pleadings from the 2009 DirecTV Lawsuit. *See* 4/27/20 Tr. at 55:20-56:5, 62:18-21; Plts. Exs. 3, 20. Although Defendants do not believe the pleadings from a 2009 lawsuit are relevant here, the circumstances of the 2009 DirecTV Lawsuit demonstrate there is no basis for finding Defendants showed contempt for any advertising injunction embodied in § 362(a)(3).

The most obvious indication that Charter did not believe § 362(a)(3) enjoined any form of advertising is the fact that it did not seek any sanction for a violation of § 362(a) when it sued

- 7 -

DirecTV for bankruptcy-related false advertising. *See* Plts. Exs. 3, 20. In thirty-eight pages devoted

to advertising allegations in its Complaint, Charter did not once mention § 362(a). Plts. Ex. 3. *See*

*also* Plts. Ex. 20 (36 pages including no reference to § 362(a)).

B.    *The Challenged Advertisement would have been entirely permissible under the standard*
      *applied in the 2009 DirecTV Lawsuit.*

Kelly Atkinson, a former Charter vice president, approved the use of the advertisements

collected at Joint Exhibit 10 (the "Challenged Advertisement"). Atkinson Dep. (5/1/19) at 32:22-

25. She joined Charter in September 2018. Atkinson Dep. (9/19/19) at 19:21-20:4. There is no

evidence that she knew about the 2009 DirecTV Lawsuit—or even knew about the 2009 Charter

bankruptcy. The undisputed evidence is that neither the bankruptcy nor the lawsuit had any impact

on her decision-making. *Id.* at 47:18-22. Ironically, although she was apparently unaware of the

2009 DirecTV Lawsuit, the advertisement Atkinson approved would have been permissible under

the district court's false advertising analysis because it did not purport to predict how the

uncertainty of Plaintiffs' bankruptcies would be resolved.[8]

No bankruptcy-related advertising would be permissible under the standard suggested by

this Court's prohibition on stating or implying that Plaintiffs are "in bankruptcy or Chapter 11 as

part of an effort to persuade Windstream customers to switch their service to Spectrum." Dkt. No.

25 at 5-6, ¶1(k); Dkt. No. 61 at 6, ¶1(k). But the false advertising standard adopted by the district

court in the 2009 DirecTV Lawsuit permitted a wide range of bankruptcy-related advertising. Far

from proscribing all bankruptcy references, the district court refused to enjoin messages claiming

---

[8] The Court did not enter a preliminary injunction in the 2009 DirecTV Lawsuit. It seems unlikely that the court's
stop-gap prohibition on predictions would have continued. *See, e.g., Global Tech Led, LLC v. Hilumz Int'l Corp.*, No.
2:15-cv-553, FtM-29CM, 2017 WL 588669, at *6 (M.D. Fla. Feb. 14, 2017)(finding that a warning that plaintiff was
"going out of business" was a non-verifiable "prediction or opinion about the future of [the plaintiff], and
consequently, is not actionable as a false or misleading statement of fact under the Lanham Act").

that, as a result of its bankruptcy, Charter "(1) is going out of business, (2) is not able to continue to provide services to customers, (3) is not able to provide new services or content or the latest technology, (4) is going to provide inferior customer service, or (5) that Charter's customers will be adversely impacted."[9]  It likewise refused to enjoin, inter alia, the following:

- "Life-preserver" print advertisements referencing the Charter bankruptcy filing and telling the public "now's the time to save yourself" or "we'll save the day" and "Get Help while you can."

- "Fire extinguisher" print advertisements directing the public to "Get Help while you can" and "instead of waiting to see how Charter's bankruptcy might affect you, just switch to DirecTV."

- "Life-preserver" billboard advertisements referencing the Charter bankruptcy filing and telling the public to "SAVE YOURSELF." (Case No. 4:09-cv-00730-RWS, Dkt. No. 16)

The district court determined that a competitor could refer to the uncertainty of bankruptcy, but could not predict its outcome or state that Charter cannot provide service. Thus, it did not enjoin radio advertisements stating that Charter's operations are in a "mess" because they filed for bankruptcy. And it refused to enjoin the stand-alone phrase "do you really think [Charter will] have the time to bring you the latest technology, more channels in HD or new exclusive programming?" but enjoined the same phrase if used with the prediction "Probably not."[10]

---

[9] Defendants request judicial notice of the 2009 DirecTV Litigation TRO as entered and CCI's proposed TRO. *See, e.g.*, *AQ Consulting WLL v. Branca*, No. 10 CIV 7496 AKH, 2011 WL 240812, at *1 (S.D.N.Y. Jan. 19, 2011). Defendants do not seek judicial notice of those pleadings for the truth of the matters asserted therein.

[10] *See Charter Communications Holding Co., et al. v. DirecTV, Inc.*, No. 4:09-cv-00730, Dkt. No. 16, TRO, at 1-2. Thus, the "Save Yourself" billboard and the "life preserver" letter with the phrase "probably not" removed would both be permissible under the standard adopted by the district court.



There is no meaningful difference between the Challenged Advertisement and advertisements that would have been acceptable in the 2009 DirecTV Lawsuit.

C.    *The Challenged Advertisement was drawn directly from statements of industry experts and was consistent with statements made by both plaintiffs and this Court.*

The Challenged Advertisement was mailed in March of 2019. Defendants used a third-party advertising agency (RAPP) to produce the Challenged Advertisement. It is undisputed that Defendants never instructed RAPP to suggest any plaintiff was going away or would not emerge

from Chapter 11.[11] RAPP Dep. at 50:21-51:22; 126:5-127:9; 127:11-22; Atkinson Dep. (9/19/19) at 175:5-176:3; 176:8-18; 177:2-6; Plts. Ex. 40. And it is undisputed that Defendants did not direct anyone at RAPP to match Plaintiffs' colors or attempt to deceive consumers into believing the Challenged Advertisement came from any plaintiff.[12] RAPP Dep. at 42:22-43:22; 56:13-57:13; Atkinson Dep. (9/19/19) at 201:6-202:2.

The Challenged Advertisement states "Windstream has filed for Chapter 11 bankruptcy, which means uncertainty." The statement that bankruptcy "means uncertainty" falls between the statement "Don't Risk Losing Your Internet and TV Services" and the question "Will they be able to provide Internet and TV services you rely on in the future?" *See* Joint Ex. 10. Of the 345 words in the Challenged Advertisement depicted in Plaintiffs' Complaint, 204 deal with the comparative superiority of Spectrum products and 75 deal with Plaintiffs' bankruptcies.[13] The biggest font on the advertisement is reserved for a **$59.98** offer on Spectrum Internet and Spectrum Lifestyle TV. The body of the letter emphasizes five specifics: (1) "**Fast Speeds up to 200 Mbps**," (2)

---

[11] The phrase "Goodbye Windstream, **Hello Spectrum**" is a "call to action."[11] RAPP Dep. at 60:12-16; 120:11-121:11; 123:9-19; Atkinson Dep. (9/19/19) at 118:25-119:14. A "call to action" is "a closing line that is tied to a mechanic to get in touch," which would "normally set alongside a telephone number or a website URL." RAPP Dep. at 120:23-121:4. The only evidence is that the call to action in the Challenged Advertisement did not predict that any plaintiff was going out of business. RAPP Dep. at 121:2-25; 122:2-13; 123:9-19; 125:13-25; Atkinson Dep. (9/19/19) at 118:25-119:14. Purporting to describe the Challenged Advertisement in their Complaint, Plaintiffs deceptively edited the call to action. They deleted the references to the Spectrum telephone number and website, suggested "Goodbye Windstream" was a standalone message by inserting blank lines between the phrase "Goodbye Windstream" and the phrase "**Hello Spectrum**," and removed the bold font emphasizing the "**Hello Spectrum**" portion of the call to action. *See* Plts. Ex. 1 at ¶ 22. Plaintiffs later admitted that "Goodbye Windstream, **Hello Spectrum**" was a call to action in their summary judgment papers. Dkt. No. 123 at 11. This Court did not reference "Goodbye Windstream, **Hello Spectrum**" in its summary judgment decision. *See generally* Dkt. No. 237.

[12] According to the undisputed testimony of its corporate representative, RAPP "took inspiration" from the color palette on a Windstream website. RAPP Dep. at 56:13-24. Just as it is common and permissible for soft drink sellers to sell cola in red cans with white letters and diet cola in white cans with red letters, there is nothing wrong with using colors associated with a competitor to draw attention to a superior alternative product in the telecommunications industry. The Second Circuit has instructed that "copying in order to market a functionally equivalent alternative product might well benefit consumers, which is one of the aims of the Lanham Act." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1005 (2d Cir. 1997). Although Charter broadband is generally faster and cheaper (compare Plts. Ex. 1 at 10 with Joint Ex. 10), it is a functional equivalent to the product offered by the fifty-six broadband provider plaintiffs.

[13] Roughly 66 words do not fit comfortably into either category.

"**Spectrum is the top performing internet provider**," (3) "**FREE** modem," (4) "**FREE** HD,"

and (5) "Download the **Spectrum TV App**." None of these elements predict any plaintiff is going

out of business.

For years, Defendants have relied on One Touch Intelligence (One Touch), a third party

competitive intelligence company to identify relevant news about competitors. Atkinson Dep.

(9/19/19) at 43:5-16; 155:2-10; 156:12-158-21; 157:18-158:5; 158:22-159:05.

One Touch provides a twice-monthly "TELCOTRAK" analytical report distilling its

market intelligence review into a handful of articles on important developments related to Charter

competitors. *See* Defs. Ex. 26. The second report for February 2019 included the following

observations about Plaintiffs' bankruptcies:

- "In truth, Windstream's misfiring business strategy had it teetering on the edge of financial insolvency long before Aurelius Capital Management entered the picture. But while Chapter 11 will provide some legal shelter while the telco reorganizes its tangled debt structure, **uncertainty about the service impacts will make some residential and business customers uneasy**. They may start looking elsewhere for voice, video and data services – and competitors including cable operations will be more than happy to help them jump ship."

