UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
In re:

Windstream Holdings, Inc., et al.,

       Debtors.
-------------------------------------------------------------------x
Windstream Holdings, Inc., et al.,

  Plaintiffs,

  v.

Charter Communications Inc. and
Charter Communications Operating, LLC

  Defendants.
-------------------------------------------------------------------x

Chapter 11
Case No. 19-22312 (RDD)
(Jointly Administered)


Adv. Pro. No. 19-08246


**MEMORANDUM OF DECISION ON COUNT VI (CONTEMPT FOR VIOLATION OF THE AUTOMATIC STAY) AND COUNT VII (EQUITABLE SUBORDINATION)**

Appearances:

Katten Muchin Rosenman LLP, by Terence P. Ross, Michael R. Justus, and Shaya Rochester, for Debtors/Plaintiffs

Morrison & Foerster LLP, by Lorenzo Marinuzzi and Todd M. Goren, for the Official Committee of Unsecured Creditors

Thompson Coburn LLP, by John Kingston, Michael Nepple, and Brian Hockett, for Defendants

Hon. Robert D. Drain, United States Bankruptcy Judge

   After December 18, 2019 a bench ruling, the Court entered an order [Dkt. No. 274]

granting in part and denying in part the motion of plaintiffs/debtors and debtors in possession

("Plaintiffs or "Debtors") for partial summary judgment on all counts in this adversary

proceeding.  In an order dated March 30, 2020 following a memorandum of decision appearing

1

at Windstream Hldgs., Inc. v. Charter Communs. Inc. (In re Windstream Hldgs., Inc.), 2020

Bankr. LEXIS 708 (Bankr. S.D.N.Y. Mar. 17, 2020), the Court decided to hear the remaining

issues in this adversary proceeding only with respect to Count VI (breach of the automatic stay

set forth in 11 U.S.C. § 362(a)) and Count VII (equitable subordination under 11 U.S.C. § 510(c))

of the claims filed in these chapter 11 cases by defendant Charter Communications Operating,

LLC ("Operating;" the defendants together, "Defendants" or "Charter").[1]

The Court's order on the Debtors' summary judgment motion held that the Defendants

breached the automatic stay set forth in 11 U.S.C. § 362(a) by their termination of "last mile"

connectivity service to certain of the Debtors' customers based on the Debtors' prepetition

default under the parties' Spectrum Business Value Added Reseller Agreement, dated April 11,

2018 (the "VAR Agreement"),[2] as well as Defendants' literally false and intentionally misleading

advertising campaign to induce the Debtors' customers to terminate their agreements with the

Debtors.

The remaining issues on Count VI are whether the Defendants are liable in civil

contempt for such breaches and, if so, the proper compensatory sanction.

As to Count VII, the remaining issues are the amount of harm caused by the foregoing

conduct to the creditors of the Debtors against which Operations has filed claims (the

"Applicable Debtors") and whether equitably subordinating Operations' claims to those

creditors' claims conflicts with any other provision of the Bankruptcy Code, the Applicable

---

[1] The reference has since been withdrawn by the District Court with respect to the remaining issues pertaining to Counts I-V, for a jury trial.  The Court assumes the parties' familiarity with these and the other prior rulings in this adversary proceeding
[2] Joint Exhibit ("JE") 1.

Debtors' summary judgment motion having previously established the other elements of their

equitable subordination claim under 11 U.S.C. § 510(c).

The Court conducted a four-day trial on these issues and has considered the witness'

testimony, the parties' agreed deposition designations, the documents admitted into evidence,

and the parties' post-trial submissions.  This Memorandum of Decision explains why (a) the

Defendants should be held in contempt for violating the automatic stay under (i) 11 U.C.C. §

362(a)(3) and (6) for their termination of service to the Debtors' customers on account of

prepetition amounts owing under the VAR Agreement, and (ii) 11 U.S.C. § 362(a)(3) for their

literally false and intentionally misleading advertising campaign that wrongfully interfered with

the Debtors' customer contracts and goodwill; (b) the Defendants should be jointly and

severally sanctioned in the amount of certain of the Debtors' actual damages arising from their

termination of customer service under the VAR Agreement, in the aggregate sum of $5,278.85;

(c) the Defendants should be jointly and severally sanctioned $19,179,329.45 for the losses

caused by their violation of the automatic stay by intentionally and wrongfully interfering with

the Debtors' customer contracts and good will; (d) (i) the harm to the Applicable Debtors'

general unsecured creditors in Class 6A under the Debtors' confirmed Chapter 11 Plan caused

by Operations' foregoing conduct is, as set forth in in the Court-Approved Disclosure Statement

therefor,[3] far greater than Operations' projected recovery on its claims against the Applicable

Debtors that are Class 6A Obligors, warranting the equitable subordination of Operations'

unsecured claims in full under 11 U.S.C. § 510(c) to the other general unsecured claims against

the those Debtors, and (ii) such subordination does not conflict with any other provision of the

---

[3] Dkt. No. 1813 at 5.

Bankruptcy Code; and (e) because the general unsecured creditors in Class 6B under the

Debtor's Chapter 11 Plan would receive a full recovery regardless of the damages caused by

Operations, Operations' claims against the Applicable Debtors that are Class 6B Obligors should

not be equitably subordinated.

**Jurisdiction**

The Court has previously ruled that it has "arising under" jurisdiction under 28 U.S.C. §§

157(a)-(b) and 1334(b) with respect to Counts VI and VII, which are core proceedings under 28

U.S.C. § 157(b) that the Court can decide by a final order under the United States Constitution.

In re Windstream Hldgs., Inc., 2020 Bankr. LEXIS 708 at *6, *12-14; *see also* In re Residential

Capital, LLC, 571 B.R. 581, 585 (Bankr. S.D.N.Y. 2017) ("If a civil contempt proceeding arises out

of a core matter, the contempt proceeding is core."); Ames Dept. Stores, Inc. v. Lumbermens

Mut. Cas. Co. (In re Ames Dep't. Stores, Inc.), 542 B.R. 121, 141-43, 145 (Bankr. S.D.N.Y. 2015)

(bankruptcy court has not only core but also exclusive jurisdiction over claims for breach of the

automatic stay and equitable subordination).  Confirmation of the Debtors' Chapter 11 Plan

after the trial in this proceeding did not deprive the Court of jurisdiction over these pending

claims.  New York Skyline Inc. v. Empire State Bldg. Co. LLC (In re New York Skyline Inc.), 2019

Bankr. LEXIS 2837, at *35-39 (Bankr. S.D.N.Y. Aug. 26, 2015).

**Discussion**

**Contempt for Violation of the Automatic Stay**.

Acts taken in violation of the automatic stay set forth in 11 U.S.C. § 362(a) are void.  In

re 48th St. Steakhouse, 835 F.2d 427, 431 (2d Cir. 1987); 3 Collier on Bankruptcy ¶ 362.12[1]

(16th ed. 2020), and courts routinely grant injunctive relief to ameliorate their effect.  In re

Adelphia Communs. Corp. v. The American Channel, LLC, 345 B.R. 69, 83-84, 86 (Bankr. S.D.N.Y. 2006).  In addition, under certain circumstances monetary sanctions may be warranted for such violations.  In the Second Circuit, if the debtor is not a natural person such sanctions derive from the Court's inherent contempt power, Maritime Asbestos Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.), 920 F.2d 183, 187 (2d Cir. 1990); see also Fidelity Mortgage Investors v. Camelia Builders, Inc., 550 F.2d 47, 52-53 (2d Cir. 1976), cert. denied, 429 U.S. 1093 (1977); 3 Collier on Bankruptcy ¶ 362.12[2], as well as under 11 U.S.C. § 105(a), which provides that "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," in this instance 11 U.S.C. § 362(a).[4]

Generally, "Federal Courts consider two factors in determining whether to hold a party in civil contempt:  whether the alleged contemnor had notice of the court order, and whether that person complied with the order."  In re Residential Capital, 571 B.R. at 585.  As held by In re Chateaugay Corp., the automatic stay has the effect of a court order for purposes of the contempt power as further supported by 11 U.S.C. § 105(a).  920 F.2d at 187; see also Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1191 (9th Cir. 2003) ("Because the metes and bounds of the automatic stay are provided by statute and systematically applied to all cases, there can be no doubt that the automatic stay qualifies as a specific and definite court order.") (internal quotation and citation omitted).

---

[4] A separate, statutory basis governs sanctions for breach of the automatic stay, 11 U.S.C. § 362(k) (formerly section 362(h)), which states that, with one exception, "[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." The Second Circuit has determined, however, that this provision applies only to natural persons.  In re Chateaugay Corp., 920 F.2d at 186-87.

In addition, "To justify a civil contempt order, a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." Weston Capital Advisors v. PT Bank Mutiara, Tbk, 736 Fed. App'x 19, 21 (2d Cir. 2018); see also In re Residential Capital, 571 B.R. at 585; In re Chief Exec. Officers Clubs, Inc., 359 B.R. 527, 535 (Bankr. S.D.N.Y. 2007) (noting, further, at 534, "it is well established that bankruptcy courts have power to enter civil contempt orders"). Lastly, an alleged contemnor's inability to comply with an order cannot be punished by contempt if the burden to prove such inability is carried "clearly, plainly, and unmistakably." Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995).

The Supreme Court has clarified that when a court uses its inherent civil contempt power (including in the bankruptcy context when invoked in conjunction with 11 U.S.C. §§ 105(a) and 524), an additional finding of bad faith or willfulness is not required. Taggart v. Lorenzen, 139 S. Ct. 1795, 1802 (2019). See also Dibattista v. Selene Fin. LP (In re Debattista), 615 B.R. 31 (S.D.N.Y. 2020), which dismissed the argument that the willful violation of an order in the sense of an intent to violate, as opposed to an intentional act in violation of the order, is required to hold one in contempt: "This standard . . . does not seem to survive Taggart, where the Court held that 'the absence of willfulness does not relieve [a party] from civil contempt.' 139 S. Ct. at 1802." Id. at 39.

Instead, "civil contempt should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." Taggart v. Lorenzen, 139 S. Ct. at 1801 (internal quotation and citation omitted). Moreover, "This standard is generally an objective

6

one.  We have explained before that a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable." Id. at 1802.