- "While the move is intended to ensure Windstream survives, **it could result in the opposite** – and at the very least it gives competitors including cable players some valuable new marketing ammunition."

- "Customers will probably be more concerned that distractions and tighter financial restrictions during Windstream's bankruptcy may lead to **service issues, ranging from outages to spiraling customer support response times**."  (Defs. Ex. 26 (emphasis added))

The undisputed evidence is that Defendants learned of the uncertainty regarding Plaintiffs'

bankruptcies from information provided by One Touch and incorporated that One Touch

information into the Challenged Advertisement. *See* Atkinson Dep. (9/19/19) at 161:10-15;

162:10-13; 167:8-15; 216:12-25; 217:10-218:11; Defs. Ex. 26. There were no assertions about

Plaintiffs' bankruptcies in the Challenged Advertisement that Defendants did not (1) obtain from

One Touch and (2) subjectively believe to be true. *See* Defs. Ex. 26; Atkinson Dep. (9/19/19) at

218:25-219:5; 219:9-15 (excerpted below).

> Q.    Does Charter have any reason to believe that One Touch was misleading Charter
>       when it indicated that there was uncertainty related to Windstream's bankruptcy,
>       and that that uncertainty could extend to Windstream's ability to provide services?
>
> A.    They were not misleading. (*Id*. at 219:9-15)

One Touch's analysis is consistent with Plaintiffs' admission that "Our financial condition,

the defaults under our debt agreements and master lease agreement with Uniti, and the risks and

uncertainties surrounding the Chapter 11 Cases, raise substantial doubt about our ability to

continue as a going concern." Defs. Ex. 3 at 3.096-97.

D.    *Defendants promptly responded to all of Plaintiffs' complaints about the "Challenged
      Advertisement" before Plaintiffs filed this lawsuit.*

The undisputed evidence is that throughout March of 2019, Plaintiffs' sole objection to

bankruptcy-related message in the Challenged Advertisement was that it referenced "risk" and

"uncertainty." Plts. Ex. 48 at 18:4-19:23. Plaintiffs' did not object, for example, to the "Goodbye

Windstream, **Hello Spectrum**" call to action or to the fact that Defendants were stating or implying

plaintiffs were in bankruptcy. *See id*. Defendants responded to Plaintiffs' objections and removed

all references to "risk" and "uncertainty." *See id.* at 20:10-24. There is no evidence that Defendants

refused to accommodate a single bankruptcy-related concern expressed by a single plaintiff before

this lawsuit was filed. *Accord id.* at 18:4-19:23; 20:10-24.

E.    *Those plaintiffs that provide broadband service fell further and further behind Charter in
      terms of speed and product offerings in 2019.*

Of the 205 plaintiffs, fifty-six are actually providers of broadband internet service.[14] Each

provider plaintiff, like Windstream Georgia Communications, LLC (Windstream Georgia) is a

---

[14] *See* Fixed Broadband Deployment Data from FCC Form 477, FEDERAL COMMUNICATIONS COMMISSION,
available at https://www.fcc.gov/general/broadband-deployment-data-fcc-form-477 (last accessed 6/9/2020). The

separate Incumbent Local Exchange Carrier (ILEC) with its own customers, cash flows, and bank accounts. *See* Defs. Ex. 130 (Plaintiffs' Monthly Operating report reflecting discrete cash flows and bank accounts for all plaintiffs). Windstream Georgia's customers are instructed to make their checks payable to "Windstream Georgia Communications, LLC." *See* Defs. Ex. 127; 4/28/20 Tr. at 44:7-45:1; 51:8-57:18.

Windstream Holdings identified losing ground to faster cable companies as a concern in its public filings. Defs. Ex. 3 at 3.036 ("Cable operators may be able to take advantage of certain technology to deploy faster broadband speeds more rapidly than Windstream."). At the beginning of 2018, subsidiaries of Windstream Holdings advertised broadband service of at least 500 megabits per second (Mbps) in 4.17% of the geographies in its competitive footprint and Charter advertised broadband speeds of at least 500 Mbps in 17.91% of its footprint.[15] By the beginning of 2019, however, Charter had expanded its 500 Mbps minimum speed to 98.93% of its footprint, while the fifty-six provider plaintiffs marginally expanded by less than 1% to 4.91% of its footprint.[16] *See also* 4/28/20 Tr. at 127:24-128:22. In every geographic location discussed at trial, Charter either was not present or dramatically improved its speed offerings between the beginning of 2018 and the beginning of 2019. *Id.* at 130:13-143:21; *see* Defs. Imp. Exs. 1, 2, 4, 5, 23, 25, 30,

---

user must search for "Windstream" in the "Find in this dataset" search bar in the upper right hand corner. Plaintiffs' FCC data was originally provided to the Court as Defendants' Exhibit 364. At this Court's suggestion, Defendants are directing the reader to where the information can be found on the FCC's website for the FCC references herein. *See* 4/29/20 Hearing Tr. 18:16-19.

[15] *See* Defs. Imp. Exs. 4-5; 4/28/20 Tr. 127:17-23. View Service Provider Details for Charter Communications and Windstream Holdings, Inc., FEDERAL COMMUNICATIONS COMMISSION, available at https://broadbandmap.fcc.gov/#/provider-detail?version=dec2017&direction=d&hoconums=130235,131413 (last accessed 6/9/2020). Each provider, in this case Charter Communications and Windstream Holdings, Inc., must be entered into the search bar at the link provided and the user must then press "view details." The relevant information then appears pictorially and numerically underneath the heading "Provider coverage overlap and population coverage."

[16] View Service Provider Details for Charter Communications and Windstream Holdings, Inc., FEDERAL COMMUNICATIONS COMMISSION, available at https://broadbandmap.fcc.gov/#/provider-detail?version=dec2018&direction=d&hoconums=130235,131413 (last accessed 6/9/20).

31, 32, 38, 39. In addition, in 2019, Charter offered its high-speed internet in new markets—a fact that Plaintiffs' damages expert admitted he did not account for in his damage calculation. *See* 4/28/20 Tr. 138:2-139:1. *See also* Defs. Ex. 3 at 3.035 (Windstream Holding's public filing stating, "Cable television companies have aggressively expanded in our consumer markets, offering voice and high-speed Internet services in addition to video services.").

Charter also widely offered a new product throughout 2019 that was not even available in March, April, and May of 2018. Joint Ex. 3 at 15; Joint Ex. 4 at 56. Spectrum Mobile wireless telephone service permits internet customers to inexpensively bundle their mobile telephone service and their internet service. *See id.* *See also* 4/28/20 Tr. 156:5-11. No provider plaintiff offered a comparable service in 2019. Among the customers purchasing internet service after calling the telephone number listed in the call to action on the Challenged Advertisement, 11.5% (70 out of 614) also purchased the new Spectrum Mobile. Joint Ex. 2.

F.      *Plaintiffs' Lanham Act damage claims are based entirely on false testimony, junk science, and hearsay opinion testimony from an out-of-court declarant.*

No plaintiff has introduced evidence of its own damages.  Notwithstanding that each plaintiff is a separate company, with its own bankruptcy estate, creditors, cash flow, and bank account, no injury has been connected to any plaintiff in its own right.

According to Plaintiffs' corporate representative Lewis Langston, Plaintiffs searched their call records for the key words "Spectrum" or "bankruptcy" to identify the transcripts provided in Plaintiffs' Exhibits 18 and 19.  Langston Dep. 196:25-197:6. Those transcripts suggest that at most fourteen customers were lost because of the Challenged Advertisement. Plts. Exs. 18, 19. Assuming those transcripts accurately reflect the audio recordings they purport to transcribe, damages from losing those fourteen customers would be the only real damage evidence in this case. Everything else is the product of a shoddy study rendered worthless by the failure to follow

basic principles of statistical studies, a blatant lie that was exposed at trial, or the hearsay opinion of an out of court declarant that has never been identified as witness—let alone an expert.

The most troublesome aspect of Plaintiffs damage claims is their attempt to secure a double recovery by falsely describing the nature of a claimed $4 million injury in a sworn declaration. When their damage expert's attempt to support a double recovery was identified in expert discovery, Plaintiffs removed that duplicate damage claim from his opinion and plugged an essentially identical opinion (with updated figures) into the testimony of a fact witness—using a false description to hide the fact that the expert and fact witness were relying on the identical alleged injury.

1.    *Plaintiffs' claims for a Lost Customer Injury and Retained Customer Injury.*

Plaintiffs claimed two discrete false advertising injuries, one related to lost customers and the other related to retained customers.

First, Plaintiffs claimed an alleged injury suffered from losing 1,386 customers (the "Lost Customer Injury"). A plaintiff could recover for its Lost Customer Injury by, e.g., using a promotion to attract new customers to replace the 1,386 lost customers and receiving a payment for the costs of that promotion (i.e., recovering its "promotional costs") or (2) simply receiving a payment for the profit it would have gotten from the 1,386 lost customers (i.e., recovering its "lost profits"). But a plaintiff cannot recover twice for a Lost Customer Injury from losing the same 1,386 customers. *See Phelan v. Local 305*, 973 F.2d 1050, 1063 (2d Cir. 1992) ("plaintiff may not recover twice for the same injury").

Second, Plaintiffs claimed a separate injury suffered from allegedly having to spend money convincing customers affected by the Challenged Advertisement to maintain their service (the "Retained Customer Injury"). A plaintiff could recover for its Retained Customer Injury by

receiving a payment for the costs it incurred convincing customers to maintain their service. Because they are different injuries, a plaintiff's recovery for a Retained Customer Injury would theoretically not impede its recovery for a Lost Customer Injury.