Taggart applied to a motion to hold a creditor in contempt for violating a discharge order under 11 U.S.C. § 524, and the Court specifically reserved on whether the "fair ground of doubt" standard should also apply to violations of the automatic stay, where "lower courts often have used a standard akin to strict liability to remedy violations," id. at 1803-04, and the automatic stay "aims to prevent damaging disruptions to the administration of a bankruptcy case in the short run." Id. at 1804.  This has led to some uncertainty with respect to the post-Taggert standard to be applied to stay violations. *Compare* Suh v. Anderson (In re Jeong), 2020 Bankr. LEXIS 714, at *10-11 (BAP 9th Cir. March 16, 2020) (applying Taggert's "fair ground of doubt" standard) *and* In re Freeland, 2020 Bankr. LEXIS 2174, at *7 n.3 (Bankr. D. Ore. Aug. 12, 2020) (noting issue but finding contempt under Taggart standard as well as prior Ninth Circuit standard in any event); *see also* In re Spiech Farms, LLC, 603 B.R. 395, 408 (Bankr. W.D. Mich. 2019).

There are at least two reasons to make such a distinction.  First, to the extent that section 363(k) of the Bankruptcy Code applies to a stay violation, it reflects a congressional policy separate from the courts' general contempt power and is the subject of extensive case law interpretation.  Second, because (a) bankruptcy courts are actively supervising cases covering all of the debtor's property while the automatic stay is in effect and (b) the automatic stay is of fundamental importance in the collective, multi-party context of bankruptcy cases, *see* Midlantic Nat. Bank v. N.Y. Dept of Envtl Prot., 474 U.S. 494, 503 (1986); United States v.

Colasuanno, 697 F.3d 164, 172 (2d Cir. 2012); H.R. Rep. No. 95-595 at 340-41 (1977), it is logical

to require those in doubt whether the stay applies to seek clarification from the court or be

sanctioned for shooting first and aiming later.  *See* Squire v. Stringer, 820 Fed. App'x 429, 434

(6th Cir. Aug. 10, 2020) ("Allowing a creditor to circumvent the automatic stay based on his own

judgments would lead to the very chaotic and uncontrolled scramble for the debtor's assets the

stay was designed to prevent.") (internal quotation and citation omitted).

In any event, it should be clear from the nature of Taggert's reservation regarding

breaches of the automatic stay that applying a standard that is more *lenient* to potential

violators of the automatic stay than the objective "fair ground of doubt" approach is highly

unlikely.  Any issue in the Second Circuit whether a greater showing is required when applying

the Court's contempt power, such as of malice or bad faith, for violation of the stay therefore

appears to be resolved by Taggert in the negative.[5]

Applying the facts to the foregoing standard, the evidence shows that the Defendants

should be held in contempt for breaching the automatic stay set forth in 11 U.S.C. § 362(a)(3)

and (6) when they terminated services to certain customers of the Debtors based on the

---

[5] Such doubts might otherwise have arisen because of dicta in In re Chateaugay Corp., which summarized In re Crysen/Montenay Energy Co., 902 F.2d 1098, 1105 (2d Cir. 1990), as holding that "contempt involves maliciousness or a lack of a good faith argument and belief that the party's actions were not in violation of the automatic stay." 920 F.2d at 187.  On the other hand, courts have interpreted Crysen/Montenay as holding that "any deliberate act taken in violation of the stay, which the violator knows to be in existence [suffices for contempt] . . .  In other words, specific intent to violate the stay is not required; instead, general intent in taking actions which have the effect of violating the stay is sufficient to warrant damages."  Wells Fargo Bank, N.A. v. Weidenbenner (In re Weidenbenner), 2019 U.S. Dist. LEXIS 69907, at *6, *17-18 (S.D.N.Y. Apr. 25, 2019), and the cases cited therein.  *See also* FirstBank P.R. v. Barclays Capital Inc. (In re Lehman Bros. Hldgs Inc.), 526 B.R. 481, 496 (S.D.N.Y. 2014), *aff'd* 645 Fed. App'x 6 (2d Cir. 2016) ("The Bankruptcy Court also correctly held that subjective good faith is not a bar to contempt."), *citing* City of New York v. Local 28 Sheet Metal Workers' Int'l Ass'n, 170 F.3d 279, 283 (2d Cir. 1999).  *Compare* In re Diamond Beach Assocs. Ltd Pship, 185 B.R. 408, 412 (Bankr. D. Conn. 1995) (accord) *and* In re Coney Island Land Co., LLC, 2005 Bankr. LEXIS 2909, at *11 (Bankr. E.D.N.Y. Mar. 31, 2005) (requiring a showing of malice or lack of a good faith argument and belief that stay was violated before contempt sanctions would be imposed).

Debtors' default under the VAR Agreement.  It is uncontroverted that Charter had notice of the

commencement of the Debtors' chapter 11 cases and the imposition of the automatic stay

before terminating services, which Charter admittedly terminated because of its belief that the

Debtor parties to the VAR Agreement were in default of prepetition obligations thereunder.  It

is also uncontroverted that 11 U.S.C. § 362(a)(6) clearly and unambiguously stays such conduct.

A reasonable person would not think otherwise.

Charter's only response is a variation on the "inability" defense to a finding of contempt,

that is, that the termination of service was wholly mechanical, arising from "automatic

nonpayment protocols" programmed into its computerized billing system,[6] or, possibly, that

Charter reasonably attempted to comply.  There are two problems with these arguments,

however.  First, it is not really a defense for a large and sophisticated entity like Charter that

provides services to many customers, some of whom inevitably will file for relief under the

Bankruptcy Code, to argue that its systems do not have an effective fail-safe to prevent it from

violating the automatic stay.  Charter has not contended that it lacked the capacity to adopt

systems to override such automated collection activity.  Under similar circumstances, courts

have routinely found contempt for a stay violation.  *See, e.g.*, Jove Eng'g Inc. v. IRS (In re Jove

Eng'g, Inc.), 92 F.3d 1539, 1556-57 (11th Cir. 1996); Price v. U.S. (In re Price), 42 F.3d 1068, 1070

(7th Cir. 1994); Associated Credit Servs. v. Campion (In re Campion), 294 B.R. 313, 317 (B.A.P.

9th Cir. 2003); De La Fuente v. Wells Fargo Bank, N.A., 430 B.R. 764, 799-89 (Bankr. S.D. Tex.

---

[6] Defendants' Post-Trial Brief on Counts VI and VII, dated June 9, 2020 ("Charter Mem.") 3-4. As stated in agreed designations from the deposition of Charter's Frederick Gunzel, because of Operation's automated billing system, its personnel took from February 25, 2019 to May 9, 2019 to complete their manual analysis and restoration of the Debtors' accounts that should not have been automatically terminated in violation of the automatic stay.  This resulted in the termination of service to many the Debtors' customers in March 2019 and a smaller number of additional shutoffs in April and May 2019.  Gunzel Dep. Tr. at 25-27, 66.

2010).  Turning a blind eye to the automatic stay by choosing systems that are incapable of

complying with it is not tantamount to an inability to comply nor with making diligent efforts to

comply in a reasonable manner.[7]

Second, when the Defendants terminated service to the Debtors' customers, they did

not even comply with the VAR Agreement itself, which provides at page 2 for 30-days' notice

before service cancellation.  Such compliance would perhaps have enabled the Debtors to

identify their affected customers so that Charter could have manually overridden its automated

cancellation procedures in a timely manner in compliance with the automatic stay.

The evidence also shows that Charter should be held in contempt of 11 U.S.C. §

362(a)(3) for interfering with the Plaintiffs' customer contracts and goodwill through Charter's

literally false and intentionally misleading advertising campaign intended to create the

impression, using mailings designed to seem as if they were coming from the Debtors, that the

Debtors were going out of business.  As set forth in the Court's summary judgment decision,

the existence of that campaign was clearly established.  Again, it is also uncontroverted that

Charter had notice of the Plaintiffs' bankruptcy cases and the imposition of the automatic stay

when it launched the campaign; indeed, Charter premised the campaign on false assertions

regarding the Debtors' bankruptcy cases.

Like section 362(a)(6), section 362(a)(3) of the Bankruptcy Code also is clear and

unambiguous as applied to Charters' conduct.  It automatically stays "any act to obtain

possession of property of the estate or of property from the estate or to exercise control over

---

[7] It is possible that Charter also may be arguing in its post-trial memorandum that its after-the-fact efforts to correct its violation of the automatic stay should excuse it from being held in contempt, but the focus should be on its actions before the violation, not after.

property of the estate." 11 U.S.C. § 362(a)(3). By its plain terms section 362(a)(3) is not

confined to acts to collect or enforce a claim or judgment against the debtor, i.e., creditor

activity. National Tax Credit Partners, L.P. v. Havlik, 20 F.3d 705, 708 (7th Cir. 1994). Other

subsections of section 362(a) address such conduct. Instead, as noted by the leading treatise

on bankruptcy law, section 362(a)(3) of the Bankruptcy Code was enacted, with 11 U.S.C. §§

542 and 543, to ensure that a trustee or debtor in possession maintains control of the estate's

property and to protect against its "dismemberment" in furtherance of an eventual equitable

distribution to creditors. 3 Collier on Bankruptcy ¶ 362.03[5]; *see also* In re Trump Entm't

Resorts, Inc., 534 B.R. 93, 102 (Bankr. D. Del. 2015); In re Stinson, 221 B.R. 726, 730-31 (Bankr.

E.D Mich. 1998).

Section 362(a)(3) clearly encompasses and protects a debtor's executory contracts,

which are property of the debtor's estate under 11 U.S.C. § 541. 3 Collier on Bankruptcy ¶

362.03[5][a] ("Executory contracts and leases are considered a form of property of the estate.

As property of the estate, the debtor's interests in such contracts and leases are protected

against termination or other interference that would have the effect of removing or hindering

the debtor's rights in violation of section 362(a)(3)."); *see also* U.S. BankTrust Nat'l Assn. v. Am.

Airlines, Inc. (In re AMR, Inc.), 485 B.R. 279, 294 (Bankr. S.D.N.Y. 2013) (contract rights are

property of the estate protected by section 362(a)(3) from the exercise of control over them),

*aff'd* 730 F.3d 88 (2nd Cir. 2013); Adelphia Communs. Corp. v. The America Channel, LLC (In re

Adelphia Communs. Corp.), 2006 Bankr. LEXIS 975, at *10 (Bankr. S.D.N.Y. Apr. 5, 2006) ("An

interference with the estate's . . . contractual right [under its sale contract] . . . is a classic and

egregious violation of section 362(a)(3).").

Section 362(a)(3) protects a debtor's goodwill, too, which also is well recognized property of the estate under 11 U.S.C. § 541(a)(1).  3 Collier on Bankruptcy. ¶ 362.03[5], n. 48; Cyganowski v. Biolitec U.S., Inc. (In re Biolitec, Inc.), 2015 Bankr. LEXIS 228, at *31-32 (Bankr. D. N.J. Jan. 22, 2015); Phillips v. Diecast Marketing Innovations, LLC (In re Collecting Concepts), 2000 Bankr. LEXIS 615, at *9 (Bankr. E.D. Va. Feb. 28, 2000); *see also* Merry Hull & Co. v. Hi-Line Co., Inc., 243 F. Supp. 45, 50 (S.D.N.Y. 1965) ("Goodwill is an asset of a bankrupt like any other asset, and to hold that upon the bankruptcy of the business the goodwill vanishes would be to deprive the creditors of the bankrupt of what might be a substantial asset.").