In his direct testimony, Plaintiffs' Lanham Act damage expert, John Jarosz, testified regarding the alleged Lost Customer Injury. He claimed there were 1,386 lost customers (but had no idea which plaintiffs lost them) and opined that Plaintiffs could recover for that injury by receiving a lost profits payment of $3.2 to $5.1 million. *See* Jarosz Decl. ¶ 27. Jarosz had previously disclosed an opinion that Plaintiffs could recover roughly $8 million for the cost of a new customer promotion undertaken to address the Lost Customer Injury.[17] But, after a defense expert pointed out that both the lost profits recovery and promotional cost recovery would be for the same Lost Customer Injury, Jarosz omitted a promotional cost opinion from his trial declaration.[18] *See generally* Jarosz Decl. Although Plaintiffs had successfully argued that an expert opinion was required for Jarosz's opinion that $862,775 in alleged corrective advertising costs were reasonably incurred (*see* Dkt. Nos. 198. 216, 254, 255), he did not opine on corrective advertising costs.

In his direct testimony, Plaintiffs' chief fact witness, Jeffrey Auman, testified that the Retained Customer Injury, that is, the costs some plaintiffs incurred to "convince customers to maintain their service," was $4,033,425. Auman Decl. ¶ 15.

---

[17] Jarosz did not credibly explain the basis for this opinion or his opinion on corrective advertising costs and Charter objected that he was parroting the opinion of an undisclosed expert. Dkt No. 116 at 23.

[18] In his expert disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2), Jarosz identified $8 million as the approximate "cost of the Windstream campaign in September 2019 to recover its subscriber base." *See* Dkt No. 117, Ex. 1 at 3-4, ¶ 8. Dr. Jules Kamin noted that that the promotion costs calculation was duplicative because the lost profit calculation represented full compensation for allegedly lost customers. *See* Dkt No. 193, Ex. A at 13. Pursuant to Federal Rule of Evidence 201(c), Defendants request judicial notice of the contents of Jarosz's and Kamin's disclosure statement for the proposition that Plaintiffs' expert disclosed a new customer promotion damage opinion and Plaintiffs subsequently had notice that such an opinion could be challenged as seeking a duplicative recovery on the same Lost Customer Injury. *See, e.g., AQ Consulting WLL*, 2011 WL 240812, at *1. Defendants do not seek judicial notice of any expert disclosures for the truth of the matters asserted therein.

Jarosz and Auman were the only trial witnesses Plaintiffs disclosed. On April 27, 2020, Plaintiffs confirmed that they had no trial witnesses beyond Jarosz and Auman. 4/27/20 Tr. 188:23-189:2. After the conclusion of Auman's trial testimony, however, Plaintiffs submitted the out of court statement of Daniel Martinez, offering an opinion similar to the promotional cost opinion Jarosz disclosed in October 2019. Where Jarosz's had opined the promotional campaign cost $8 million, Martinez opined that it cost $4,033,425. *See* Dkt No. 117, Ex. 1 at 3-4, ¶ 8; Plts. Ex. 317. Martinez never provided an expert disclosure statement under Rule 26(a)(2) and was not present for cross examination on his opinion—notwithstanding the fact that Plaintiffs could have secured his "presence" at the virtual trial with an internet connection and a telephone line.

2.    *Seeking a double recovery on Lost Customer Damages, Plaintiffs' chief fact witness lied about the nature of an alleged $4 million dollar injury.*

Auman is an Executive Vice President of Sales and Marketing with Windstream Holdings, Inc. In the trial declaration he submitted under penalty of perjury, Auman testified that Retained Customer Injury damages were $4,033,425. Auman Decl. ¶15. In sixty-four paragraphs, Auman did not mention lost customers, new customers, or costs incurred to acquire 1,386 new customers to replace those that had been lost. *See generally* Auman Decl. Instead, he testified that one or more Plaintiffs were "forced to offer customer upgrades, discounts, and pricing promotions to convince customers to maintain their service" and that the "total approximate costs of this was $4,033,425." *Id.* Auman lied. He falsely described an alleged Lost Customer Injury as a Retained Customer Injury.

Not one nickel of the alleged $4,033,425 Retained Customer Injury was truly spent "to convince customers to maintain their service." To the contrary, Auman admitted on cross examination that the $4,033,425 was spent acquiring new internet customers to make up for the alleged loss of 1,386 customers:

**Q.** You spent, you're now telling the Court that Plaintiffs spent $4,033,425 acquiring new internet customers, right?

**A.** Yes, sir. We did.

**Q.** And those new internet customers. Those aren't the one that you're figuratively hugging to maintain their service that we talked about before, right?[19]

**A.** Those in particular would be new customers. (5/6/20 Tr. 52:14-53:4)

\* \* \*

**Q.** Your understanding, Mr. Auman, is that the new internet customer promotion was to make up for customers that had been previously lost; is that right?

**A.** Yes, sir, absolutely. And not just the customers that were lost, but the demand that was suppressed.

**Q.** And the number of customers that Plaintiff contends were lost – pretty specific Plaintiff, but generally is roughly 1,300 customers, right?

**A.** That's my understanding of the expert witnesses estimate. Is there a document to review. (5/6/20 Tr. 109:1-10)

The $4,033,425 Retained Customer Injury in Auman's declaration is in truth an effort to reassert the duplicative promotional cost opinion that Jarosz abandoned after Defendants' expert identified his error. By falsely stating that a duplicative lost customer injury claim was a non-duplicative injury claim based on the costs of maintaining customers, Auman sought to deceive this Court. His deception could have potentially resulted in a double recovery for the same injury notwithstanding the established principle that such a double recovery is not authorized by law.[20]

*Phelan*, 973 F.2d at 1063.

In the heat of testimony, a witness may testify falsely because he or she panics or does not fully understand a question. Thus, the federal perjury statute includes a safe harbor provision

---

[19] Explaining the difference between acquiring new customers and convincing existing customers to maintain their service Auman identified "figuratively giving them a bear hug" as one method by which Plaintiffs sought to convince existing customers to maintain their service with Windstream. *See* 5/6/20, Trial Tr. 33-35.

[20] By lying about the nature of the alleged costs incurred, Auman would also avoid the necessity of expert testimony to prove those costs. As Plaintiffs recognized when they asked Jarosz to opine on the topic, new customer promotion costs would require expert testimony to explain how securing new customers (locked into twelve month contracts) actually costs any one of the plaintiffs money. *See* Dkt No. 117, Ex. 1 at 3-4, ¶ 8.

permitting one to recant false testimony during the same proceeding. *See* 18 U.S.C. § 1623(d).[21] But Auman did not blurt out his false testimony in the heat of the moment. He spent hours crafting his false trial declaration with counsel. *See* Plts. Ex. 315 (document claiming 20 hours spent by in-house counsel on Auman's trial declaration); Plts. Ex. 109 (fee statement claiming outside counsel spent 28.9 hours working on Auman's trial declaration in March 2020; Case No. 19-22312-rdd, Dkt. No. 1824 (fee statement claiming outside counsel spent 30.1 hours working on Auman's trial declaration in April 2020).

In the hours that he spent working on his trial declaration, there is no possibility that Auman confused convincing customers to maintain their service with going out to get new customers:

> **Q.**   One way that you build your business is to go out and get new customers, yes?
> **A.**   Absolutely. Yes, sir.
> **Q.**   And then once you have that new customer, once you have that customer, then you want to convince that customer to maintain their service with you. And that's a different thing, right?
> **A.**   Yes, sir.[22] (5/7/20 Tr. 35:10-23)

The unavoidable conclusion is that Auman lied in a trial declaration submitted under penalty of perjury to mislead this Court about the nature of a duplicative $4 million claim. He is not a credible witness.

---

[21] Section 1623(d) states as follow: "Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed."

[22] Auman continued: "The convincing isn't as much of a sales pitch as it is delivering. It's honoring our commitment to that customer and making sure that they don't get disconnected, making sure that what we advertise the price to be is what they pay. And when they call in, they get the service. Just like you would expect, as we all expect as being consumers."

3. *Jarosz admitted he cannot estimate damages from an alleged stay violation and did not attempt to estimate any individual plaintiff's injury.*

Jarosz unequivocally admitted that he cannot "estimate with a reasonable degree of certainty damages flowing from and flowing from only the alleged violation of the automatic stay." 4/28/20 Tr. 63:18-23. Jarosz has not disputed or recanted that admission.

All 205 plaintiffs are separate entities with separate revenue sources and bank accounts. 4/28/20 Tr. 64:4-69:23; Defs. Ex. 130. Only fifty-six of those plaintiffs purport to be broadband providers.[23] Notwithstanding these facts, Jarosz did not try to calculate the subscribers that any plaintiff actually lost. 4/28/20 Tr. at 69:21-23.

4. *Jarosz made no effort to address confounding variables or ensure that his control group and treatment group were reliably identified.*

A "confounding variable" or "confounder" is defined as follows: "A variable that is correlated with the independent variables and the dependent variable. An association between the dependent and independent variables in an observational study may not be causal, but may instead be due to confounding." Annotated Reference Manual on Scientific Evidence, *Reference Guide on Statistics*, 2004 WL 48151, 54 (West 2020).[24] In purporting to calculate damages, Jarosz did not attempt to address obvious confounding variables. He also ignored the best evidence of who received the Challenged Advertisement and relied on the untestable opinion of an absent "expert" regarding geographies where Plaintiffs contend they compete with Defendants.

---

[23] *See* Fixed Broadband Deployment Data for Windstream, FEDERAL COMMUNICATIONS COMMISSION, *available at* https://opendata.fcc.gov/dataset/Fixed-Broadband-Deployment-Data-Dec-2018-Status-V1/kydr-hyy5/data    (last accessed 6/9/2020).