Consistent with section 362(a)(3)'s plain terms, which automatically stay not only actions directly against the debtor but all actions to obtain property of or from the estate or to exercise control over property of the estate, *see* Amedisys, Inc. v. Nat'l Century Fin. Enters. (In re Nat'l Century Fin. Enters.), 423 F.3d 567, 578 (6th Cir. 2005); Official Com. of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines), 928 F.2d 565, 573-74 (2d Cir. 1991) (because net operating loss carryforward was an asset of the debtor's estate, taking a worthless stock deduction that would impair the NOL was stayed), section 362(a)(3) stays acts that impair, interfere with or destroy the estate's interest in contracts or goodwill.  *See, e.g.*, ACandS, Inc. v. Travelers Cas. & Sur. Co., 435 F.3d 252, 260 (3d Cir. 2006) (Alito, J.) (third-party litigation that would adversely impair debtor's insurance contract rights automatically stayed), *cert. denied*, 547 U.S. 1159 (2006); Licensing by Paolo v. Sinatra (In re Gucci), 126 F.3d 380, 392 (2d Cir. 1996) (trade mark litigation against non-debtor sublicensee of debtor licensor automatically stayed); In re 48th St. Steakhouse, 835 F.2d 427, 430-31 (2d Cir. 1987) (owner's termination of lease with non-debtor that had the effect of terminating debtor's sublease automatically stayed); In re

12

Extraction Oil & Gas, Inc., 2020 Bankr. LEXIS 3378, at *9-11 (Bankr. D. Del. Dec. 3, 2020) (third-party litigation that interfered with debtor's contractual and business relationships with service providers automatically stayed); Cyganowski v. Biolitec U.S., Inc. (In re Biolitec, Inc.), 2015 Bankr. LEXIS 228, at *31-41 (interference with debtor's customer contracts and goodwill automatically stayed); Alert Hldgs., Inc. v. Interstate Protective Services, Inc. (In re Alert Hldgs., Inc.), 148 B.R. 194, 202-03 (Bankr. S.D.N.Y. 1992) (intentionally deceptive advertising that interfered with debtor's customer contracts and harmed goodwill automatically stayed); *see also* Corp. Claim Mgmt. v. Shaiper (In re Patriot Nat'l, Inc.), 592 B.R. 560, 571-72 (Bankr. D. Del. 2018) (motion to dismiss denied:  complaint stated claim for breach of section 362(a)(3) based on defendants' knowing use of misappropriated information protected by debtor's contracts); In re Prithvi Catalytic, Inc., 2015 Bankr. LEXIS 1185, at *36-40 (Bankr. W.D. Pa. Apr. 8, 2015) (motion to dismiss denied; complaint stated claim for breach of section 362(a)(3) based on defendants' hiring key employees knowing that they were parties to debtor's non-compete contracts); Phillips v. Diecast Marketing Innovations, LLC (In re Collecting Concepts), 2000 Bankr. LEXIS 615, at *9-10 (preliminary injunction granted against interference with debtor's goodwill and executory contracts by competitor in violation of section 362(a)(3)).

Many of these decisions do not limit the effect of section 362(a)(3) of the Bankruptcy Code to acts for which the violator would be liable under applicable non-bankruptcy law and instead apply the stay by its plain terms to conduct that simply interferes with the debtor's contract rights. *See, e.g.*, ACandS, Inc. v. Travelers Cas. & Sur. Co., 435 F.3d at 260, and In re 48th Street Steakhouse, 835 F.2d at 430-31.  In contrast, where it was clear that the acts impairing the debtor's property, including the debtor's contracts and goodwill, were lawful

under applicable non-bankruptcy law, the courts in In re Trump Entm't Resorts, Inc., 534 B.R. at

104-05, and Allentown Ambassadors, Inc. v. Northeast Am. Baseball, LLC (In re Allentown

Ambassadors, Inc.), 361 B.R. 22, 439-40 (Bankr. E.D. Pa. 2007), employed a balancing test to

determine whether to enforce the stay.  The issue need not be resolved here, of course,

because Defendants' literally false and intentionally misleading advertising campaign was not,

in the words of Allentown Ambassadors, "ordinary course commercial conduct," 361 B.R. at

440, but, rather, violated federal and state statutes, in contrast to the union's actions in Trump

Entm't that were protected by the Norris-Laguardia Act.  534 B.R. at 104.

The Defendants do not meaningfully address any of this caselaw or commentary.

Instead, in addition to attempting to reargue the merits of the Court's prior ruling that they

violated the automatic stay by engaging in their literally false and intentionally misleading

advertising campaign to poach the Debtors' customers,[8] they argue, contrary to Taggert's

objective "no reason to doubt" standard, that they subjectively did not believe they were

violating the stay.[9]  Further, they contend that if anyone violated the stay, it was their

advertising agency and their consultant, One Touch Intelligence in developing the campaign,[10]

which, however, ignores the Defendants' authorization of the campaign to be modeled on a

prior campaign relating to a competitor that was "shutting down service"[11] to create doubt

whether the Debtors would remain in business,[12] and the obvious contradictions between it

---

[8] Indeed, Defendants go so far as to point to "undisputed evidence" allegedly adduced at trial that they did not engage in such a campaign, Charter Mem. 10-13, ignoring that such "evidence" was irrelevant to the remaining issues to be tried after the Court's summary judgment ruling.
[9] Charter Mem. 7-8, 13-14.
[10] Charter Mem. 10-11, 12-13.
[11] Dep. Tr. of Kelly Atkinson, dated May 1, 2019, at 42.
[12] Dep. Tr. of Kelly Atkinson, dated September 19, 2019 at 117-18.

and One Touch and Charter's own analyses of the Debtors' financial condition.[13]  Moreover, the

acts of the Defendants' agents in violation of the stay would be imputed to them.  HSBC Bank

USA v. Crawford (In re Crawford), 476 B.R. 83, 86-87 (S.D.N.Y. 2012); In re Stringer, 586 B.R.

535, 446 (Bankr. S.D. Oh. 2019), aff'd Squire v. Stringer, 820 Fed. App'x 429 (6th Cir. Aug. 10,

2020).[14]

        The Defendants make two other arguments that require more attention.  First, they

contend that applying section 362(a)(3) to their literally false and intentionally misleading

advertising campaign would violate their First Amendment right to free speech[15] and, implicitly,

that they therefore would have a fair ground for doubt that the automatic stay applied.

        In doing so, however, they acknowledge, albeit in a footnote, that this right is not

absolute and can be curtailed, such as by application of the automatic stay, if part of behavior

prohibited in furtherance of a legitimate government interest.[16]  See, e.g., Desert Palace Inc. v.

Baumblit (In re Baumblit), 15 Fed. App'x 30, 36-37 (2d Cir. 2001) ("It is well settled that First

Amendment rights are not immune from regulation when they are used as an integral part of

conduct which violates a valid statute.").  The principle clearly applies to violations of the

automatic stay.  See Collier v. Hill (In re Collier), 410 B.R. 464, 474-76 (Bankr. E.D. Tex. 2009), in

which the posting of a sign that said, "Brad Collier owes me $943.23. Will you please come and

---

[13] One Touch Intelligence's February 25, 2010 report to Charter noted that the Debtors had "secured $1 billion in debtor-in-possession financing to maintain operations during the reorganization process" which "minimizes operational disruptions" and that the Chapter 11 filing "will allow [the Debtors] to reorganize."  JE 27.  Charter itself recognized that the Debtors "have funding to continue in normal operations," Plaintiffs' Trial Ex. 29 ("P. Ex.") and would operate "BAU" (business as usual). P. Ex. 8.

[14] The Defendants' argument that their response to the Plaintiffs' cease and desist letter adequately addressed any violation of the automatic stay, Charter Mem. 13, apparently on a waiver theory, is not only precluded by the Court's summary judgment ruling but contradicted by the correspondence itself and the Debtors' ongoing efforts to enforce their rights.

[15] Charter Mem. 29-30.

[16] Charter Mem. 30 n. 34.

pay me!" was not protected by the First Amendment because it was debt collection activity

prohibited by 11 U.S.C. § 362(a)(6), and In re Andrus, 189 B.R. 413, 416-18 (N.D. Ill 1995), which

held that conduct including the posting of signs stating that the debtor "Went Bankrupt! He

Didn't Pay His Bills! He Is A Deadbeat!  This Is a  Public Service Announcement" and "Gene

Andrus, Where's My Money?" was not protected speech, but, rather, properly prohibited:  "The

fact that [defendant's] conduct contained a communicative element does not necessarily

render it protected speech under the First Amendment.").  See also In re Sechuan City, Inc., 96

B.R. 37, 42-44 (Bankr. E.D. Pa. 1989); 3 Collier on Bankruptcy ¶ 362.03[8][d].

    The Defendants nonetheless contend that this principle, clearly applicable to section

362(a)(6) of the Bankruptcy Code, does not apply to section 362(a)(3) of the Bankruptcy Code.

To the contrary, Defendants' advertising campaign constituted conduct that Congress could

properly regulate under section 362(a)(3).  The campaign's goal was to induce the Debtors'

customers to terminate their contracts[17] and switch to Charter by sending them literally false

and intentionally misleading information about the Debtors' bankruptcy cases and financial

wherewithal.  Such commercial speech is properly curtailed by precluding such wrongful

conduct.  See generally Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 248-53

(2010) (regulation of misleading commercial speech is not entitled to either strict or

intermediate scrutiny under the First Amendment but instead must only be reasonably related

to a governmental interest).  As discussed at length above, section 362(a)(3) of the Bankruptcy

Code, like section 362(a)(6), protects a strong governmental interest threatened by the

---

[17] On average a customer's relationship with the Debtors lasts 50 months.  May 6, 2020 Trial Tr. at 39 (testimony of
Jeffrey H. Auman).

Defendants' conduct. The Defendants' failure to identify any countervailing interest is highlighted by In re National Service Corp., 742 F.2d 859 (5th Cir. 1984), upon which they heavily rely for the incorrect proposition that section 362(a)(3) cannot be used to regulate any speech not intended to coerce payment of a claim.[18] In fact, unlike here, the defendant in National Service *accurately* reported a debtor's bankruptcy status on a billboard commissioned from it by the debtor which otherwise would have *inaccurately* implied that the debtor was affiliated with a financially healthy company and therefore could pay its bills. Id. at 860, 862. The defendant's addition to the billboard was found to be primarily informational; there was no act to harm and thus no violation of section 362(a) of the Bankruptcy Code. Id. at 862.