[24] According to an educational website on basic statistics: "A confounding variable is an 'extra' variable that you didn't account for. They can ruin an experiment and give you useless results." *See* https://www.statisticshowto.datasciencecentral.com/ experimental-design/confounding-variable/ (last accessed 6/7/2020).

Jarosz purported to perform an observational study akin to what one would use to evaluate a potential coronavirus treatment. One could observe whether a large dose of Vitamin D was an effective treatment by comparing results between a "control" group of patients that did not receive the Vitamin D treatment and a "treatment" group that did. Similarly, Jarosz purported to compare results between a control group of customers that did not receive the Challenged Advertisement in 2019 with a treatment group that did. But Jarosz ignored other 2019 "treatments" and made no effort to ensure the treatment group actually received the subject treatment. What Jarosz did was the equivalent of attempting to study the impact of a Vitamin D treatment in a "treatment group" whose members were simultaneously being treated with Vitamin A, Vitamin B, and Vitamin C (and who may have never received Vitamin D). Just as such a study would be useless for measuring the impact of Vitamin D, Jarosz's study is useless for measuring the impact of the Challenged Advertisement.

Jarosz did not account for a variety of Charter-specific "treatments" in 2019 that could only exist in areas where Charter and Plaintiffs compete for customers, including (1) the fact that in 2019 Charter dramatically expanded the markets where it offered speeds much faster than those offered by the fifty-six broadband service provider plaintiffs; (2) the fact that Charter entered new Windstream markets in 2019; and (3) the fact that Charter in 2019 started mass marketing a new broadband-related product, Spectrum Mobile.  There is no indication in his declaration that Jarosz made any effort to account for any of these confounding variables.

Moreover, Jarosz made no effort to ensure the treatment group received the "treatment." Even though Plaintiffs have confirmed that the mailing list for the Challenged Advertisement provided to Plaintiffs on May 13, 2019 "is the best evidence identifying those individuals that were sent the Charter advertisements," Defs. Ex. 148, Jarosz ignored that mailing list in attempting to

ascertain who received the treatment he claimed to study. 4/28/20 Hearing Tr. 156:5-11. *See also* Def. Ex. 383.  The undisputed evidence is that the Challenged Advertisement was mailed to 22 states.[25] Defs. Exs. 87, 110, 148, 383. But Jarosz purported to study a treatment applied in only 12 states. 4/28/20 Tr. 80-81. His control group is riddled with those who received Vitamin D and his treatment group is riddled with those who did not.

G.    *The only non-speculative evidence is that not a single plaintiff suffered any quantifiable harm to its goodwill.*

According to monthly operating reports submitted to this Court under penalty of perjury, neither Plaintiff Windstream Holdings, Inc. nor any of its subsidiaries suffered a quantifiable injury to their goodwill as a result of advertising or the interruption of services from March through December of 2019.[26]  According to bankruptcy petitions submitted under penalty of perjury, 124 of the 205 plaintiffs do not use the word "Windstream" in their legal name and do not "do business as" Windstream. *See* Defs. Ex. 77.

H.    *Defendants spent thousands of hours working to avoid disconnects even as Plaintiffs failed to pay millions of dollars in post-petition debt.*

Defendants have spent literally thousands of hours trying to avoid disconnecting Plaintiffs' customers. And the undisputed evidence is that all 289 customers disconnected on March 15, 2019

---

[25] There is no question that Exhibit 110 was provide to Plaintiffs on May 13, 2019. *See* Defs. Ex. 383. Plaintiffs' counsel agreed to provide the Court with Plaintiffs' own copy of Exhibit 110, 4/29/20 Tr. 13:1-15 ("Mr. Ross: We'll find that and get it, Your Honor. And if you don't mind, we'll give it a new exhibit number and submit it post hoc to the court."), but later reneged. 5/6/20 Hearing Tr. 6:13-19 ("We've been challenged in trying to figure out what's right and what's wrong, but we're going to just allow Defendants' Exhibit 110 come in for whatever it is."). Plaintiffs have had ample opportunity to demonstrate that Exhibit 110 is not the mailing list incorporated by reference in their sworn interrogatory response, but have not done so. Likewise, they have had every opportunity to demonstrate Exhibit 87 is not an accurate summary of Exhibit 110 and have not done so.

[26] *See* Plaintiffs' Consolidated Month Operating Reports in Case No. 22312 (Dkt. Nos. 530, 599, 737, 948, 987, 1109, 1216, 1273, 1379, 1519) (verified as true and executed under penalty of perjury by either John Eichler, Senior Vice President—Controller of Windstream Holdings or Bob Gunderman, Chief Financial Officer of Windstream Holdings, Inc.)

were reconnected by March 18 before Plaintiffs' lawyers billed one hour to this case. *See* Plts. Ex. 48 at 57:13-58:8; Plts. Ex. 67.

The number of subscribers served by subsidiaries of companies like Windstream Holdings, Inc. and Charter Communications, Inc. is a key metric used by investors deciding to buy or sell shares of those companies. Gunzel Dep. at 32:23-33:5. Subscribers matter to investors because each represents a stream of payments. *See* Gunzel Dep. at 34:9-16. Maintaining non-paying subscribers can deceive investors by suggesting a payment stream that does not really exist. *See, e.g., In re Charter Comms., S.E.C. Litig.*, 443 F.3d. 987 (8th Cir. 2006)(affirming dismissal of securities fraud allegations alleging efforts to boost subscriber numbers by "deliberately delaying the disconnecting of customers no longer paying their bills"). Corporate officers in the Defendants' industry have been imprisoned for declining to disconnect subscribers who stopped paying. Gunzel. Dep. at 35:13-17.

To avoid over-counting subscribers, telecommunications companies commonly employ automatic disconnection protocols with a bias toward disconnecting non-paying customers. Gunzel Dep. at 22:11-23; 33:19-36:19; 48:21-24. Consistent with that industry practice, 25,000 Charter employees can access various billing systems employed and place a non-paying account on an automatic disconnect protocol. *See* Gunzel Dep. at 39:24-40:11.

Since Plaintiffs' bankruptcy filing, Defendants' employees have spent roughly 3,600 hours identifying and protecting more than 14,500 accounts served under the "Last Mile Contract" (Last Mile Accounts) associated with up to 284 company names across eight billing systems. *See* Gunzel Dep. at 47:16-21; 37:6-39:16; 45:15-46:6; 49:20-51:13. Identifying Last Mile Accounts took several months because the various company names among the 205 plaintiffs appear in different

variations in billing records and no plaintiff has ever provided a complete listing of its Last Mile Accounts. Gunzel Dep. at 64:2-65:3; 65:7-20.

When the inadvertent automatic disconnects occurred on Friday, March 15, 2019, Defendants were still working to identify and secure the roughly 14,500 accounts.[27] Gunzel Dep. at 48:25-49:15. Defendants reconnected all 289 of the inadvertently disconnected last mile customers by Monday, March 18, 2019. Plts. Ex. 48 at 57:13-58:8; Gunzel Dep. 11:12-17.

Plaintiffs' trial exhibits confirm that no plaintiff was required to spend money on legal fees to compel Defendants to work to prevent or correct service interruptions. *See* Plts. Ex. 67 (showing no fees billed on or before March 18, 2019); Plts. Ex. 315; Plts. Ex. 51 (3/15/19 text conversation history discussing preventing and addressing service interruptions of Last Mile Accounts without any reference to lawyers or legal intervention); Plts. Ex. 52 (3/15/19 email thread between Charter and Windstream employees reflecting efforts to prevent service interruptions without any reference to lawyers or legal intervention); Joint Ex. 13 (3/16/19 email thread reflecting same).

In April and May, there were four other disconnects among more than 14,500 Last Mile Accounts occurred for unrelated reasons, including weather outages and coding errors by a handful of more than 25,000 customer care employees. Gunzel Dep. at 11:18-12:13. None of the coding errors could violate § 362(a)(6) because each involved miscoded **post-petition** charges. Gunzel Dep. at 28:17-29:11.

The undisputed evidence is that Defendants have not intentionally disconnected service, even when various plaintiffs repeatedly failed to pay millions of dollars in post-petition debt for

---

[27] The disconnections of 289 accounts during the weekend of March 15, 2019 only affected business customers in regions where Plaintiffs and Defendants generally do not compete for residential customers. Auman Decl. ¶ 5 (Last Mile "connectivity service is largely provided outside of the twelve states in which Windstream and Charter compete directly for consumer business").

more than 60 days. Fredrick Gunzel, Vice President of Enterprise Planning, is the person responsible for the Last Mile Contract relationship. Gunzel Dep. at 7:24-8:2. Since the February bankruptcy filing, he would have had to order a service disconnection. He has never done so.[28] Gunzel Dep. at 68:14-20 ("Q. And at that time, there had been no instruction from you to take any steps to disconnect Windstream customers -- or Windstream last-mile customers despite the fact that Windstream was, at that time, 60 days past due on $3.3 million of post-petition debt? A. Correct."). *See also* Gunzel Dep. at 56:11-25; 68:14-20.

I.    *All of Auman's trial testimony regarding disconnections of service was the alleged the repetition of out of court statements by unidentified declarants.*

Auman is not a credible witness because he lied about the nature of a $4 million claim. Moreover, Auman admitted that (1) he was not involved in the preparation of financial statements for Plaintiffs (5/6/20 Tr. 17:3-11), (2) he had no responsibility related to the VAR Agreement (*id.* at 21:4-22), and (3) prior to September 24, 2019, he had no personal knowledge related to the interruption or disconnection of service to Windstream customers (*id.* at 18:10-14). In his trial declaration, Auman purports to repeat out of court statements (made by unidentified people, written on unidentified documents, or appearing on unavailable computer screens) for the truth of the matter asserted. *See* 5/6/20 Tr. 18:10-19:10.[29]  Plaintiffs produced no declarant subject to cross examination in court to testify on disconnect related events that he or she actually witnessed.