Second, the Defendants contend that section 362(a)(3) is ambiguous or impermissibly broad in regulating their conduct[19] and therefore, again implicitly, that they would have a fair ground of doubt that their advertising campaign violated the stay. Section 362(a)(3) indeed has at times been found to be ambiguous with respect to the meaning of "any act . . . to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). That ambiguity has been identified in only two contexts, however, neither of which is relevant here. First, courts have differed over whether the statute covers the *failure* to act to return property seized prepetition that nonetheless remains property of the estate. *See, e.g.*, In re Young, 193 B.R. 630, 624 (Bankr. D. D.C. 1991), cited by the Defendants for the general proposition that section 362(a)(3) is ambiguous.[20] Second, courts have grappled with the application of the subsection's use of the

---

[18] Charter Mem. 2 n. 2, 30.

[19] Charter Mem. 30-32.

[20] The Supreme Court has since held that section 362(a)(3) does not apply to a creditor's maintaining the status quo by merely retaining a vehicle seized prepetition on account of a debt. City of Chicago v. Fulton, 141 S. Ct. 585 (2021).

phrase "exercise control over property of the estate" where estate property is sought to be

protected against a strong countervailing interest held by the alleged violator of the stay.  Id. at

627 (possessory lien would be destroyed by returning vehicle repossessed prepetition); In re

Harchar, 393 B.R. 160, 177 (Bankr. N.D. Oh. 2008), aff'd Harchar v. United States (In re Harchar),

694 F.3d 639, 646 (6th Cir. 2012) (temporary freeze of tax refund to enable IRS to determine

whether to seek amendment to debtor's plan or to obtain stay relief to exercise setoff right or

to pay the refund to the chapter 13 trustee is not a violation of section 362(a)(3)); see also In re

Trump Entm't, 534 B.R. at 103-104 (section 362(a)(3) not enforced to enjoin union

communications with prospective customers of debtor where Norris-Laguardia Act precluded

an injunction of the union's actions outside of bankruptcy and debtor's interest in prospective

customers was tenuous).[21]

    As highlighted by the Trump Entm't decision, at times evaluation of the nature and

extent of the estate's interest in the property at issue can pose challenges to application of

section 362(a)(3).  For example, because the court in In re Allentown Ambassadors, Inc. needed

to consider further the nature of the debtor's contract rights, it denied the defendants' motion

for summary judgment that they did not violate section 362(a)(3) when they dissolved the

baseball league in which the debtor was a member and formed a new league that excluded the

debtor.  361 B.R. at 457.  Again, the Defendants cited this decision for the general proposition

that "control" as used in the statute is ambiguous, a matter of degree, but failed to address

whether there was any ambiguity in how the statute applied to their own conduct.[22]  They also

---

[21] The same judge enforced section 362(a)(3) in In re Patriot Nat'l, Inc., 592 B.R. at 571-72, where the debtor had a clear property interest in existing contracts.
[22] Charter Mem. 31.

failed to note the decision's clear guidance that if a party doubts section 362(a)'s applicability to their conduct, they should seek relief from the automatic stay under 11 U.S.C. § 362(d). Id. at 441 n. 40. Similarly, in In re Golden Distribs., Ltd., 122 B.R. 15 (Bankr. S.D.N.Y. 1990), also relied upon by the Defendants, the debtor's former salespeople did not harm the debtor's goodwill or contracts because they had not appropriated any customer lists or similarly protected information and the former customers who changed their allegiance did not have contracts with the debtor. Id. at 19-20 (stating that "Under certain circumstances where the debtor *has* contractual arrangements with its customers which can be translated into assured sales or income, such intangible property rights or good will can be protected from interference by others within the context of 11 U.S.C. § 362(a)(3).") (emphasis added).[23] Here, to the contrary, there is uncontroverted evidence that the Debtors' customer contracts' average duration at the time of the stay violation was 50 months.[24]

No reasonable person would believe that Defendants' advertising campaign, designed to use false and knowingly misleading information to cause the Debtors' customers to terminate their contracts and switch to Charter, protected a legitimate interest of Charter's and did not harm property interests of the Debtors. Although every corporation expects legitimate advertising by competitors, and thus such advertising does not "exercise control" over its property, improper advertising such as the Defendants' clearly and objectively interfered with

---

[23] *See also* United States v. Inslaw, Inc., 932 F.2d 1467, 1472-73 (D.C. Cir. 1991) (section 362(a)(3) not violated where debtor's alleged property interest in computer software in the possession of the Department of Justice was in dispute and therefore not yet, if ever, property of the estate).
[24] May 6, 2020 Trial Tr. at 39 (testimony of Jeffrey H. Auman).

the Debtors' customer contracts and goodwill and thus clearly was precluded by section

362(a)(3)'s plain terms and the caselaw applying them.

Nor, as applied here, is section 362(a)(3) unduly broad as the Defendants contend

simply because it could conceivably be applied more broadly to advertising in general.  It is the

actual application of the statute that matters for First Amendment purposes, Milavetz, Gallop &

Milavetz, P.A. v. United States, 559 U.S. at 247-49; and the foregoing caselaw sufficiently cabins

that application for there to be no fair ground of doubt that Charter fell on the wrong side of

the statute when it undertook to mislead the Debtors' customers to end their contracts and

impaired the Debtors' goodwill.

**Sanctions for Violation of the Automatic Stay**

Bankruptcy courts can award three types of sanction under their civil contempt power

for breach of the automatic stay:  (1) coercive sanctions to encourage compliance, Bartel v.

Shugrue (In re Ionosphere Clubs, Inc.), 171 B.R. 18, 21 (S.D.N.Y. 1994); (2) damages for

monetary harm, id.; *see generally* Taggart v. Lorenzen, 139 S. Ct. at 1801; McComb v.

Jacksonville Paper Co., 336 U.S. 187, 191 (1940) ("Civil contempt . . . is a sanction to enforce

compliance with an order of the court or to compensate for losses or damages sustained by

reason of noncompliance."); Weston Capital Advisors v. PT Bank Mutiara, Tbk, 738 Fed. App'x at

21 ("Compensatory [contempt] sanctions shall reimburse the injured party for actual damages,

though there need not be a one-to-one ratio between actual damages and the value of the

assets subject to civil contempt.  Where a fine is paid directly to the other party rather than the

court, the sanction should correspond at least to some degree with the amount of damages.")

(internal citations and quotations omitted); and (3) in appropriate, generally egregious

circumstances, relatively minor non-compensatory, or punitive sanctions.  In re Crysen/Montenay Energy Co., 902 F.2d at 1105; In re 1601 Sunnyside #106, LLC, 2010 Bankr. LEXIS 4903, at *20 (Bankr. D. Idaho Dec. 20, 2010); see generally Rosellini v. United States Bankruptcy Ct. (In re Sanchez), 941 F.3d 625, 627-28 (2d Cir. 2019) (bankruptcy court has power to issue minor non-compensatory contempt sanction).

Courts have stated that unlike under section 362(k) of the Bankruptcy Code, which provides that the Court "shall" award actual damages for a willful stay violation, they have discretion to award damages when exercising their general contempt power and 11 U.S.C. § 105(a) with respect to a breach of the automatic stay.  See, e.g., First Bank P.R. v. Barclays Capital Inc. (In re Lehman Bros. Hldgs.), 526 B.R. 481, 497 (S.D.N.Y. 2014), aff'd 645 Fed. App'x 6 (2d Cir. 2016), in which the court also observed that while a party's subjective good faith is not relevant to whether it should be held in contempt, it "is merely a factor that a bankruptcy court may consider in deciding whether to impose sanctions."  Id.[25]  On the other hand, other courts, including the Second Circuit, have held that courts' discretion is considerably narrowed and perhaps absent when the focus is on compensatory rather than coercive or punitive sanctions. Weitzman v. Stein, 98 F.3d 717, 719 (2d Cir. 1995) ("The compensatory goal . . .  can only be met by awarding to the plaintiff any proven damages"); Vuitton Fils, S.A. v. Carousel Handbags, 592 F.2d 126, 131 (2d Cir. 1979) ("The District Court is not free to exercise its discretion and withhold an order of civil contempt awarding damages to the extent they are established."); Robin Woods Inc. v. Woods, 28 F.3d 396, 400 (3d Cir. 1994) ("Because damages assessed in civil

---

[25] See also Taggert v. Lorenzen, noting in dicta that "a party's good faith, even where it does not bar civil contempt, may help to determine the appropriate sanction."  139 S. Ct. at 1802.

contempt cases are oftentimes compensatory (instead of coercive) the mental state of the

violator should not determine the level of compensation due.") (internal quotation and citation

omitted). *See generally* In re Genesys, Inc., 273 B.R. 290, 294 (Bankr. D. D.C. 2001) (listing cases

on both sides of the question and noting, "The Court was unable to find any decision addressing

the possible conflict between these two sets of decisions."), an observation that applies today,

as well, although a closer look at the caselaw can harmonize most of the disagreement.

First, based on the principle underlying compensatory sanctions, awarding actual

damages for contempt generally does not require a finding that the contemnor acted willfully,

Manhattan Indust. v. Sweater Bee By Banff, Ltd., 885 F.2d 1, 5 (2d Cir. 1989) ("that

[contemnor's] conduct may not have been willful does not preclude such an award, since

sanctions for civil contempt can be awarded without a finding of willfulness" where violations

were "sustained and material"), *citing* McComb v. Jacksonville Paper Co, 336 U.S. at 191. *See*

*also* Leary v. Great Lakes Educ. Loan Servs. (In re Leary), 620 B.R. 39, 57-58 (Bankr. S.D.N.Y.

2020), and the cases cited therein (rejecting argument that bad faith or willfulness is required

to impose civil contempt sanction), although such a finding of course supports the sanction,

Taggert, 139 S. Ct. at 1802; Lehman Bros. Hldgs., 526 B.R. at 497.

Nevertheless, courts should have some discretion to decide whether further warnings

are warranted before imposing a compensatory sanction in the light of the complexity of the

issues and the risk of harm to the non-breaching party. That is, when a court can manage the

parties' conduct to avoid more conflict, it may and sometimes should give the alleged

contemnor the chance to comply without imposing a monetary sanction. Relatedly, even if the

court does not have such an opportunity, a plaintiff is not relieved of the duty to mitigate; a

debtor should not recover extensive attorneys' fees, for example, for litigating a stay violation

that was voluntarily and promptly corrected before other damages accrued or that it failed to

try to head off with a simple phone call or by invoking a well-established, court-approved

procedure for addressing such violations short of litigation.  In re Sturman, 2011 U.S. Dist. LEXIS

1095, at *10-12 (S.D.N.Y. Sept. 26, 2010); In re Squire, 2014 Bankr. LEXIS 1291, at *10 (Bankr.