---

[28] In his trial testimony, Auman repeats hearsay from unidentified employees and unidentified documents of plaintiff to suggest otherwise. But even ignoring that Auman is not a credible witness—no plaintiff has even attempted to sustain its burden of establishing that the hearsay he repeated is admissible under any exception to the hearsay rule.

[29] That Paragraphs 10, 12, and 13 reference alleged statements of Charter employees does not solve the hearsay problem. Those paragraphs contain out of court statements by unidentified Windstream representatives regarding alleged Charter statements and are offered for the truth of the matter asserted. *See* Auman Trial Decl. ¶¶ 10 ("[Windstream] customers) were told by Charter that …"), 12 ("Charter's representatives informed Windstream that …"), and 13 ("Charter's representatives informed Windstream that …").

J.      *The thirty-six plaintiffs asserting claims under Count VII have introduced no evidence
that any of their creditors were harmed or unfairly prejudiced.*

Not one of the thirty-six Count VII plaintiffs presented evidence showing that its creditors

were harmed by CCO's alleged inequitable conduct. The thirty-six plaintiffs did not provide

evidence showing that any one of them have customers, or lost customers, spent money to retain

customers, or spent money on lawyers. The only creditor they identified was CCO.

## ARGUMENT

I.    **Civil contempt is not possible where the subject injunction does not clearly and
unambiguously proscribe the challenged conduct or plaintiffs do not prove a lack of
reasonable diligence in complying with the subject injunction.**

The "old soil," *Taggart*, 139 S. Ct. at 180, governing contempt for violating an injunction

in the Second Circuit is well established. A plaintiff must "show (1) that the order not complied

with is clear and unambiguous, (2) the proof of the noncompliance is clear and convincing, and

(3) the contemnor has not diligently attempted to comply in a reasonable manner."[30] *In re*

*Masterwear Corp.*, 229 B.R. 301, 310 (Bankr. S.D.N.Y. 1999)(Bernstein, J.)(citing *King v. Allied*

*Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)); *Drywall*, 889 F.2d at 395 (same).

To be unambiguous, an injunction "must leave 'no uncertainty in the minds of those to

whom it is addressed, who must be able to ascertain from the four corners of the order precisely

---

[30] In *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1105 (2d Cir. 1990), the court established a strict liability
standard for imposing sanctions under § 362(k) in the Second Circuit: "any deliberate act taken in violation of a stay,
which the violator knows to be in existence." The Second Circuit has expressly held that the strict liability standard
for that statutory claim can ONLY apply to claims brought by a natural person. *In re Chateaugay Corp.*, 920 F.2d
183, 186–87 (2d Cir. 1990)("We now hold that a bankruptcy court may impose sanctions pursuant to § 362(h) [now
§ 362(k)], under the standard set out in *Crysen/Montenay*, **only** for violating a stay as to debtors who are natural
persons.")(emphasis added). A court cannot invoke its contempt authority to provide corporate debtors the cause of
action that Congress declined to provide them in § 362(k). *See In re Chateaugay Corp.*, 920 F.2d at 186–87 ("even if
we thought § 362(h) would better serve the code's purposes by being applied to all debtors, we could do no more than
invite Congress to change the result").

what acts are forbidden.'"[31] *In re Treco*, No. 00-8137, 2001 WL 1566709, at *6 (Bankr. S.D.N.Y.

Dec. 10, 2001)(Bernstein, J)(quoting *King*, 65 F.3d at 1058). *Accord Metro. Opera Ass'n, Inc. v.

Local 100*, 239 F.3d at 176-178 (2d Cir. 2001). Thus, the "party enjoined must be able to ascertain

from the four corners of the order precisely what acts are forbidden." 889 F.2d at 395.[32]

"The proper measure of clarity," in the Second Circuit, "is not whether the decree is clear

in some general sense, but whether it unambiguously proscribes the challenged conduct." *Chao v.

Gotham Registry, Inc.*, 514 F.3d 280, 292 (2d Cir. 2008). Thus, that § 362(a)(3) unambiguously

proscribes stealing a debtor's customer list or repossessing its car does not mean it unambiguously

imposes an ex parte prior restraint upon certain advertising.[33]

Federal courts have routinely applied this old soil to § 362(a) contempt claims. *See U.S.*

*on behalf of I.R.S. v. Norton*, 717 F.2d 767, 774 (3d Cir. 1983)(reversing contempt based on §

362(a) and instructing that a "party should not be held in contempt unless a court first gives fair

warning that certain acts are forbidden; any ambiguity in the law should be resolved in favor of

the party charged with contempt"); *Frankford Tr. Co. v. Allanoff*, 29 B.R. 407, 410 (E.D. Pa.

1983)(reversing contempt because "the automatic stay provision of the Bankruptcy Code, read in

conjunction with the wording of the consent judgment, was not sufficiently definite and specific").

## II.    Section 362(a)(3) does not clearly and unambiguously enjoin bankruptcy related advertisements.

---

[31] In reviewing a lower court's contempt ruling, the "interpretation of the terms of the underlying order or judgment is subject to de novo review." *Latino Officers Ass'n v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009).

[32] *Drywall* was one of two decisions the court cited for the proposition that contempt was available for a stay violation in *Chateaugay*. 920 F.2d at 186–87. In the other, *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, the court stated "It is, of course, true that, for a person to be held in contempt, the court order violated must 'be specific and definite.'" 550 F.2d 47, 51 (2d Cir. 1976)(contempt defendant commenced lawsuit against debtor in violation of prohibition on "the commencement or the continuation of any court or other proceeding against the debtor").

[33] Even where an order expressly refers to advertising, it must precisely identify the advertising enjoined. *See Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.,* 779 F.3d 102, 111 (2d Cir. 2015)(contempt order not warranted where advertising injunction enjoining use of "Get Lucky mark or colorable limitations thereof" did not "clearly forbid" use of "Lucky Brand" marks).

A novel violation of § 362(a)(3) for attempting to control property by advertising would be unconstitutional and can provide no basis for civil contempt. No broad definition of "property" can salvage such a civil contempt claim.

A.    *Because an ex parte prior restraint on speech before a finding that the speech was false or misleading would be unconstitutional, there is fair ground to doubt § 362(a)(3) imposes such an injunction.*

A "prior restraint" under the First Amendment enjoins communications before they occur. *Alexander v. United States*, 509 U.S. 544, 550 (1993)(citing M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4–14 (1984)). An injunction on advertising is a prior restraint. *See id.*

It is literally hornbook law that "the ex parte issuance of a restraining order or other prior restraint on speech will be void in most circumstances." Nimmer, *supra*, at § 15:70. *See also Carroll,* 393 U.S. at 180-81 (ten day *ex parte* inunction on speech unconstitutional).

A prior restraint is unlawful if it has not "been accomplished with procedural safeguards that reduce the dangers of suppressing constitutionally protected speech." *New York Magazine*, 136 F.3d at 131. False or misleading commercial speech is not protected. But "a particular communication cannot be authoritatively called protected or unprotected at a point when, by definition, no court has yet determined the constitutional question." Laurence H. Tribe, American Constitutional Law at 1047 (2d ed. 1988). Thus, the Second Circuit has found commercial speech cannot be enjoined before there has been a determination that it is false or misleading. *New York Magazine,* 136 F.3d at 131. *Accord Freedman v. State of Md.*, 380 U.S. 51, 58 (1965)("only a procedure requiring a judicial determination suffices to impose a valid final restraint").

Because an ex parte prior restraint enjoining bankruptcy-related advertising before a determination that the enjoined advertising was false or misleading would be obviously unconstitutional, there is fair ground to doubt § 362(a)(3) imposes such an injunction. *See Clark v.*

- 29 -

*Martinez,* 543 U.S. 371, 381 (2005)(under the canon of constitutional avoidance, if one of two statutory constructions presents constitutional concerns, the other construction should prevail).

B.    *Section 362(a)(3) does not unambiguously enjoin the Challenged Advertisement.*

Section 362(a)(3) states that a Chapter 11 petition "operates as a stay, applicable to all entities, of … any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."   The word "advertising" does not appear in § 362(a). There is no hint of an intent to enjoin advertising in § 362(a)'s legislative history.  *See generally,* 1978 U.S.C.C.A.N. 5963. Treatises and courts have consistently indicated that § 362(a) does not proscribe statements about a bankruptcy that are not an attempt to collect a prepetition debt.[34] *See* 9B Am. Jur. 2d Bankruptcy § 1742 ("The automatic stay does not apply to the merely informative public statement that an … entity has filed a bankruptcy petition, as long as the communication does not represent an attempt by the creditor to collect a prepetition debt.")(collecting cases). There is no reference to competitive advertising (false or otherwise) in 2 A.L.R. Fed. 2d 459 "What Constitutes 'Willful Violation' of Automatic Stay Provisions of Bankruptcy Code (11 U.S.C.A. § 362(h)) Sufficient To Award Damages—Chapter 11 and 12 Cases" (West 2020).[35] That any prohibition on soliciting customers is not necessarily apparent from the four corners of § 362(a) is evidenced by, for example, the *In re Golden* decision. There,

---

[34] For obvious reasons, this Court did not find that that the "Challenged Advertisement" was an effort to collect a debt under § 362(a)(6). Dkt. No. 274. Thus, First Amendment issues related to the distinction between directive speech (e.g., "please pay me") and communicative speech are not present here. *Compare In re National Service Corp.*, 742 F.2d 859, 862 (5th Cir. 1984)(reversing injunction under § 362(a) against creditor's billboard stating debtor was in bankruptcy and did not pay its bills)(citing *N.A.A.C.P. v. Claiborne Hardware Co.*, 102 S.Ct. 3409, 3425 (1982)("The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from first amendment protection.")); *In re Collier*, 410 B.R. 464, 475–76 (Bankr. E.D. Tex. 2009)(sign containing directive "WILL YOU PLEASE COME PAY ME!" was not primarily a communication and violated § 362(b)(6) as an effort to collect a debt).