N.D.N.Y. Mar. 26, 2014). In re Genesys Inc., 273 B.R. at 294-95.

Third, while it is well recognized that compensatory damages for violation of the

automatic stay include fees and expenses incurred in trying to enforce the stay, In re

Ionosphere Clubs, 171 B.R. at 21; see also Lowe v. Bowers (In re Nicole Gas Prod.), 916 F.3d 566,

577-79 (6th Cir. 2019), cert. denied sub nom. Caffey v. Bowers, 140 S. Ct. 39 (2019), as well as in

proving and enforcing a sanction for other damages caused by the violation, In re Pace, 67 F.3d

at 193; Americas Servicing Co. v. Schwartz-Tallard, (In re Schwartz-Tallard), 803 F.3d 1095, 1099

(9th Cir. 2015); In re Am. Med. Utilization Mgmt. Corp., 494 B.R. 626, 637-38 (Bankr. E.D.N.Y.

2013) (fees and expenses awarded for curing breach and prosecuting contempt and sanctions

motion); 3 Collier on Bankruptcy ¶ 362.12[3]; see generally Weitzman v. Stein, 98 F.3d at 719

(district court may award appropriate attorneys' fees to a victim of civil contempt); In re Cowan,

2020 Bankr. LEXIS 3466, at *22 (Bankr. N.D. Ga. Dec. 10, 2020) (well established exception to

"American Rule" applies to contempt sanction for violations of court order, including discharge

injunction), the Second Circuit has recognized that it has yet to decide whether "a finding of

willfulness or bad faith is required before a court may order attorneys' fees as a sanction for

violating a court order, and the issue appears to remain an open one in our Circuit," Jacobs v.

Citibank, N.A., 318 Fed App'x 3, 5 n.3 (2d Cir. 2008).  Again, though, while a finding of

23

willfulness may not necessarily be a prerequisite to an award of fees and costs, a finding of willfulness strongly supports them.  Weitzman v. Stein, 98 F.3d at 719.

In any event, however, "willfulness" for this purpose is defined as "where the contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply."  Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp., 2007 U.S. Dist. LEXIS 75812, at *12 (S.D.N.Y. Oct. 10, 2007); In re Lehman Bros. Hldgs., 526 B.R. at 496-97.

Last, it is also well recognized that courts have considerable discretion when determining the proper attorneys' fees and expenses as a compensatory sanction, albeit guided by established principles pertaining to fee and expense awards.  *See, e.g.*, Medina v. Bother, 2019 U.S. Dist. LEXIS 156139, at *11-18, *22-23 (S.D.N.Y. Sept. 9, 2019) (lodestar rate sets presumptive framework, subject to market evidence; analysis of complexity of work performed and number of hours to be compensated is guided by Johnson factors and the court's understanding of what a reasonable lawyer would do under the circumstances).  These principles are well embodied in the standards followed by bankruptcy courts in deciding fee and expense applications for estate compensated professionals under section 330 of the Bankruptcy Code, a task that they regularly perform.  11 U.S.C. § 330; *see also* In re Cenargo Int'l PLC, 294 B.R. 571, 595-96 (Bankr. S.D.N.Y. 2003).

Notwithstanding the Defendants' suggestion that the Plaintiffs seek coercive and substantial punitive sanctions, the latter requiring a jury trial,[26] it is clear that, to the contrary, Plaintiffs seek only compensatory sanctions for their damages.

---

[26] Charter Mem. 5, 33.

These damages are easily addressed with respect to Charter's termination of services under the VAR Agreement, which constituted a willful breach of the automatic stay under the caselaw cited above.  The Debtors' contention that they provided $5,278.85 of credits[27] to customers whose service was temporarily shut off apparently is uncontroverted and, in any event, credible.  Because the Defendants' breach was a proscribed act to collect under the VAR Agreement, such sum should be paid to the Debtor parties to that agreement.  Although the Debtors argued that they incurred additional loss to their goodwill, as well as attorneys' fees and expenses to enforce their rights under the automatic stay based on this breach,[28] they have not provided quantifiable evidence in support, however.  Nor do the time and expense records submitted by the Debtors sufficiently identify legal work related to the violation of the automatic stay related to the VAR Agreement, and no evidence has been submitted regarding the amount of allegedly lost goodwill.

On the other hand, the Debtors have provided evidence to support the following types of damages caused by the Defendants' literally false and intentionally misleading advertising campaign in breach of section 362(a)(3) of the Bankruptcy Code:  (1) lost profits from customers who switched to Charter as a result of the campaign, (2) the cost of corrective advertising to maintain customers, (3) the cost of a promotional campaign to recover market share, or new customer momentum lost because of the breach, and (4) the fees and expenses of outside counsel and the Plaintiffs' expert witness related to enforcing the automatic stay and recovering the foregoing damages.

---

[27] Witness Declaration of Jeffrey H. Auman, dated April 20, 2020 ("Auman Decl."), ¶14.
[28] Auman Decl., ¶¶14, 20.

Although the Defendants identified four expert witnesses, they chose not to present them.[29]  Nor did they offer any fact witness regarding the scope and reasonableness of the damages claimed by the Plaintiffs as to lost profits, the reach or cost of Plaintiffs' corrective advertising and the promotional campaign, or the Plaintiffs' claimed legal fees and costs. Instead, they chose to attack certain portions of the Plaintiffs' damages case on cross and with certain exhibits as noted below.

The Plaintiffs offered John C. Jarosz as their expert on lost profits attributable to customers' termination of their agreements because of the ad campaign.[30] Mr. Jarosz opined that the Plaintiffs "lost approximately 1,386 customers as a result of the unlawful conduct of Charter, and that this represents lost profits to [Plaintiffs] in the range of approximately $3.2 million to $5.1 million."[31] He further testified that his calculation of lost customers "is conservative" because (a) his analysis covered only April through August 2019 while Charter's late-March 2019 campaign could have influenced customers after August 2019, and (b) he considered customers lost only in areas where the Plaintiffs and Charter competed, and customers in other areas might well be influenced by communications with friends and family

---

[29] The Defendants argued that they were in effect precluded from presenting these experts by the Court's ruling in Windstream Hldgs., Inc. v. Charter Communs., Inc. (In re Windstream Hldgs., Inc.), 2020 Bankr. LEXIS 708, on their motion for a declaration that the Court lacked jurisdiction to decide Counts VI and VII of the complaint because of their right to a jury trial on the other counts. After reviewing the parties' post-trial submissions on this issue, however – more specifically, their timelines related to it provided at the Court's request – as well as the docket, it is clear that the Plaintiffs put the Defendants on sufficient notice that they were introducing expert testimony on the scope of the sanction under Count VI and the extent of equitable subordination under Count VII with ample time for Plaintiffs to prepare and present their expert witnesses, who already had prepared opinions and been deposed, in rebuttal.
[30] Witness Declaration of John C. Jarosz, dated April 17, 2020 ("Jarosz Decl."), ¶6
[31] Id.

and on social media.[32]  As discussed in more detail below, he also stated that the lower end of

his lost profits range is likely too conservative.[33]

Mr. Jarosz is an economist "whose specialty is IP valuation and monetary relief

(including damages) assessments."[34]  He is well credentialed; his CV, attached as an exhibit to

his Witness Declaration runs 44 pages of small print, including a list of 20 articles, most of which

involve the calculation of damages.  He has provided expert testimony approximately 100 times

at trial or in arbitration.[35]

He was also a credible expert witness.  Notwithstanding an untethered reference to

"junk science" in a heading in their post-trial brief,[36] the Defendants do not challenge Mr.

Jarosz's general methodology, which he describes as "a commonly used empirical methodology

that I have used in the past and which is widely accepted for use in this type of economic

analysis."[37]  To form his opinion, he took three steps:  he determined the number of customers

lost by examining whether there were any changes to the Plaintiffs' "churn rate" for the April-

August 2019 period following Charter's ad campaign that would be reasonably attributable to

that campaign and quantifiable in terms of lost customers; he determined the lost revenue

associated with those lost customers; and he applied the Plaintiffs' profit margins to the lost

revenue associated with the lost customers.[38]  The Defendants quarrel with only the first step.

---

[32] Id., ¶20
[33] Id., ¶26.
[34] Id. ¶2.
[35] Id.
[36] Charter Mem. 16
[37] Jarosz Decl., ¶5.
[38] Id., ¶7.

"'Churn rate' refers to the percentage of customers that discontinue service in a given

period.  It is calculated as the number of disconnected customers in a period divided by the

total number of customers at the beginning of that period."[39]  The Plaintiffs kept this

information in the regular course of their business.[40]  It was recorded according to, or by,

"Exchanges," which are the geographical units in which the Plaintiffs' usually input and retain

their customer data, which includes not only the number of customers in a particular Exchange,

but also customer adds and disconnects from service and other information routinely used in

their business.[41]

To determine the change in churn rate attributable to Charter's ad campaign, Mr. Jarosz

compared Plaintiffs' churn rate data for April-August 2019 (the first full month through the last

month of the campaign) against their churn rate for April-August 2018 in (a) Exchanges where

the Plaintiffs competed with Charter and (b) the Exchanges were the Plaintiffs and Charter did

not compete and in which, also, Charter did not engage in the ad campaign.[42]  Assuming no

material competitive changes during the relevant periods with the exception of Charter's ad

campaign as between the Charter Exchanges, on the one hand, and the non-Charter Exchanges,

on the other, this "difference-in-difference" comparison would logically identify whether the ad

campaign caused a higher churn rate and, if so, enable one to calculate the number of lost

customers attributable to that higher rate.[43]  That is, the trend in churn rate for the Charter

Exchanges for the two periods can be compared to the parallel trend in churn rate for the non-

---

[39] Id., ¶8.

[40] Auman Decl., ¶18

[41] May 6, 2020 Trial Tr. at 76-77, 87 (testimony of Jeffrey H. Auman) at 76-77, 87. P. Ex. 5.  See also April 28, 2020
Trial Tr. at 177 (testimony on John C. Jarosz).

[42] Jarosz Decl., ¶9.  See P. Ex. 60.