[35] There is likewise no reference to competitive advertising (false or otherwise) in 23 A.L.R. Fed. 2d 339 "What Constitutes 'Willful Violation' of Automatic Stay Provisions of Bankruptcy Code (11 U.S.C.A. § 362(k)) Sufficient to Award Damages—Chapter 7 Cases" (West 2020)(Originally published in 2007, updated weekly).

the court determined that the "debtor's customers cannot be regarded as property of the debtor's estate within the meaning of 11 U.S.C. § 541." 122 B.R. at 21-22. It further found "the defendants' solicitation of business from such customers does not constitute an act to obtain possession of property of the estate or the exercise of control over property of the estate within the context of the automatic stay as imposed under 11 U.S.C. § 362(a)(3)." *Id.*

C.    *Because there is a difference between a verb phrase and a noun, the Code's broad definition of "property" does not help Plaintiffs' claim for contemptuous advertising.*

No broad definition of "property" can help any plaintiff's contempt claims because the relevant question is not whether customers are clearly and unambiguously its "property" under the statute, it is whether the statute's prohibition on any act to obtain possession of property imposes an *ex parte* injunction on advertising. *Accord, e.g.*, *In re Young*, 193 B.R. at 624; *In re Harchar*, 393 B.R. 160, 177 (Bankr. N.D. Ohio 2008)(noting the lack of a "bright-line rule" and concluding that whether there is impermissible "control" is "all a matter of degree"); *In re Allentown Ambassadors, Inc.*, 361 B.R. 422, 440 n.40 (Bankr. E.D. Pa. 2007)(same).

Reading § 362(a)(3)'s ambiguous prohibition on controlling property to enjoin advertising would not further any policy. The stay does not enjoin **wrongful** acts to control property, it enjoins **any** acts. A creditor violates § 362(a)(3) by repossessing a car even if it has every right to do so under the financing agreement. Thus, § 362(a)(3) cannot enjoin "unfair competition" or "false advertising." If anything, it must enjoin "competition" or "advertising." Taking at face value any plaintiff's assertion that its customers are its property (Dkt. No. 274 at 4), "true advertising" would necessarily be an effort to exercise control over that property every bit as much as "false advertising." Congress did not enact § 362(a)(3) to immunize a debtor from competition. *Accord Allentown Ambassadors*, 361 B.R. at 439–40 & n.38 (stay provisions should be construed to "avoid giving the bankruptcy estate an undue legal advantage in its relationship with other parties"); *In re*

- 31 -

*Trump Ent. Resorts, Inc.*, 534 B.R. 93, 102 (Bankr. D. Del. 2015); Epstein, Nickles & White, Bankruptcy, Practitioner Treatise Series, Vol. 1, § 3-14, at 174 (1992)("In essence, competing against the debtor is not the same as taking debtors' good will.").

 Executory contracts, accounts receivable, and customer lists may well be property of the estate. *See, e.g.*, *In re Enron Corp.*, 300 B.R. 201, 211-12 (Bankr. S.D.N.Y. 2003)(concluding employment agreements, as executory contracts, are property of the estate and that seeking payment of a retention bonus pursuant to an employment agreement is an act to exercise control over property of the estate); *In re A.M.R.*, 485 B.R. 279, 294 (Bankr. S.D.N.Y. 2013)( notice of deceleration of certain notes under indenture agreements for prepetition financing secured by aircraft constitutes an attempt to control property of the estate); *In re Alert Holdings, Inc.*, 148 B.R. 194, (Bankr. S.D.N.Y. 1992)(on motion for preliminary injunction concluding that executory contracts, accounts receivable, customer lists, and other intangibles, are property of the estate and that competitors who had misappropriated a customer list and sought to acquire debtor's exclusive contracts using misappropriated customer list exercised control over estate property in violation of the stay). But Defendants have found no case that holds or suggests the mere solicitation of customers not contractually bound to the debtor violates §362(a)(3). To the contrary, "[a]bsent any evidence as to exclusivity agreements between the debtor and its customers or that such customers are required to purchase from the debtor specific quantities of products, the debtor can point to no property interest with respect to its potential customers which can be interfered with by the defendants, or which is capable of being lost to the possession or control of the defendants in violation of 11 U.S.C. § 362(a)(3)." *In re Golden Distributors, Ltd.*, 122 B.R. at 20.

III.    **Plaintiffs cannot salvage their contemptuous advertising claims by invoking inherent authority or inventing novel subjective contempt standards.**

A "bankruptcy court's contempt power is narrowly circumscribed." *In re DiBattiston*, No. 19-cv-8118 (CS), 2020 WL 1819948 at *4 (S.D.N.Y. 2020). It "does not 'authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.'" *In re Kalikow*, 602 F.3d 82, 96 (2d Cir. 2010)(citations omitted). Thus, Plaintiffs cannot repurpose the § 362(k) strict liability standard or invent a subjective contempt standard to save their claims.

A.    *Plaintiffs cannot circumvent the Second Circuit "old soil" governing contempt under §105(a) by seeking "inherent authority" sanctions.*

The Court's inherent power to impose "relatively minor non-compensatory sanctions," *In re Sanchez*, 941 F.3d 625, 628 (2d Cir. 2019), cannot supplant the Second Circuit's established requirements for contempt based on the violation of an injunction. In the Second Circuit, any sanction in excess of $100,000 requires a jury trial and proof beyond a reasonable doubt. *See Mackler Prods., Inc. v. Cohen*, 146 F.3d 126, 129–30 (2d Cir. 1998)(holding that, regardless of the judicial power invoked, "substantial punitive sanctions" require "the procedural protections appropriate to a criminal case" and identifying $10,000 as the threshold for substantial punitive sanctions for an individual); *United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 663-665 (2d Cir. 1989)(adopting bright-line rule of $100,000 for the "absolute dollar amount of fines above which the Sixth Amendment entitles all corporations and other organizations to a jury trial for criminal contempt, regardless of contemnor's financial resources"); *Colon v. Howard*, 215 F.3d 227, 233 (2d Cir. 2000)(confirming $100,000 "bright-line rule").

B.   *No subjective standard could salvage Plaintiffs' claims for civil contempt for violating §362(a)(3) through bankruptcy-related advertising.*

In *Taggart*, the Court did not purport to articulate a new subjective contempt standard. But it recognized that a defendant's subjective knowledge has at times been found relevant in contempt jurisprudence. *Taggart*, 139 S. Ct. 1802 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949)).   While dicta in *Chateaugay* suggests an additional subjective requirement must be satisfied for contempt under § 362(a), this Court need not reach the issue because application of the existing objective requirements already precludes contempt. And this case is plainly not like the *McComb* decision cited in *Taggart*, where a defendant's previously-adjudicated violation of a statutory provision justifies enjoining further violations of the same provision.[36]

In *Chateaugay*, the Second Circuit did not purport to modify the established contempt standard established in, e.g., *Drywall*.[37] But the Court did suggest (albeit in dicta) that a contempt claim based on § 362(a) requires an additional subjective showing that the alleged violator acted with "maliciousness" and did not have "a good faith argument and belief that its actions did not

---

[36] The *Taggart* Court also cited *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) for the proposition that Supreme Court "cases suggest, for example, that civil contempt sanctions may be warranted when a party acts in bad faith." 139 S.Ct. at 1802. *Chambers* did not involve a civil contempt proceeding. 501 U.S. 41-42. Rather, it involved a court's invocation of its inherent powers to award attorneys' fees as an exception to the American Rule in response to the prolonged bad faith misconduct of a "recalcitrant litigant," which the Court compared to civil contempt as an avenue for vindicating the trial court's authority. *Id.* at 41-42, 53-54. Although an inherent power fee shifting award based on bad faith serves the same purpose as civil contempt, the Court noted that, unlike civil contempt, the "underlying rationale" of the bad faith exception to the American Rule is "of course punitive." Leaving aside that it is not a contempt case, *Chambers* cannot help Plaintiffs because (1) Defendants were not litigants (recalcitrant or otherwise) on February 25, 2019 or when the Challenged Advertisement was mailed in March and (2) a fine for bad faith litigation is by definition non-compensatory and therefore subject to the Second Circuit's $100,000 bright line limitation for non-compensatory fines without a jury trial. *See, e.g, U.S. v. Twentieth Century Fox Film Corp.*,882 F.2d 656, 663-665 (2d Cir. 1989).

[37] Moreover, *Chateaugay* could not alter *Drywall's* contempt standard because (1) an appellate panel cannot reverse the decision of a prior panel, and (2) there was no contempt claim before the *Chateaugay* court. *See, e.g., In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 154 (2d Cir. 2015)(Circuit "panel is bound by prior decisions of this court unless and until the precedent established therein are reversed en banc or by the Supreme Court"); *Ming Shi Xue v. Bd. of Immigration Appeals*, 439 F.3d 111, 121 (2d Cir. 2006)("An opinion simply cannot hold more than the facts before it.").

violate the stay." *See In re Chateaugay Corp.*, 920 F.2d at 186–87 ("contempt involves maliciousness or lack of a good faith argument and belief that the party's actions were not in violation of a bankruptcy stay"). Without more, the Complaint from the 2009 DirecTV Lawsuit (Plts. Ex. 3) establishes Defendant's subjective belief that § 362(a)(3) does not enjoin any advertising. Plaintiffs have introduced no contrary evidence. Plaintiffs have introduced no evidence suggesting malice. Defendants' advertising would have been permissible in 2009 and then promptly changed it when Plaintiffs complained. Plts. Ex. 48 at at 18:4-19:23; 20:10-24. And the fact that § 362(a)(3) does not mention "advertising" (and could not constitutionally impose an ex parte prior restraint on advertising if it did) establishes a good faith argument that the Charter Advertisement was not in violation of § 362(a)(3). Thus, application of the additional subjective requirements suggested by *Chateaugay* would further preclude contempt. Whether the adoption of an objective § 105(a) standard in *Taggart* precludes the additional subjective requirement suggested in *Chateaugay* is an issue this Court need not reach because the established objective standard under § 105(a) precludes contempt.