[43] Id., ¶¶9-11

Charter Exchanges for those periods to determine if the key distinguishing factor, the ad

campaign in the Charter Exchanges, had a quantifiable effect in the form of lost customers.[44]

And indeed according to Mr. Jarosz, the Charter Exchanges and the control group, non-

Charter Exchanges had comparable parallel churn rates for the two periods until the

introduction of Charter's ad campaign, at which point the Charter Exchanges reflected a

materially greater churn.[45] Multiplying the increase in churn rate against Plaintiffs' customer

base in the Charter Exchanges yielded Mr. Jarosz's 1,386 lost customers attributable to the ad

campaign[46] (out of at least approximately 4,500 who switched to Charter during that period).[47]

Again, the Defendants have not attacked Mr. Jarosz's general methodology, which, as

he noted, is commonly accepted for such damage calculations. *See*, *e.g.*, <u>Messner v.

Northshore Univ. HealthSystems</u>, 669 F.3d 802, 818 (7th Cir. 2012), *reh. denied*, 2012 U.S. App.

LEXIS 4778 (7th Cir. Feb. 28, 2012); <u>Smith v. Keurig Green Mt., Inc.</u>, 2020 U.S. Dist. LEXIS

172826, at *26-30 (N.D. Cal. Sept. 21, 2020); <u>Lowes Foods LLC v. Burroughs & Chapin Co.</u>, 2019

U.S. Dist. LEXIS 100410, at *7 (D. S.C. Apr. 17, 2019) (each discussing "difference-in-difference"

analysis); and <u>Kurtz v. Kimberly-Clark Co.</u>, 414 F. Supp. 3d 317, 330 (E.D.N.Y. 2019), and the

cases cited therein, *aff'd in part, rev'd in part on other grounds*, 818 Fed. App'x 57 (2d Cir. 2020)

---

[44] Id. ¶¶11-14.

[45] Id. ¶17-19 and Tabs 2 and 3 to Jarosz Decl. See also Auman Decl., ¶¶17-19 (discussing "significant spike in customers discontinuing service in those exchanges in which [the Plaintiffs] compete with Charter; P. Ex. 60;  May 5, 2020 Trial Tr. at 110 (testimony of Jeffrey H. Auman): "The false and misleading advertising had a big impact on our business, and it was immediate, it was seen in net subscriber losses, it was seen by my sales organization in customers not coming in, missed commissions, missed sales plans.  It had a profound impact on our business and we didn't see it in the non-Charter [Exchanges]."

[46] Id., ¶20.

[47] Auman Decl., ¶ 19

(discussing general acceptance of regression models).  Instead, the Defendants raise three

relatively narrow criticisms.

First, they argue that Mr. Jarosz's calculations should have been on a Plaintiff-by-

Plaintiff basis.  However, the Plaintiffs established that the ad campaign attacked their common

"Kinetic by Windstream" brand by which they marketed themselves to their customers.[48] If

there is any dispute as to what particular Plaintiff was injured by the loss of which particular

customers based on that attack, it would properly be among the Debtors/Plaintiffs, not

between the Plaintiffs and the Defendants, who, if Mr. Jarosz's calculations are reasonably

accurate, would owe aggregate lost profits damages to the Plaintiffs as a whole, for later

allocation among the Plaintiffs without Defendants' further involvement.[49]  The authority relied

upon by the Defendants, Hatahley v. United States, 351 U.S. 173, 182 (1956), where the trial

court did not tie the numbers of lost horses and burros to specific plaintiffs, is clearly

distinguishable.

Second, the Defendants contend that the geographical unit of measurement -- by

Exchange -- for Mr Jarosz's "difference-in-difference" analysis was not precise enough, in that

another unit of measurement for the areas in which the Plaintiffs and Defendants allegedly

competed head to head -- FCC census reporting data[50] -- shows locations within Charter

Exchanges where the companies actually did not compete.  This argument is not persuasive,

---

[48]Id., ¶3; May 6, 2020 Trial Tr. at 88, 118 (testimony of Jeffrey H. Auman); April 28, 2020 Trial Tr. at 68, 177 (testimony of John C. Jarosz).
[49] The Debtors' confirmed Chapter 11 Plan basically moots any such inter-Debtor dispute by establishing a class of general unsecured creditors holding allowed claims against the so-called "Obligor Debtors," entitled to a very small pro rata distribution, and a class of general unsecured holding allowed claims against the so-called "Non-Obligor Debtors," entitled to payment in full.
[50] Charter Impeachment Exs. 1-5, 23, 25, 30-31, 38-39.

however, because (a) as noted above, the Plaintiffs record their new customer and customer discontinuance data by Exchanges, and the FCC reporting data does not include such information,[51] (b) the Exchanges are themselves rather small in size and enable the Plaintiffs to readily track their customers vis a vis their competitors, including Charter, which they do actively and in many ways, by Exchange,[52] and (c) the difference-in-difference comparison of Charter and non-Charter Exchanges was uniformly undertaken; that is, the geographical configuration of the Exchanges did not change from the April-August 2018 time frame to the April-August 2019 time frame.  Thus, as long as the spike in lost customers in the Charter Exchanges without a corresponding change in the non-Charter Exchanges can be tied to the ad campaign as opposed to other variables, Exchanges would appear to be an appropriate geographical unit for the analysis.

The Defendants' third criticism of Mr. Jarosz's analysis, based on the contention that there were in fact other variables besides the ad campaign to which the spike in "churn" can be attributed, requires closer consideration.  Clearly if such a variable or variables were established, Mr. Jarosz's difference-in-difference analysis would lose efficacy based on the failure to control for them.  *See, e.g.*, Banks v. United States, 102 Fed. Cl. 115, 197-98 (2011), *rev'd on other grounds*, 741 F.3d 1268 (Fed. Cir. 2014).  It should be noted, however, that in establishing lost profits, some degree of speculation on the Plaintiffs' part is acceptable, although causation must be initially established.  Playtex Prods. V. Proctor & Gamble Co., 2003 U.S. Dist. LEXIS 8913, at *14 (S.D.N.Y. May 28, 2003), *aff'd* 126 Fed. App'x 32 (2d Cir. 2005).

---

[51] See n.41 supra; May 6, 2020 Trial Tr. at 121 (testimony of Jeffrey H. Auman).
[52] See n.41 supra; May 6, 2020 Trial Tr. at 34-35, 92-93, 96-97 (testimony of Jeffrey H. Auman).

The trend study for non-Charter Exchanges generally reflected, as Mr. Jarosz noted, that both the Charter and non-Charter Exchanges "were exposed to [the same] systemic factors unrelated to Charter's false advertising campaign that may affect [the Plaintiffs'] churn rate," such as the Plaintiffs' "corporate strategy or truthful and accurate news surrounding [the Plaintiffs'] bankruptcy"[53] as the data moved in parallel tracks until the start of the ad campaign. Mr. Jarosz further concluded that "there were no indications of other variables causing those parallel trends to deviate during the time period I reviewed."[54]  And indeed the Defendants raised no confounding variables -- such as, for example, a different business strategy for the non-Charter Exchanges than in the Charter Exchanges or increased competition in Charter Exchanges but not in the non-Charter Exchanges from third parties during April-August 2019 -- with two exceptions.[55]  The first alleged confounding variable was Charter's introduction of higher internet speed service in much of the Charter Exchanges starting at some time after the end of 2017 and during 2018.[56]  The Defendants introduced no evidence, however, of the effect of such an increase on their position vis a vis the Plaintiffs and other business competitors, although one can reasonably infer that such evidence exists in such a clearly competitive and data-driven market.  In other words, the Defendants left it to the Court to speculate that faster

---

[53] Jarosz Decl., ¶9.

[54] Id., ¶13.

[55] Charter refers to a third possible confounding variable at Charter Mem. 15 and 22, namely that "in 2019, Charter offered its high-speed internet in new markets."  However, not only does Charter fail to identify these "new markets" or whether and, if so, when in 2019, and to what extent, any involved new competition with the Plaintiffs, but also offers no evidence for the assertion with the exception of a reference to Windstream Holdings, Inc.'s Form 10-K for the year ending December 31, 2018 stating that "Cable television companies have aggressively expanded in our consumer markets."

[56] April 28, 2020 Trial Tr. at 127-29 (testimony of John C. Jarosz) (discussing FCC data showing that the percentage of Plaintiffs' internet service in excess of 500 mbps remained basically stable between December 2017 and December 2018 while Defendants' percentage of such service increased between December 2017 and December 2018 from 17.91 percent to 98.93 percent).

internet speeds lead to greater churn without showing anything regarding the tipping point between Defendants' speeds and Plaintiffs' for purposes of customer churn.[57]  Moreover, they did not explain how the April-August 2019 spike in churn could be tied to the introduction of higher speeds when Charter's increased speeds were introduced on a widespread basis sometime between the end of 2017 and the end of 2018, with almost complete coverage at higher speeds by December 2018,[58] which could easily have affected the April-August 2018 control period as well the April-August period of Charter's misleading ad campaign.

In addition, Plaintiffs provided unrefuted testimony that after the Defendants' ad campaign was halted and the Plaintiffs engaged in corrective advertising and promotional efforts to recover suppressed demand, the Plaintiffs eventually returned to plan,[59] yet there is no evidence that the Plaintiffs came close to matching Defendants' increased internet speeds during that time.  It is unlikely, therefore, that the Plaintiffs would have regained their market share if the earlier spike in lost customers was, as Charter contends, attributable to Charter's widespread introduction of higher internet speeds in 2018.

Charter's second proposed confounding variable is that "Charter also widely offered a new product throughout 2019 that was not even available in March, April, and May of 2018."[60] The "product" according to one of the two pieces of evidence cited by Charter in support of this statement, was the introduction of "Spectrum mobile service to residential customers" before

---

[57] On the other hand, there is evidence that simple differences in internet speed alone did not drive competition between Plaintiffs and Defendants.  May 6, 2020 Trial Tr. at 63-65 (testimony of Jeffrey H. Auman).
[58] Id.  See also id. at 178 (testimony of John C. Jarosz).
[59] May 6, 2020 Trial Tr. at 110-11 (testimony of Jeffrey H. Auman:  "October was the first month we got back, where we started meeting our plan again.  So, we finally started to offset the losses in October and it continued through the end of the year."
[60] Charter Mem. 15.

the end of 2018.[61]  The other evidence cited in support of the statement, Charter

Communications Inc.'s Form 10-Q for the period ending June 30, 2019, states, "We began mass

market advertising of Spectrum Mobile in September 2018.  In the second quarter of 2019, we

expanded our Spectrum Mobile bring-your-own-device ("BYOD") program across all sales

channels to include a broader set of devices.  We believe our BYOD program will lower the cost

for consumers of switching mobile carriers, and will reduce the short-term working capital

impact of selling new mobile devices on installment plans.  We expect these developments to

contribute to the growth of our mobile business."[62]  Again, Charter did not provide evidence of

the nature and scope of this product or program or its effect vis a vis the Plaintiffs and Charter's

other competitors.  Charter therefore again asks the Court to speculate, as did its Form 10-Q,

that the program would increase its competitiveness generally (although even the Form 10-Q

does not address competitiveness versus the Plaintiffs) and explain at least some portion in the

spike in churn during April-August 2019.  Again also, the inference that Charter asks to be

drawn is belied by Plaintiffs' eventual return to plan by the end of 2019[63] notwithstanding

Charter's BYOD program, as well as the parallel trends for 2018 and 2019 with the exception of

the period immediately following the misleading ad campaign.