The *Taggart* Court cited *McComb* for the suggestion that subjective knowledge could be relevant to contempt where an established record of legal violations can justify shifting the burden of uncertainty to the party whose violations prompted the subject injunction. 139 S.Ct. at 1802. *McComb* involved a civil contempt proceeding arising from a permanent injunction entered at the conclusion of an action brought by the Department of Labor against the Jacksonville Paper Company.[38] *See* 336 U.S. at 189 (discussing *Fleming v. Jacksonville Paper Co.*, 128 F.2d 395 (5th Cir. 1942) and *Walling v. Jacksonville Paper Co.*, 317 U.S. 564 (1943)). In the original action, the district court found Jacksonville Paper violated the Fair Labor Standards Act in a number of

---

[38] In the original litigation and subsequent contempt proceeding, Phillip Fleming served as the Administrator of the Wage and Hour Division before being replaced by Metcalfe Walling and later William McComb.

respects and enjoined it from, inter alia, "violating any of the provisions of the Fair Labor Standards Act of 1938." *Fleming*, 128 F.2d at 399. The Fifth Circuit found the district court erred by imposing such a broad injunction: "Such an injunction would put the defendants in contempt of court if thereafter in any way they violated this law, whereas it should have been restricted to a repetition of such violations as were found to have been committed, and similar ones." *Id.* On remand from a Supreme Court decision rejecting the argument that the Act did not apply to certain facilities, the district court entered a decree permanently enjoining Jacksonville Paper from repeating its previously-adjudicated violations of the specified provisions of the Act. *See McComb*, 336 U.S. at 191-92.

Jacksonville Paper later repeated its violations of those same provisions, but employed different methods. Because Jacksonville Paper had previously been found to have violated the Fair Labor Standards Act, the Supreme Court rejected its argument that an injunction proscribing further violations of the same provisions was too vague to sustain civil contempt. *Id.* at 192 ("Decrees of that generality are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown."). Consistent with *McComb*, courts have recognized that a party that has been found to have violated a statute and later disobeys an injunction prohibiting further violations of the specified statutory provision cannot avoid contempt by claiming the second violation was not described in the original injunction. *See, e.g., Hodgson v. Corning Glass Works*, 474 F.2d 226, 236-37 (1973)(reversing trial court and instructing "injunction must be narrowed" where there was no showing of "proclivity for unlawful conduct" or record of continuing and persistent violations).

Unlike the post-adjudication injunctions in *McComb* and *Hodgson*, the § 362(a)(3) injunction was entered ex parte—without any determination of misconduct by Defendants (or any

other entity). It is thus impossible for any "record of continuing and persistent violations," *Taggart*,

139 S.Ct. at 1802, to support a departure from the established requirement that the subject

injunction unambiguously prohibit the alleged contemptuous conduct.

**IV.    Having spent more than 3,600 hours trying to avoid service interruptions related to 14,500 accounts potentially connected to 205 separate entities, Defendants cannot be credibly accused of a lack of diligence.**

Plaintiffs have wholly failed to prove Defendants have "not been reasonably diligent and

energetic in attempting to accomplish what was ordered." *Drywall,* 889 F.2d at 394; *Fiber-Shield*

*Indus., Inc. v. N.Y. Fire-Shield, Inc.*, 189 F.3d 460 (2d Cir. 1999) (affirming denial of contempt

where "the violation of an order was inadvertent and was promptly cured"). Even under the lower

standard for claims under § 362(k), courts typically only find liability in similar circumstances

where the violator refused to restore service.  *See In re Smith,* 170 B.R. 111 (Bankr. N.D. Ohio

1994)(refusal to restore telephone service until payment made); *In re Tarrant*, 190 B.R. 704

(Bankr. S.D. Ga. 1995)(refusing to accept deposit to restore electrical service).

Defendants spent literally thousands of hours trying to ensure continued service to Last

Mile Accounts.  They worked to restore service without judicial intervention and before a single

hour had been billed by a single lawyer. There is no basis for contempt.

**V.    This Court cannot constitutionally decide the damage issues that are to be decided by a jury in Counts I through V.**

In the district court, a jury will decide how many customers each plaintiff lost, how much

each plaintiff spent to convince customers to maintain their service, how much each plaintiff paid

for corrective advertising (and whether that payment was reasonable), and how much each plaintiff

was damaged by service disconnects to Last Mile Accounts.  Defendants have the Seventh

Amendment right to have that jury act "as a fact-finding body on those issues." *Beacon Theatre*

*v. Westover,* 359 U.S. 500, 501 (1959). There is not a single case suggesting the non-creditor

defendants' Seventh Amendment right to have a jury decide those facts before a court sitting in equity is diminished by the fortuity that the plaintiff is in bankruptcy. *Accord, e.g., In re MarketXT Holdings Corp.*, 336 B.R. 39, 64 (Bankr. S.D.N.Y. 2006). And there is not a single case suggesting the joinder of 369 non-creditor claims to 36 creditor claims under Federal Rule of Civil Procedure 20 can impair the substantive Seventh Amendment rights of the non-creditor defendants. *See Dammers & Vanderheide & Scheepvaart Maats Christina B.V. v. Corona*, 836 F.2d 750, 760 (2d Cir. 1988).

Plaintiffs made no effort to differentiate between damages in the 36 claims against creditors and damages in the 369 claims against non-creditors. It is thus impossible for this Court to decide damage issues related to injuries incurred by virtue of alleged false advertising or alleged breach of contract without violating Defendants' Seventh Amendment rights. *Ross v. Bernhard,* 396 U.S. 531, 538 (1970), *Beacon Theatre,* 359 U.S. at 501; *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962).

The Supreme Court's decision in *Katchen v. Landy,* 382 U.S. 323 (1966) does not impair a non-creditors' Seventh Amendment rights. In *Granfinanciera*, the Supreme Court instructed that *Katchen* "says nothing about a creditor's Seventh Amendment right to a jury trial on a trustee's preference action when the creditor has not entered a claim against the estate." *Granfinanciera*, 492 U.S at 59, n.14. If *Katchen* "says nothing" about creditors that have not entered a claim against the estate, it *a fortiori* can "say nothing" about non-creditors.[39]

---

[39] The Court also indicated in *Granfinanciera* that *Katchen*'s reasoning would not even apply where the claims asserted against a creditor were asserted in the same action. *Id*. at 64, n. 18 (recognizing that the "delay and expense of providing a jury trial in the same action," as opposed to the separately-filed actions considered in *Katchen*, "could never override *Beacon* and *Dairy Queen*")(quoting Warner, Katchen Up in Bankruptcy: The New Jury Trial Right, 63 AM.BANKR.L.J. 1, 39 (1989)(internal citations omitted)).

Moreover, because "seeming curtailment" of Seventh Amendment rights must "be scrutinized with the utmost care," *Beacon Theatres*, 359 U.S. at 501, *obiter dicta* from *In re CBI Holding Co., Inc.*, cannot be read to justify a new curtailment of jury trial rights for non-creditor defendants sued by bankrupt plaintiffs. 529 F.3d 432, 466 (2d Cir. 2008).[40]

## VI.   Because no legal fees were incurred to convince defendants to comply with § 362(a) and this Court cannot determine damages, fees are not available here.

Contempt damages are not available because there is no basis for a finding of contemptuous advertising under §362(a)(3) or contemptuous disconnects under § 362(a)(3) or §362(a)(6). *See U.S. v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947)(A compensatory "fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy.").

Legal fees would not be available even with a proper contempt finding because there is no evidence that any fees were required to cure the alleged contemptuous conduct.

The undisputed evidence is that Defendants fully responded to Plaintiffs' request to modify the bankruptcy-related components of the Challenged Advertisement before the Complaint was filed on April 5, 2019. Plts. Ex. 48 at 18:4-19:23; 20:10-24. And it is clear that the only reason any bankruptcy-related language would not have been changed before this lawsuit was filed was because Plaintiffs had not asked. *Id.*

Similarly, the undisputed evidence is that Plaintiffs' lawyers did not start billing Plaintiff before March 19, 2019 and Defendants had fully restored service to the 289 disconnected accounts on March 18, 2019. The four subsequent inadvertent disconnects involved weather or data entry errors regarding post-petition charges. They could have no connection to the automatic stay.

---

[40] The Second Circuit could limit a non-creditor defendant's Seventh Amendment rights in *CBI* because *CBI* involved no non-creditor defendant. *See, e.g., Xue*, 439 F.3d at 121. Moreover, the *CBI* court based its decision on *Katchen*, which does not apply to claims asserted against non-creditor defendants. *Granfinanciera* 492 U.S. at 59, n. 14.

Even with the strict liability standard and mandatory fee provision of § 362(k), courts in the Second Circuit have warned against awarding fees where damages have not been established. *See, e.g., In re Sturman*, 2011 WL 4472412, at *4 (Bankr. S.D.N.Y. 2011)(noting that "many courts have expressed reluctance to award fees and costs in the absence of other actual damages for fear of encouraging an excessively litigious approach to minor stay violations" and finding generalized allegations of harm to reputation to be "too far removed from the types of harm that usually fall upon debtors and property as a result of interference with the bankruptcy estate and proceedings"). Those concerns are amplified in the contempt context where any award "must be restrained by the principle that only the least possible power adequate to the end proposed should be used in contempt cases." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801 (1987)(internal quotations and alterations omitted). Given the foregoing, attorneys' fees cannot be awarded before damages have been adjudicated. To do otherwise risks awarding massive fees where there are literally no damages.