Based on the foregoing, on the only contested aspects of Plaintiffs' lost-profits case the

Plaintiffs have carried their burden of proof.  *See* Ardray v. Ardry-Mart, Inc., 76 F.3d 984, 989

(9th Cir. 1995), and Alpo Petfoods Inc. v. Ralston Purina Co., 997 F.2d 949, 954 (D.C. Cir. 1993)

---

[61] JE 3, Charter Communications Inc. Form 10-K for year ending December 31, 2018.
[62] JE 4, Charter Communications Inc. Form 10-Q for period ending June 30, 2019.
[63] See n. 59.

(burden on uncertainty of damages is rightfully on the wrongdoer), each citing Bigelow v. RKO Pictures Inc., 327 U.S. 251, 265 (1945).

It remains to briefly address the third step in Mr. Jarosz's analysis, translating lost customers into lost profits. He posited two ways to make such a calculation, each starting with Plaintiffs' average monthly revenue per customer in March 2019 ($73.63) and the number of months the lost customers otherwise would have remained with the Plaintiffs (50 months), both taken from data kept by the Plaintiffs in the ordinary course.[64] For his first alternative calculation, Mr. Jarosz applied the Plaintiffs' gross profit margin to the lost revenue and derived lost profits of $5.1 million.[65] Alternatively, he deducted from gross profit margin Plaintiffs-wide operating expenses such as selling, general, and administrative expenses, resulting in a lost profits calculation of $3.2 million.[66] He opined, however, that this alternative was probably too low based on the likelihood that such operating expenses would be incurred regardless of the loss of 1,386 customers from a much larger customer pool.[67] Given the size of the Plaintiffs' customer base in the Charter Exchanges -- 360,865[68] -- and the nature of Plaintiffs' business, that assessment, which the Plaintiffs have not challenged, is reasonable. Whatever common operating expenses might be attributable to the lost customers would be offset, moreover, by the spillover effect of Charter's campaign past August 2019 and in non-Charter Exchanges discussed but not included by Mr. Jarosz in his lost profits calculation. Accordingly, Plaintiffs'

---

[64] May 6, 2020 Trial Tr. at 39 (testimony of Jeffrey H. Auman); Jarosz Decl., ¶¶23-24.
[65] Id., ¶24.
[66] Id., ¶25-26.
[67] Id., ¶26.
[68] Id., ¶17.

have met their burden to show that they suffered $5.1 million of lost profits because of

Defendants' violation of section 362(a)(3) with their ad campaign.

The Defendants have not challenged Plaintiffs' assertion[69] of damages of $862,775

comprising the cost of corrective advertising in response to the ad campaign.[70]  The cost of such

corrective advertising is a well-recognized component of damages for harm caused by wrongful

advertising.  Alpo Pet Foods v. Ralston Purina Co., 997 F.2d at 952; Mobius Management Sys. v.

Fourth Dimension Software, 880 F. Supp. 1005, 1022-23 (S.D.N.Y. 1995); Cuisinarts v. Robot-

Coupe Int'l Corp., 580 F. Supp. 634, 641 (S.D.N.Y. 1984).  Given the lack of objection and the

evidence in support of this element of Plaintiffs' damages claim, Plaintiffs have carried their

burden that such costs were reasonable and causally related to Defendants' ad campaign.  Alpo

Pet Foods, 997 F.2d at 952 ("We think it hardly meet that the party injured by a false

advertising campaign be required to prove the false advertisements were the sole reason for

the responsive campaign.  It is enough that the campaign would not have been undertaken but

for the false ads."); Mobius Management Sys., 880 F. Supp. at 1025 n.13.

The Defendants have, however, challenged the next element of Plaintiffs' damages

claim, namely Plaintiffs' claim for the cost of a promotional campaign comprising customer

upgrades, discounts and other pricing promotions undertaken from September through

December 2019.[71]  The Defendants do not question the $4,033,425 cost or reasonableness of

the campaign, nor that it was, like Plaintiffs' corrective advertising, incurred because of and in

---

[69] Auman Decl., ¶ 15 and the exhibits cited therein.
[70] Charter Mem. 16-17 ("A plaintiff could recover for its Retained Customer Injury by receiving a payment for the costs it incurred convincing customers to maintain their service.").
[71] May 6, 2020 Trial Tr. at 56-58 (testimony of Jeffrey H. Auman).

response to Defendants' ad campaign.  In any event, the cost of the promotional campaign is

supported by sufficient evidence in addition to Mr. Auman's testimony,[72] as is Plaintiffs'

assertion that the campaign was targeted in direct response to Charter's misleading ad

campaign.[73] It was "the most aggressive campaign that [Plaintiffs] have run,"[74] "was absolutely

uncommon for [Plaintiffs],"[75] and was aimed to address the Charter campaign's "profound

impact on [Plaintiffs'] business, and we didn't see it in the non-Charter [Exchanges],"[76] where

Plaintiffs' campaign was not offered.[77]

Instead, the Defendants assert that awarding such damages would unfairly duplicate

Plaintiffs' lost profits damages, based on the contention that because Plaintiffs' promotional

campaign concededly was not intended to retain remaining customers,[78] it must have been

intended to win back the lost customers accounted for in Mr. Jarosz's lost profits calculation.[79]

It stands to reason that, just as with the corrective advertising that Defendants do not

contest as an element of damages, some the promotional campaign reached former customers

---

[72] Id. at 55-57; P. Exs. 313, 316.

[73] May 6, 2020 Trial Tr. at 52, 58, 109-10 (testimony of Jeffrey H. Auman).

[74] Id. at 66.

[75] Id. at 109; see also id. at 111.

[76] Id. at 110.

[77] Id. at 52

[78] Id. at 56-57, 58-59.

[79] Charter Mem. 16, 19-20.  At the same time, Defendants make the rather wild argument that because Mr. Auman, Plaintiffs' witness on this issue, described the promotional campaign in ¶15 of his witness Declaration as intended "to convince customers to maintain their service with [Plaintiffs]," the Court should disregard his testimony in its entirety because he made it clear in his live testimony that the promotional campaign was intended to attract new customers to replace "suppressed demand."  May 5, 2020 Trial Tr. at 56, 109.  Such testimony does not warrant Defendants' allegations of perjury or justify the wholesale disregard of Mr. Auman's testimony on cross examination, however, which the Court found to be consistently credible.  (It is worth noting that there was nettle to no added difficulty in assessing witness credibility presented by the video format of the trial.)  Nor should the Court give credence to Defendants' speculation about Mr. Jarosz' motive for reducing his damages calculation from his expert report to his trial declaration, which Defendants apparently base not on any testimony by Mr. Jarosz (he was not questioned about this issue on cross examination), but, rather, on the alleged effect on Mr. Jarosz of a report by an expert retained by the Defendants who was not offered at trial.  Charter Mem. 17.

who had terminated their contracts with Plaintiffs because of Charter's campaign.  Indeed, Mr.

Auman testified that although the promotion was open only to those who had not

disconnected with the Plaintiffs in the past 30 days, "some of those customers likely

disconnected and came back with us and enjoyed a promotional period, or a promotion that we

offered."[80] The question, however, is whether the promotional campaign was intended to win

back the customers that Plaintiffs had lost or primarily to redress other damages caused by

Charter, because it is well recognized that damages for wrongful advertising can include both

lost profits and the cost of damage control programs, including corrective advertising, at the

same time.  *See* Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 264-65 (2d Cir. 2014)

(overruling defendant's contention that "corrective advertising when paired with the district

court's award of damages, constitutes an unfair double recovery"); Alpo Pet Foods Inc. v.

Ralston Purina Co., 913 F.3d 958, 969 (D.C. Cir. 1990) (actual damages based on false

advertising include (i) plaintiff's lost profits on sales diverted to the defendant, (ii) plaintiff's lost

profits on sales made at reduced prices because of defendant, (iii) plaintiff's cost of corrective

advertising, and (iv) quantifiable harm to plaintiff's goodwill, to the extent that corrective

advertising has not repaired that harm); Gayle Martz v. Geo Global Grp., 1998 U.S. Dist. LEXIS

6295, at *9 (S.D.N.Y. Apr. 30, 1998) (actual damages include lost profits, cost of corrective

advertising and the harm to plaintiff's goodwill).  *See also* Balance Dynamics Corp. v. Schmitt

Indus., 204 F.3d 683, 692-93 (6th Cir. 2000), *cert. denied* 531 U.S. 927 (2000) (recognizing

damage control costs and harm to goodwill as damages).

---

[80] May 5, 2020 Trial Tr. at 52 (testimony of Jeffrey H. Auman).

Here, Mr. Auman testified credibly that before the Defendants' false advertising campaign, Plaintiffs "were on a growth trajectory" but after the campaign they were "behind plan.  And at one point, in April-June timeframe, we were about 5,000 customers behind our busines plan. And so, we introduced [the promotional program] later in the year."[81] That program was primarily designed to recover "demand that was suppressed"[82] or Plaintiffs' "commitment" to return to plan,[83] which occurred in October 2020, "the first month we go back, we started meeting our plan again."[84]  Under the circumstances, therefore, Plaintiffs have carried their burden, including that the cost of their promotional campaign constitutes damages separate from their lost profits damages from lost customers.[85]

As discussed above, the Plaintiffs are also entitled to damages in the amount of the reasonable attorneys' fees and expenses incurred because of Defendants' breach of the automatic stay under section 362(a)(3) of the Bankruptcy Code. Plaintiffs' have asserted that the amount of such fees and expenses is $10,281.858.26, comprising the fees and expenses of their counsel and experts, the fees and expenses of counsel for the Official Committee of Unsecured Creditors, which intervened in support of the Plaintiffs, and the imputed fees and expenses of Plaintiffs' in-house counsel.  The Court has reviewed these asserted damages employing the standard set forth in section 330 of the Bankruptcy Code, which generally adopts

---

[81] Id. at 51-52.

[82] Id. at 109.

[83] Id. at 110

[84] Id.