**VII.   Even ignoring that a jury must decide facts pertaining to damages, Plaintiffs have introduced no cognizable damage evidence.**

The fact that no plaintiff has introduced evidence of its own actual losses precludes any compensatory fee award here. *See, e.g.*, *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 810 (2d Cir. 1981) ("If a fine is imposed for compensatory purposes, the amount of the fine must be based upon the complainant's actual losses sustained as a result of the contumacy."); *Windstream Holdings, Inc., et al. v. Charter Communications, Inc., et al.*, 7:19-cv-09354-CS, 4/21/20 Bench Ruling at 15:10-11 ("Each plaintiff will still need to prove its damages at trial."); *Hatahley*, 351 U.S. at 182 (remanded where trial court made "no attempt to allot any particular sum to any of the 30 plaintiffs").

Jarosz has admitted that he cannot calculate damages for Count VI. He has never recanted that admission. Without more, that admission bars his damage testimony. Moreover, Jarosz's data analysis regarding the payment necessary to recover for Lost Customer Injury is plainly unreliable. To be reliable, a data analysis must account for major variables, including confounding variables." *Lamarr-Arruz v. CVS Pharmacy, Inc.*, No. 15-CV-04261 (JGK), 2017 WL 4277188, at *10 (S.D.N.Y. Sept. 26, 2017)(citing *See Wills v. Merada Hess Corp.*, 379 F.3d 32, 50 (2d Cir. 2004)(Sotomayor, J.)). Jarosz made no effort to account for at least three such variables: (1) Charter's increased speed in 2019, (2) Charter's expanded product offerings in 2019, and (3) Charter's entry into new markets in 2019. Without more, Jarosz's failure to address any one of those confounding variables is fatal to his opinion on lost profits.

Auman's testimony regarding the payment to recover for the Retained Customer Injury was by his own admission false. Admittedly false testimony provides no basis for a damage award. And he could not substitute his lay opinion on corrective advertising costs for Jarosz's expert opinion simply because Jarosz did not offer his expert opinion at trial.

Martinez's out of court statement in support of double recovery for the 1,386 Lost Customer Injury provides no evidence for a damage award. Plaintiffs cannot use their own interrogatory responses as evidence because those responses are out of court statements offered for the truth of the matter asserted. *See* Fed. R. Evid. 802; *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, No. 10 Civ. 128 PAC, 2013 WL 1775367, at *8 (S.D.N.Y. Apr. 25, 2013) [T]o the extent [IBM] seeks to introduce statements from [its] own answers to interrogatories to prove the truth of the matters they assert, these statements are inadmissible hearsay.") (internal citations omitted)); *Rosenthal v. Poland*, 337 F. Supp. 1161, 1170-71 (S.D.N.Y. 1972) ("Interrogatory answers are admissible only against the party who made them."). And Plaintiffs have not identified

or attempted to establish an applicable hearsay exception for Martinez's out of court statements made in Plaintiffs' Exhibit 350. *See* Fed. R. Evid. 803. Plaintiffs' suggestion that Martinez's out of court statements are not hearsay because they are "verified," 5/6/20 Tr. 137:7-8, is absurd. All interrogatory answers are verified. The decisions cited above don't involve "unverified" interrogatory responses. *See Int'l Bus. Machines Corp. v. BGC Partners, Inc.,* 2013 WL 1775367, at *8; *Rosenthal,* 337 F. Supp. At 1170-71. The declarants were "out of court." Federal Rule of Evidence 802 likewise precludes the admission of his out of court statements because they are offered for their truth.

## VIII.   No plaintiff has introduced evidence related to its creditors that is even remotely sufficient to sustain an equitable subordination claim.

The doctrine of equitable subordination empowers the Court "to subordinate, for purposes of distribution, claims to other claims, and interests to other interests" so long as it narrowly "tailor[s] the remedy to fit the harm."[41] *In re 80 Nassau Associates*, 169 B.R. 832, 836-37 (Bankr. S.D.N.Y. 1994) (Bernstein, J.). To establish an equitable subordination claim, each plaintiff must prove (a) the claimant engaged in some type of inequitable conduct; (b) the misconduct caused the plaintiff's creditors injury and conferred an unfair advantage on the claimant; and (c) equitable subordination is consistent with bankruptcy law.[42] *See Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 610-11 (2d Cir. 1983); *In re Mobile Steel*, 563 F.2d 692 (5th Cir. 1977).

---

[41] *See also In re Bernard L. Madoff Inv. Sec. LLC,* 515 B.R. 117, 160 (Bankr. S.D.N.Y. 2014) ("It is well-settled that equitable subordination is an alternative to a monetary recovery for the creditor's wrongdoing, and the trustee cannot recover damages and equitably subordinate a claim based on the same wrong.").

[42] Circuit courts disagree as to whether the second prong of the *Mobile Steel* test is disjunctive or whether it requires a showing of both plaintiff injury *and* unfair advantage to the claimant. The Second Circuit requires a party to prove plaintiff injury *and* unfair advantage. *See In re W.T. Grant Co.*, 699 F.2d at 610-11; *In re LightSquared Inc.*, 511 B.R. 253, n. 152 (Bankr. S.D.N.Y. 2014) ("Although the second prong of the *Mobile Steel* test is stated in the disjunctive, the better view (and the one followed by courts in this District) is that injury must be shown; and "unfair" advantage to the claimant, in the absence of injury to creditors, is not sufficient.").

A claim can only be subordinated in proportion to the injury caused to creditors by the inequitable conduct. *Nassau*, 169 B.R. at 840 ("equitable subordination is remedial, not penal, and a claim will be subordinated only to the extent necessary to offset the harm that resulted"). Any claim subordinated out of proportion to the proven injury is impermissibly penal. *In re Enron Corp.*, No. 01-16034 (AJG), 2005 WL 3832053, at *12 (Bankr. S.D.N.Y. Nov. 28, 2005); *In re Sunbeam Corp.*, 284 B.R. at 364.

Accordingly, the remaining equitable subordination issues are (1) whether the creditors of the any of the thirty-six plaintiffs against whom CCO filed claims were harmed, and (2) whether CCO gained some unfair advantage over the any of the creditors of those thirty-six plaintiffs. For each of the thirty-six plaintiffs that establishes those elements, the Court must determine which creditors were harmed and unfairly disadvantaged and the extent of harm to each creditor. The Court must use that information to fashion a remedy that *only* remedies the harm to those creditors from alleged inequitable conduct.

Not one of the thirty-six Count VII plaintiffs presented evidence showing that its particular creditors were harmed by CCO's alleged inequitable conduct. Moreover, not one of the thirty-six plaintiffs introduced evidence that CCO obtained an unfair advantage over their creditors. The only evidence provided by the plaintiffs regarding how CCO's conduct affected other creditors' ability to recover on their claims was the proposed plan of reorganization, which provides for specific distributions to creditors. J. Auman Declar., ¶ 32. *See also* Plts. Exs. 101, 102. There is no evidence that CCO's conduct altered the distributions or harmed the other creditors' ability to recover on claims under the proposed plan. The only factor that differentiates distributions to general unsecured creditors in Class 6 of the proposed plan is whether a particular plaintiff's estate is subject to a lien securing the secured lender obligations. Whether CCO participates *pari passu*

with the general unsecured creditors in those distributions has no effect on the distributions to be made to the Class 6 general unsecured creditors under the proposed plan. There is no evidence that CCO obtained an advantage in the distribution scheme.

Without evidence showing which specific creditors were harmed *and* disadvantaged, and to what extent, this Court cannot fashion a remedy that would not be penal. *See, e.g., In re 80 Nassau Assocs.*, 169 B.R. at 840. The Court cannot subordinate a CCO claim against the estimate of Windstream Services, LLC (or any of the other Count VII thirty-five plaintiffs) to proportionally address a harm suffered by creditors of, e.g., BOB, LLC. With no ability to measure the quantum of subordination or at least to determine the proportionality of the subordination to the harm caused to a particular plaintiff's estate or creditors, any subordination would be penal. The Count VII Plaintiffs have thus failed to prove their claims.

## IX. Equitable disallowance is not available because no plaintiff has asserted a claim objection under 11 U.S.C. § 502(b).

Plaintiffs also improperly request equitable disallowance. In Judge Chapman's well-reasoned decision in *In re LightSquared Inc.*, 504 B.R. at 244, the court held that equitable disallowance is not permitted under the Bankruptcy Code. In considering Count VII, the Court should not entertain the Count VII Plaintiffs' request for equitable disallowance because the Code does not expressly provide for such a claim. Instead, the Code expressly provides that the Court shall allow a claim except as disallowed based on the grounds stated in 11 U.S.C. § 502(b). No plaintiff has asserted a claim objection or articulated any basis for disallowance of a claim under § 502(b).

## CONCLUSION

For the reasons stated above, Defendants respectfully request that this Court enter judgment for Defendants as to all plaintiffs on Counts VI and VII.

Dated: June 9, 2020

Respectfully submitted,

*/s/John Kingston*
John Kingston (pro hac vice)
Michael Nepple (pro hac vice)
Brian Hockett (pro hac vice)
THOMPSON COBURN LLP
One U.S. Bank Plaza
St. Louis, MO  63101
314-552-6461
314-552-7000 (f)
jkingston@thompsoncoburn.com
mnepple@thompsoncoburn.com
bhockett@thompsoncoburn.com

*Attorneys for Defendants*