[85] Alternatively, one could find that Mr. Auman's testimony establishes the cost of the successful promotional campaign as damages for Plaintiffs' loss of business goodwill.  Defendants' contention that this should be precluded because the Debtors' monthly operating reports filed during their bankruptcy cases showed no erosion in goodwill clearly misses the mark; GAAP goodwill for purposes of the Debtors' monthly operating reports is not business goodwill for purposes of calculating damages.

the lodestar method of determining a reasonable fee and reasonable and necessary expenses with certain additional limitations and is consistent, as discussed above, with the caselaw on fees and expenses as damages for contempt.

Based on that review, the portion of Plaintiffs' claimed fee and expense damages comprising the legal fees and expenses of the Official Committee of Unsecured Creditors, $592,134.56, should not be granted.  These fees and expenses, while they may have been properly incurred as part of the Committee's monitoring role in these chapter 11 cases, were not necessary to proving Defendants' stay violation and enforcing sanctions therefor.

Nor should Plaintiffs' damages include Plaintiffs' imputed in-house legal fees of $389,200.  Although such legal fees can be recoverable, Broadcast Music, Inc. v. R Bar of Manhattan, Inc., 919 F. Supp. 656, 661 (S.D.N.Y. 1996), here the Plaintiffs' records of the claimed fees[86] are concededly not substantially contemporaneous with the services performed but, rather, prepared several months after the fact based on calendar entries, travel records, invoices and other recollections.[87]  They also are not broken out incrementally by task performed and instead usually record several hours each day spent on the Charter matter generally, which makes meaningful review impossible.  Under section 330 of the Bankruptcy Code and the caselaw discussed above, this time therefore was not recorded in a way to support a fee request.  Id.  Similarly, the time and expense records of NERA Economic Consulting, apparently a non-testimonial expert for the Plaintiffs, are insufficiently detailed to enable meaningful review, as they are by and large limited to entries such as "Review

---

[86] P. Ex. 315.
[87] May 6, 2020 Tr. Tr. at 103-04 (testimony of Jeffrey H. Auman).

materials," "Review documents," "Discussions with staff," "Discussions with counsel," and

"Worked on report."[88]  These $33,396.25 of fees and expenses therefore also cannot be

included in Plaintiffs' damages.

On the other hand, the $154,330 of fees and expenses of Mr. Jarosz's company, Analysis

Group, Inc.[89] were reasonable and are warranted as damages, as are most of Plaintiffs' claimed

damages attributable to the fees and expenses of its outside counsel.  The Court has previously

reviewed and approved the final allowance of Plaintiffs' outside counsel's fees and expenses

under section 330 of the Bankruptcy Code.[90]  Mr. Jarosz's firm's fees and expenses also satisfy

that standard.  Plaintiffs' damages based on its outside counsel's fees and expenses should be

reduced from the amount previously allowed, however, by $83,948 for time spent representing

the Debtors on matters other than this adversary proceeding, which are properly compensable

but not properly damages that Charter should pay.[91]

To the extent that the law of the Second Circuit would require a showing of Defendants'

"willfulness" before approval of these fees and expenses for proving contempt and damages

therefor, the Court finds Charter to have acted willfully as defined by the foregoing caselaw.

While the ratio of Plaintiffs' fees and expenses to Plaintiffs' damages is high

($9,183179.45/$9,996,200), a large portion of the legal fees and expenses were incurred in

---

[88] P. Ex. 95.  Apparently, the report mentioned is not part of the record.

[89] P. Ex. 94.

[90] The Court's order approving counsel's final fees and expenses appears at Dkt. No. 2626.  The final fee and expense application appears at Dkt. No. 2393, and counsel's interim applications appear at Dkt. Nos. 932, 1319, 1679, 1701, 1824, 1993, and 2324.

[91] This includes $1,875 of Ms. Lockhart's time from Dkt. No. 1360; $8,730 of Ms. Thompson's time from Dkt. Nos. 1360 and 1449; $47,767.50 of Mr. Rochester's time from Dkt. Nos. 1360, 1449, and 1522; $12,360 of Mr. Churbuck's time from Dkt. Nos. 1360 and 1449; $640 of Mr. Justus' time from Dkt. No. 1360; $8,766.50 of Mr. Ross' time from Dkt. Nos.1449, 1522, 1993, and 2324; $2,117.50 of Ms. Yager's time from Dkt. No.1449; $195 of Mr. Sieger's time from Dkt. No.1449; and $1,496 of Ms. O'Brien's time from Dkt. No. 1449.

response to several questionable litigation choices by Defendants, some of which are detailed

in prior opinions in this adversary proceeding but which also included unnecessary discovery

disputes and misguided motions for summary judgment, judgment on the pleadings and

Daubert witness exclusion, the filing of a mammoth motion for judicial notice on the eve of trial

and then later withdrawn, and, after the Court specifically directed the parties not to do so, the

filing of purported proposed findings of fact and conclusions of law. [92]  In addition, the ration

does not take into account the significant portion of fees and expenses incurred in obtaining

the contested cessation of Charter's violation of the stay.  Plaintiffs' damages therefore should

include $9,183,179.45 of litigation fees and expenses.

In sum, Defendants should be sanctioned, jointly and severally,[93] $19,179,329.45 based

on their misleading ad campaign's willful violation of the automatic stay under section 363(a)(3)

of the Bankruptcy Code.

**Equitable Subordination**

The purpose of the doctrine of equitable subordination codified in section 510(c) of the

Bankruptcy Code is "to undo wrongdoing by an individual creditor in the interest of the other

creditors." Enron Corp. v. Springfield Assocs. LLC (In re Enron Corp.), 379 B.R. 425, 434 (S.D.N.Y.

2007).  It has been described as "a drastic and unusual remedy" that "should be applied only to

the extent necessary to offset the specific harm that creditors have suffered on account of the

inequitable conduct." Id.  Courts in this district have long applied to so-called Mobile Steel test

---

[92] Without, however, citations to the record.
[93] The sanction should be joint and several because each Defendant was responsible for the stay violation as part of their concerted misleading ad campaign.  Of course, the aggregate recovery against both Defendants cannot exceed the $19,179,329.45 sanction.

derived from Benjamin v. Diamond (In re Mobile Steel Corp.), 563 F.2d 692, 700 (5th Cir. 1977),

when asked to equitably subordinate a claim:  (1) the claimant must have engaged in some type

of inequitable conduct, (2) the misconduct caused injury to the creditors or conferred an unfair

advantage on the claimant, and (3) equitable subordination of the claim is consistent with

bankruptcy law.  Assante v. Eastern Sav. Bank (In re Assante), 2013 U.S. Dist. LEXIS 30132, at

*12 (S.D.N.Y. March 4, 2013); In re Enron Corp., 379 B.R. at 433; 80 Nassau Assocs. v. Crossland

Fed. Sav. Bank (In re 80 Nassau Assocs.), 69 B.R. 832, 837 (Bankr. S.D.N.Y. 1994).  *See also*

United States v. Noland, 517 U.S. 535, 538-39 (1996) (citing Mobile Steel).[94]  The required

"misconduct" is best described as conduct that violates a generally recognized duty that

justifies the intervention of equity.  In re 80 Nassau Assocs., 69 B.R. at 839-40.

Here, as previously determined on summary judgment, Operating's two violations of the

automatic stay, giving rise to $19,184,658.30 of contempt sanctions, clearly constitutes the

requisite misconduct.  Imposing equitable subordination of Operating's unsecured claims in this

case also would not violate any other provision of the Bankruptcy Code and would be

consistent with bankruptcy law.  As noted above, the harm caused by Operations' stay

violations was to the Debtors' common brand; it therefore does not have to be particularized

on an Applicable Debtor-by-Debtor basis.

Nevertheless, based on the Debtors' Chapter 11 Plan and the Court-approved Disclosure

Statement, of which judicial notice may be taken, unsecured creditors in Class 6B, comprising

---

[94] Although Mobile Steel and most cases applying it, including United States v. Noland, refer to "injury to the creditors *or* conferred an unfair advantage" (emphasis added), some decisions use "and/or" (*see* In re Assante, 2013 U.S. Dist. LEXIS 30132, at *12), and some courts have stated that a finding of unfair advantage without injury to creditors is insufficient.  *See* LightSquared LP v. SP Special Opportunities LCC (In re LightSquared Inc.), 511 B.R. 253, 347 n. 152 (Bankr. S.D.N.Y. 2014). Charter makes much of this distinction, although it fails to explain why it is relevant to the present facts, Charter Mem. at 42, 43, but they key point is that there must be injury to creditors.

the holders of allowed unsecured claims against "Non-Obligor Debtors" are unimpaired by the

Plan and thus will receive a 100% recovery on their claims regardless of Charters' misconduct.[95]

Therefore, the remedy of equitable subordination would not apply to Operating's Class 6B

claim numbers 5740, 5786, 5668, 5755, 5767, 5761, 5748, 5780, 5749, 5750, 5734, 5751, 5752,

5753, 5754, 5763, 5737, 5747, and 5793, which are against Non-Obligor Debtors.[96]

On the other hand, unsecured creditors in Class 6A, comprising the holders of allowed

unsecured claims against "Obligor Debtors" are described in the Disclosure Statement as

receiving a projected pro rata recovery of between 0 and .125%.[97] The Disclosure Statement

estimated the aggregate allowed amount of these claims as being between $1.183 billion -

$1.203 billion.[98] The face amount of Operating's aggregate claims against the Obligor Debtors

is $16,974,706.43, which would result in a maximum projected recovery of $21,218.34 from

such Debtors. Clearly Operating's misconduct harmed the other Class 6A creditors more than

this sum, and therefore the full amount of Operating's Class 6A claims against the Obligor

Debtors[99] should be equitably subordinated to the other Class 6A claims.

### Conclusion

For the foregoing reasons, the Defendants are in contempt of the automatic stay under

section 362(a) of the Bankruptcy Code and jointly and severally liable for compensatory

sanctions therefor constituting Defendants' resulting lossess in the aggregate amount of

---

[95] Dkt. No. 1813 at 5.
[96] See www.kccllc.net/windstream/ for "Charter claim search results.
[97] Id. at 7.
[98] Id.
[99] These are claim numbers 5731, 5732, 5733, 5735, 5736, 5738, 5739, 5758, 5759, 5760, 5762, 5764, 5765, 5766, 5769, 5790, 5791, and 5792. See www.kccllc.net/windstream/ for Charter claim search results.

$19,184,658.30.  Operating's Class 6A claims also are equitably subordinated in full under section 510(c) of the Bankruptcy Code to the other Class 6A claims.

Counsel for the Plaintiffs shall email chambers a proposed judgment on Counts VI and VII consistent with this Memorandum of Decision, with a copy to counsel for Defendants.

Dated:  White Plains, New York
    April 8, 2021

*/s/Robert D. Drain*
United States Bankruptcy Judge